**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 2, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

j                             <u>PUBLISH</u>

## UNITED STATES COURT OF APPEALS

## TENH CIRCUIT

SAN JUAN COUNTY, UTAH, a Utah
political subdivision,

        Plaintiff - Appellee,

    v.

UNITED STATES OF AMERICA;
DEPARTMENT OF INTERIOR;
NATIONAL PARK SERVICE,

        Defendants - Appellees,

----------------------------

ALASKA WILDERNESS LEAGUE,
CALIFORNIA WILDERNESS
COALITION, CALIFORNIA
ENVIRONMENTAL COALITION,
COLORADO MOUNTAIN CLUB,
GREATER YELLOWSTONE
COALITION, NATIONAL PARKS
CONSERVATION ASSOCIATION,
NATIONAL WILDLIFE REFUGE
ASSOCIATION, NEW MEXICO
WILDERNESS ALLIANCE, SAN
JUAN CITIZENS ALLIANCE,
SIERRA CLUB, SOUTHEAST
ALASKA CONSERVATION
COUNCIL, WYOMING OUTDOOR
COUNCIL; STATE OF UTAH;
MOUNTAIN STATES LEGAL
FOUNDATION; CIVIL PROCEDURE
AND PUBLIC LANDS LAW
PROFESSORS; STATES OF NEW
MEXICO, CALIFORNIA AND

No. 04-4260

OKLAHOMA; PROPERTY OWNERS
FOR SENSIBLE ROADS POLICY,

        Amici Curiae,

------------------------------

SOUTHERN UTAH WILDERNESS
ALLIANCE, a Utah non-profit
corporation; GRAND CANYON
TRUST; THE WILDERNESS
SOCIETY,

        Movants - Appellants.

---

**ON REHEARING EN BANC FROM AN APPEAL
FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. NO. 2:04-CV-552-BSJ)**

---

James S. Angell, Earthjustice, Denver, Colorado (Edward B. Zukoski, Eric G. Biber, Earthjustice, with him on the briefs for Movants - Appellants, and Heidi J. McIntosh, Stephen H.M. Bloch, Southern Utah Wilderness Alliance, Salt Lake City, with him on the briefs for Appellant Southern Utah Wilderness Alliance).

Aaron P. Avila, Attorney, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C., for Defendants-Appellees, and Shawn T. Welch, Pruitt Gushee, P.C., Salt Lake City, Utah, for Plaintiff - Appellee (Sue Ellen Wooldridge, Assistant Attorney General, Paul M. Warner, United States Attorney, Carlie Christensen, Assistant United States Attorney, Bruce D. Bernard and John L. Smeltzer, Attorneys, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C., and G. Kevin Jones, Attorney/Advisor, Office of the Solicitor, Department of the Interior, Salt Lake City, Utah, with Aaron P. Avila on the briefs for Defendants-Appellees, and A. John Davis, Pruitt Gushee, P.C., with Shawn T. Welch on the briefs for Appellee San Juan County, Utah).

Jayme Ritchie and William Perry Pendley, Mountain States Legal Foundation, Lakewood, Colorado, filed an amicus curiae brief for Plaintiff - Appellee.

Patrick J. Crank, Wyoming Attorney General, Cheyenne, Wyoming, and Mark L. Shurtleff, Utah Attorney General, Salt Lake City, Utah (J. Mark Ward, Edward O. Ogilvie, Jaysen R. Oldroyd, Assistant Attorneys General, and Ralph L. Finlayson, Special Assistant Attorney General, Salt Lake City, Utah, with him on the brief) filed an amicus curiae brief for Plaintiff - Appellee and Defendants - Appellees.

Sarah Krakoff, Associate Professor, University of Colorado Law School, Boulder, Colorado, on behalf of Civil Procedure and Public Lands Law Professors; Michael S. Freeman, Faegre & Benson LLP, Denver, Colorado, on behalf of Property Owners for Sensible Roads Policy; and Louis R. Cohen, James R. Wrathall, Brian M. Boynton, Theodore C. Liazos, Wilmer, Cutler, Pickering, Hale and Dorr LLP, Washington, D.C. filed an amicus curiae brief for Movants - Appellants.

Patricia A. Madrid, New Mexico Attorney General, Santa Fe, New Mexico, (Stephen R. Farris and Judith Ann Moore, Assistant Attorneys General, with her on the brief), Bill Lockyer, Attorney General of California, W.A. Drew Edmondson, Attorney General of Oklahoma, Oklahoma City, Oklahoma, filed an amicus curiae brief on behalf of the States of New Mexico, California, and Oklahoma, in support of neither party and in support of neither affirmance nor reversal.

---

Before **TACHA**, Chief Circuit Judge, **SEYMOUR, PORFILIO, EBEL, KELLY, HENRY, BRISCOE, LUCERO, MURPHY, HARTZ, O'BRIEN, McCONNELL,** and **HOLMES,** Circuit Judges.

---

**HARTZ**, Circuit Judge, joined by **HENRY** and **MURPHY,** Circuit Judges, and joined in all but Part IV(B) by **SEYMOUR, EBEL, BRISCOE**, and **LUCERO**, Circuit Judges.

---

We have granted en banc review in this case to resolve difficult issues concerning intervention under Fed. R. Civ. P. 24. Several conservation groups—Southern Utah Wilderness Alliance, The Wilderness Society, and the Grand Canyon Trust (collectively, SUWA)—seek to intervene in a federal quiet-title action brought by San Juan County, Utah, against the United States, the

-3-

Department of Interior, and the National Park Service (the NPS). (We will refer to the defendants collectively as the Federal Defendants.) The County sued to quiet title to the right-of-way it claims for Salt Creek Road, "an unpaved and ungraded jeep trail that runs in and out of Salt Creek" in Canyonlands National Park. 69 Fed. Reg. 32,871 (June 14, 2004). Opposed to County control of the road, SUWA applied to intervene as a matter of right under Fed. R. Civ. P. 24(a)(2) and permissively under Fed. R. Civ. P. 24(b). The district court denied the applications, and SUWA appealed.

The original parties to the action, the County and the Federal Defendants (collectively the Appellees), filed briefs supporting the district court's denial of intervention.[1] A divided panel of this court held that SUWA was entitled to intervene as a matter of right. *See San Juan County v. United States*, 420 F.3d 1197, 1201 (10th Cir. 2005). Because the panel granted intervention as of right, it did not address permissive intervention. *See id.* at 1213–14. We now hold: (1) applicants for intervention need not establish standing, (2) sovereign immunity does not bar SUWA's intervention, and (3) despite satisfying the other

---

[1]On en banc review we have also received amicus briefs from a group of civil-procedure and public-lands law professors (supporting intervention); a group of environmental organizations (supporting intervention); Property Owners for Sensible Roads Policy (supporting intervention); the States of Utah and Wyoming (opposing intervention); the Mountain States Legal Foundation (opposing intervention); and the States of New Mexico, California, and Oklahoma (neither supporting nor opposing intervention). The State of Utah, although participating on appeal only as an amicus, was granted leave to intervene by the district court after this appeal was filed. It asserts a property interest in Salt Creek Road.

requirements for intervention under Rule 24(a), SUWA is not entitled to intervene as of right because it failed to overcome the presumption that its interest was adequately represented by the Federal Defendants. We also affirm the district court's denial of SUWA's application for permissive intervention under Rule 24(b).

## I.    BACKGROUND

### A.    R.S. 2477 Rights-of-Way

The underlying controversy is one of many throughout the West that concern an alleged right-of-way across federal land arising under Revised Statute 2477, enacted by Congress in 1866. R.S. 2477 provided for "right[s]-of-way for the construction of highways over public lands, not reserved for public uses." An Act Granting the Right of Way to Ditch and Canal Owners over the Public Lands, and for Other Purposes, Ch. CCLXII § 8, 14 Stat. 251, 253 (1866). This statute reflected a "congressional policy promot[ing] the development of the unreserved public lands and their passage into private productive hands," *S. Utah Wilderness Alliance v. Bureau of Land Mgmt.*, 425 F.3d 735, 740 (10th Cir. 2005), by making "a standing offer of a free right of way over the public domain," *id.* at 741 (internal quotation marks omitted). *See generally* Harry R. Bader, *Potential Legal Standards for Resolving the R.S. 2477 Right of Way Crisis*, 11 Pace Envtl. L. Rev. 485 (1994). "[A] right-of-way could be obtained without application to, or approval by, the federal government. Rather, the grant referred to in R.S. 2477

became effective upon the construction or establishing of highways, in accordance with the state laws." *Sierra Club v. Hodel*, 848 F.2d 1068, 1078 (10th Cir. 1988) (citations, brackets, and internal quotation marks omitted), *overruled in part on other grounds by Vill. of Los Ranchos de Albuquerque v. Marsh*, 956 F.2d 970, 973 (10th Cir. 1992) (en banc).

R.S. 2477 was repealed by the Federal Land Policy and Management Act of 1976, Pub. L. No. 94-579, § 706(a), 90 Stat. 2743, 2793. But that Act "explicitly protect[ed] R.S. 2477 rights-of-way in existence" at the time of its enactment. *Sierra Club*, 848 F.2d at 1078. Because such a right-of-way could have come into existence without any judicial or other governmental declaration, much litigation continues over whether rights-of-way were in fact created on public land.

## B.   Earlier Litigation

San Juan County's quest for title to Salt Creek Road stems from its dissatisfaction with restrictions on travel imposed while the road has been under federal control. In 1992 the NPS began preparation of a Backcountry Management Plan for Canyonlands National Park. *See S. Utah Wilderness Alliance v. Dabney*, 7 F. Supp. 2d 1205, 1207 (D. Utah 1998), *rev'd*, 222 F.3d 819 (10th Cir. 2000). SUWA submitted comments and communicated with NPS personnel with the goal of closing Salt Creek Road to vehicular traffic. The final Backcountry Management Plan, published in January 1995, established a system of gates and permits to limit vehicular traffic, but it stopped short of closing the

road.  SUWA sued the NPS in federal court, challenging the plan.  *See id.* at

1206, 1209.  On June 19, 1998, the district court ruled that the NPS had violated

the National Park Service Organic Act by permitting vehicular traffic in Salt

Creek Canyon beyond Peekaboo Spring (also referred to as Peekaboo campsite).

*See id.* at 1211.  As a result of this decision, the Canyon was closed to vehicular

traffic.

On August 15, 2000, we reversed the district court, holding that it had used

an improper standard of review and remanding for further proceedings.  *See*

*S. Utah Wilderness Alliance v. Dabney*, 222 F.3d 819, 822, 829 (10th Cir. 2000).

Shortly thereafter, on October 23, 2000, the NPS issued a temporary order closing

Salt Creek Canyon above Peekaboo Spring to vehicular traffic while it engaged in

formal rulemaking regarding use of the Canyon.

Two days later the County, asserting an R.S. 2477 right-of-way through

Salt Creek Canyon, informed Canyonlands officials that NPS signs and gates near

Salt Creek Road would be forcibly removed by County officials if the NPS did

not remove them by December 1, 2000.  A few days after the deadline, County

officials removed the NPS signs and drove vehicles into the Canyon, allegedly

with the NPS's acquiescence.

SUWA, concerned about the potential environmental damage from these

activities, moved to amend its complaint in the ongoing litigation to add the

County and the State of Utah as defendants.  The proposed amended complaint

contended that "[t]he NPS . . . has an obligation and duty to determine the validity of property claims adverse to the United States, and to require specifically that the State of Utah and San Juan County demonstrate the validity of its [sic] alleged right-of-way before making a decision or taking agency action allowing use of Salt Creek as a claimed 'highway' right-of-way." Aplee. (County) App. at 31. (SUWA named the State in addition to the County because it was an alleged co-owner of Salt Creek Road.) It also sought "an order enjoining San Juan County and the State of Utah from engaging in further activities for which no valid right-of-way has been established." *Id.* The NPS, "while not agreeing with all of SUWA's legal or factual allegations," did not oppose SUWA's motion to amend the complaint, agreeing that joinder of the County and the State "would enhance the prospects that issues pertinent to the questions of agency management of resources in Salt Creek Canyon . . . [could] be resolved in an orderly way" and "would also give the court jurisdiction to ensure that San Juan County's and the State's actions pending final resolution of these issues do not limit the ability of the court to grant complete relief." Order at 6, *S. Utah Wilderness Alliance v. Nat'l Park Serv.*, No. 2:95CV559K (D. Utah Feb. 1, 2001).

The district court granted SUWA's motion to amend on February 1, 2001, stating that addition of the County and the State was "necessary for the complete and just adjudication of this matter." *Id.* In addition, the court, with the

-8-

agreement of the NPS and SUWA, stayed proceedings on all issues—with the exception of whether an R.S. 2477 right-of-way existed—until the NPS's rulemaking process was completed.

In August 2002 the County and the State separately moved for a partial summary judgment that they held a perfected R.S. 2477 right-of-way in the portion of Salt Creek Road above Peekaboo Spring. The NPS opposed the motions. It advanced several grounds, but the common essence of each ground was that the existence of the right-of-way would need to be determined in a suit under the Quiet Title Act and the County and the State had not filed such a suit (and had not satisfied certain jurisdictional prerequisites for a suit, such as providing 180 days' notice to the appropriate federal agency). It said that the State and County could file a quiet-title suit by means of a cross-claim and even said, perhaps disingenuously, that it had anticipated that such a cross-claim would be filed. Two weeks later SUWA submitted a short memorandum containing a one-sentence adoption of the NPS's argument and opposing the summary-judgment motions.

On January 15, 2003, the district court denied the motions for partial summary judgment. It was perplexed, and no doubt perturbed, by the position of the NPS and SUWA:

> SUWA has sued the NPS for, among other things, an alleged obligation and duty to determine the validity of property claims adverse to the United States and to require specifically that the State

and San Juan County demonstrate the validity of its alleged right-of-way before making a decision or taking agency action allowing use of Salt Creek Canyon as a claimed "highway" right-of-way. The State and County have asked for such a determination regarding their R.S. 2477 claims—a determination which SUWA has sued the NPS to obtain. Now, almost two years after the NPS supported SUWA's request to name the State and the County as defendants in this action so that the R.S. 2477 issue could be resolved, the NPS and SUWA suddenly assert that the court has no jurisdiction to make such a determination. At the various status conferences that have been held in this case, no mention was ever made by the NPS or SUWA that they were expecting—or demanding—that cross-claims be filed by the State and County. Further, if a claim was necessary to resolve this issue, it is unclear why the NPS itself has not asserted cross-claims against the State and County.

Aplt. Add. at 8–9 (Order, Jan. 15, 2003). Despite its displeasure with the NPS and SUWA, the court rejected the motions by the County and the State because the R.S. 2477 issue had not been raised in a proper quiet-title claim. Then, apparently acting sua sponte, the court dismissed the County and the State from the litigation, explaining:

[W]hile the NPS and SUWA have achieved their goal of convincing the court that it does not have jurisdiction to entertain motions for partial summary judgment, they have also compelled the dismissal of the State and County as defendants in this action because the State and County have been precluded from defending themselves in this lawsuit, as their only defense in this case is to seek an affirmative determination that they own a valid and perfected right-of-way. The court will not order the State and County—against their wishes—to file suit against the United States, and the NPS has declined, for whatever reason, to file its own cross-claim against these entities. Because of the legal quagmire created by these unique circumstances and the fact that the State and County have been precluded from defending themselves, the court will not grant any relief against these defendants in this action. Thus, there is no reason for the State and County to be named as defendants in this action. This court never

-10-

would have granted leave to amend SUWA's complaint to add these defendants had the NPS and SUWA made clear to the court that the State and County would be required—against their wishes—to sue the NPS as a prerequisite to defending themselves. Thus, the only just result is to dismiss the State and County from this action.

*Id.* at 9–10.

## C.    This Litigation

On June 14, 2004, the NPS issued a final rule prohibiting motor vehicles in Salt Creek Canyon beyond Peekaboo Spring and erecting a gate to effect this closure. *See* 36 C.F.R. § 7.44 (2004). The notice accompanying the decision reflected the NPS's conclusion that the County and the State held no R.S. 2477 right-of-way: "[I]t has not been shown that a valid right-of-way was constructed during the period when the lands were unreserved. Promulgation of this rule will not affect the ability of the County or State to pursue in an appropriate forum the claim that this is a valid R.S. 2477 right-of-way." 69 Fed. Reg. at 32,872. Without waiting a day, the County filed this quiet-title action, naming the United States, the Department of Interior, and the NPS as defendants. The first cause of action in its amended complaint, filed on June 30, 2004, claims an R.S. 2477 right-of-way in Salt Creek Road. It alleges that the NPS's "acts have wrongfully denied [the County] and the public the use of the Salt Creek road and disturbed [the County's] quiet enjoyment of its R.S. 2477 right-of-way." Aplt. App. at 17. The second cause of action seeks a declaration that a system of gates put in place

by the NPS deprives the County of its use of the right-of-way for vehicular travel.

The County asserts that it acquired its right-of-way before the federal government reserved the land for Canyonlands National Park in 1962. *See* Nat'l Park Serv., Canyonlands Environmental Assessment Middle Salt Creek Canyon Access Plan, app. 4, at 159 (June 2002) (explaining that land for Canyonlands National Park was withdrawn on April 4, 1962, in anticipation of legislation to establish the Park). Its amended complaint details a series of alleged uses of the right-of-way from the 1890s through 1962, including construction and use of a road by a homesteader to access his homestead, construction and use of a road by a cattle company to trail cattle and haul supplies, use by hikers and explorers, use by persons in jeeps for commercial and sightseeing purposes, and use by oil and gas companies to access drilling locations. It claims that the right-of-way must be "sufficient in scope for vehicle travel as reasonable and necessary and according to the uses to which it was put prior to" April 1962. Aplt. App. at 16.

On July 6 and August 4, 2004, the groups comprising SUWA timely sought to intervene as a matter of right and permissively. The district court denied the applications on October 29, 2004, stating:

> Well it seems to me that the pleadings define the case in a very narrow fashion and the existence or non-existence of a right-of-way and its length and its breadth are matters which it seems to me are fact driven and while I'm always interested in all the help that the

court can get it would appear to me that the parties in this matter have a point.

I am going to deny the motion to intervene on the part of the petitioners, both the motion to intervene as a matter of right and the motion to intervene permissively and we'll deny that in each instance. It appears to me that the parties may adequately present the necessary materials for an appropriate determination.

However if the prospective intervenors wish to participate as amicus in the furnishing of material written in nature to the court I'm certainly happy to grant them status as amicus if they so desire in contrast to the status of a party, but I'll leave that to the necessary requests in the event that people wish to participate in that fashion.

*Id*. at 198–99. SUWA appeals this ruling. We have jurisdiction under 28 U.S.C. § 1291.

## II.   STANDING TO INTERVENE

San Juan County first contends that SUWA cannot intervene under either Fed. R. Civ. P. 24(a) or (b) because it lacks Article III standing. Article III of the Constitution limits the jurisdiction of federal courts to Cases and Controversies. U.S. Const. art. III, § 2. The Supreme Court has held that a suit does not present a Case or Controversy unless the plaintiff satisfies the requirements of Article III standing—namely, the plaintiff must (1) have suffered an injury in fact (2) that is fairly traceable to the defendant's conduct and (3) that is likely to be redressed by a favorable decision. *See Bennett v. Spear*, 520 U.S. 154, 167 (1997).

Although it observed that "circuit courts addressing this issue have reached different results," *San Juan County*, 420 F.3d at 1204, the panel opinion in this

-13-

case concluded that "prospective intervenors need not establish their own standing to sue or defend, in addition to meeting Rule 24's requirements, before intervening," *id.* at 1203. The panel held that so long as there was Article III standing for the original party on the same side of the litigation as the intervenor, the intervenor need not itself establish standing. *See id.* at 1206. In support, it observed that "on many occasions the Supreme Court has noted that an intervenor may not have standing, but has not specifically resolved that issue, so long as another party to the litigation had sufficient standing to assert the claim at issue," *id.* at 1205 (citing *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 233 (2003); *Arizonans for Official English v. Arizona*, 520 U.S. 43, 66 (1997); and *Diamond v. Charles*, 476 U.S. 54, 64 (1986)). This failure to resolve the intervenor's standing was significant because the Court could not simply ignore whether the requirements of Article III had been satisfied. "[S]tanding implicates a court's jurisdiction, [and] requires a court itself to raise and address standing before reaching the merits of the case before it." *Id.* The panel recognized, however, that "if the original party on whose side a party intervened drops out of the litigation, the intervenor will then have to establish its own standing to continue pursuing litigation." *See id.* at 1205 n.3.

On rehearing en banc we adopt the panel's reasoning on this issue and hold that parties seeking to intervene under Rule 24(a) or (b) need not establish Article III standing "so long as another party with constitutional standing on the same

-14-

side as the intervenor remains in the case." *Id*. at 1206. In that circumstance the federal court has a Case or Controversy before it regardless of the standing of the intervenor.

## III. SOVEREIGN IMMUNITY

### A. Description of the Sovereign-Immunity Claim

Before we turn to the application of Fed. R. Civ. P. 24 to this case, we must first determine whether granting SUWA intervention under this rule would infringe upon sovereign immunity in litigation under the Quiet Title Act, 28 U.S.C. § 2409a, enacted in 1972. The Federal Rules, of course, ordinarily govern proceedings in federal court. *See* Fed. R. Civ. P. 1. Under the Rules Enabling Act, "The Supreme Court shall have the power to prescribe general rules of practice and procedure and rules of evidence for cases in the United States district courts (including proceedings before magistrate judges thereof) and courts of appeals," 28 U.S.C. § 2072(a), and "[a]ll laws in conflict with such rules shall be of no further force or effect after such rules have taken effect,"*id*. § 2072(b). On the other hand, "[s]uch rules shall not abridge, enlarge or modify any substantive right," *id*.; and Fed. R. Civ. P. 82 states that the rules "shall not be construed to extend or limit the jurisdiction of the United States district courts or the venue of actions therein."

Judge McConnell's concurrence (the "SI concurrence") contends that intervention by SUWA under Rule 24 would improperly expand the district

court's jurisdiction because it would abridge sovereign immunity. The SI concurrence's sovereign-immunity argument goes far beyond anything presented to this court by the Appellees, who mention sovereign immunity almost in passing with essentially no citation to authority that would clarify the scope of what is being asserted. But questions regarding our jurisdiction must be addressed, so we proceed despite the absence of helpful briefing.

The SI concurrence's concern about adding SUWA as a defendant is not that the Quiet Title Act bars the addition of all defendants other than the United States. The Act undoubtedly contemplates that the plaintiff can seek to clear title by naming as defendants anyone in addition to the United States who may claim an interest in the property. The statute says that "[t]he United States may be named as *a* [not *the*] party defendant in a civil action under this section to adjudicate a disputed title . . . ." § 2409a(a) (emphasis added). And joining other defendants is hardly unheard of. *See Amoco Prod. Co. v. United States*, 619 F.2d 1383 (10th Cir. 1980); *Bily v. Ill. Cent. Gulf R.R.*, 637 F. Supp. 127 (N.D. Ill. 1986) (court initially had jurisdiction under Quiet Title Act but dismissed case after government disclaimed interest because court thereby was deprived of jurisdiction under what is now § 2409a(e)). Moreover, although an additional defendant's interest may well be adverse to the United States, it also may be consistent with the United States' claim if it arises in the same chain of title. Because the United States thus may have a codefendant advocating the United

-16-

States' title, the SI concurrence's concern also is not simply the addition of a codefendant who may raise arguments in support of that claim of title.

Accordingly, the peculiar sovereign-immunity contention in this case must be the following: Sovereign immunity bars the addition in a quiet-title suit against the United States of a codefendant who claims no interest in the property and supports the United States' claim of title, even though (1) the Quiet Title Act allows the addition of codefendants of the United States, (2) such a codefendant may be a vigorous advocate of the United States' title, and (3) the added party would raise no new claim against the United States but would address only a claim on which the United States has consented to be sued.[2] Furthermore (continuing with the contention), even though no language in the Quiet Title Act bars intervention on the side of the United States, freedom from such intervention is such a fundamental attribute of sovereignty that it must be recognized because it is not expressly waived in the Act.

We find this to be a remarkable proposition. Consider the limited nature of what is at stake. The SI concurrence speaks of the burden that may be imposed on the United States by an intervenor who can "raise new issues, oppose settlements, appeal, and file petitions for certiorari." SI concurrence at 1. We

_____

[2]SUWA's intervention in the quiet-title suit hardly makes the lawsuit a "forum[] for consideration of broad-ranging arguments about competing environmental and recreational uses of the land." SI concurrence at 13. This appeal concerns only intervention in the title dispute.

-17-

address each alleged burden.  First, SUWA could not block a settlement.  *See Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 528–29 (1986) ("It has never been supposed that one party—whether an original party, a party that was joined later, or an intervenor—could preclude other parties from settling their own disputes and thereby withdrawing from litigation."); *Johnson v. Lodge #93 of the Fraternal Order of Police*, 393 F.3d 1096, 1106 (10th Cir. 2004).  And to the extent that an intervenor can present arguments against settlement to which the government must respond, so can an amicus.  *See United States v. Hooker Chems. & Plastics Corp.*, 749 F.2d 968, 992–93 (2d Cir. 1984) (Friendly, J.); *Latin Am. Law Enforcement Ass'n v. City of LA*, 29 F.3d 633, *3 (9th Cir. 1994) (unpublished table decision); *In re Telectronics Pacing Sys., Inc.*, 137 F. Supp. 2d 985, 1021–24 (S.D. Ohio 2001); *Brooks v. State Bd. of Elections*, 848 F. Supp. 1548, 1556 (S.D. Ga. 1994).

Second, there is no need to resolve at this stage of this case whether SUWA could appeal or seek certiorari when the government does not wish to.  We fail to understand the SI concurrence's statement that "[o]nce SUWA is granted party status at the trial level—in other words, once we hold that the Quiet Title Act permits such participation—it would make little sense to hold that the Act precludes such a party's participation at the appellate level."  SI concurrence at 22.  In our view, such a limitation on appeal could make perfect sense.  After all, an intervenor who lacks standing cannot pursue an appeal if the original parties

-18-

choose not to. *See* discussion, *supra*, at 13–14; *see also Korczak v. Sedeman*, 427 F.3d 419 (7th Cir. 2005) (intervenor not permitted to appeal).

The remaining "burden" that an intervenor could impose on the United States in district court would be raising new issues. But the Quiet Title Act's waiver of sovereign immunity to permit suits "to adjudicate a disputed title to real property in which the United States claims an interest," 28 U.S.C. § 2409a, inherently encompasses exposure to the risk of having to address every relevant legal theory. Indeed, the court trying the case (even in the absence of any intervenor) can require the government to address a legal theory not raised by the original parties. *See Dickerson v. United States*, 530 U.S. 428, 441 n.7 (2000). (Moreover, on its own authority the court can call and question witnesses. *See* Fed. R. Evid. 614; 29 Charles A. Wright & Victor J. Gold, Federal Practice and Procedure § 6234, at 18 (1997) (Rule 614(a) promotes "accurate factfinding" and "gives courts broad discretion to exercise its power to call witnesses in a wide range of circumstances").) In short, the Quiet Title Act has waived sovereign-immunity objections to these burdens by permitting the County's suit against the United States in the first place.

In other words, the intervention of SUWA would not expose the United States to any burden not inherent in the litigation to which it has consented in the Quiet Title Act. The lawsuit would still concern only the relative rights of the County, the State, and the United States in Salt Creek Road. SUWA would not be

adding a new claim; it seeks no coercive judicial remedy against the United States. And every issue, every legal argument, every item of evidence that SUWA might present is one that another party or the court would undoubtedly have the right to present in the absence of SUWA. SUWA may in fact present matters that would not have been presented by other parties or the court, but, from the point of view of the government's waiver of sovereign immunity, that is a mere fortuity; nothing raised by SUWA would be an expansion of what the government potentially faced at the initiation of the lawsuit. We now discuss whether intervention would nevertheless infringe upon the government's sovereign immunity.

## B. Framework of the Analysis

The SI concurrence cites a number of opinions that purportedly support a sovereign-immunity claim in this case. To analyze those cases properly, we must first distinguish two concepts: (1) sovereign immunity and (2) a condition on a waiver of sovereign immunity. As we shall explain, protection from intervention by an aligned party is neither "an aspect of the government's immunity," SI concurrence at 5, nor a condition on the waiver of sovereign immunity in the Quiet Title Act, *see id*. at 4 (referring to "terms of the immunity waiver" of the Quiet Title Act); *cf. id*. at 11-12 (referring to limitations in Quiet Title Act regarding pleading requirements). But treating the two concepts separately will clarify the analysis.

As stated by Alexander Hamilton in *The Federalist*, "It is inherent in the nature of sovereignty, not to be amenable to the suit of an individual, *without its consent*." The Federalist No. 81, at 446 (E.H. Scott ed., 1898). Sovereign immunity is immunity from suit. *See* Black's Law Dictionary 766 (8th Ed. 2004) (Defining *sovereign immunity* as "1. A government's immunity from being sued in its own courts without its consent. . . . 2. A state's immunity from being sued in federal court by the state's own citizens."). Absent a waiver of sovereign immunity—that is, consent by the government to be sued—a court cannot make a government pay its debts or compensate for its torts, or impose other coercive remedies on the government. In contrast, when a court proceeding cannot result in the imposition of a coercive sanction against the government, the proceeding does not infringe upon sovereign immunity. Thus, in *Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440 (2004), the Supreme Court discerned no infringement of state sovereignty arising from an adversary proceeding in bankruptcy court to determine whether to discharge a Chapter 7 debtor's student loan that was guaranteed by a state entity. The impact on the State of a discharge was obvious (as the guarantor, it would have to pay) and the State would surely wish to participate in the adversary proceeding; but the debtor did "not seek monetary damages or any affirmative relief from a State . . . nor d[id] he subject an unwilling State to a coercive judicial process." *Id*. at 450. Examples of infringements of sovereign immunity for which there must be a waiver include

judgments for money, such as imposition of state civil fines against the United States, *see U.S. Dep't of Energy v. Ohio*, 503 U.S. 607 (1992) (no waiver of sovereign immunity from state civil fines); an award of interest on attorney fees, *see Library of Congress v. Shaw*, 478 U.S. 310 (1986) (no waiver of sovereign immunity from award of interest on attorney fees); and liability for tort claims, *see Laird v. Nelms*, 406 U.S. 797 (1972) (no waiver of sovereign immunity from strict or absolute liability for ultrahazardous activity).

Sovereign immunity is to be contrasted with the imposition of conditions on the waiver of that immunity. When the government consents to be sued, it can impose conditions on that consent. *See Block v. North Dakota*, 461 U.S. 273, 287 (1983); *Lehman v. Nakshian*, 453 U.S. 156, 161 (1981). It can require notice of suit, set a statute of limitations, forbid discovery from the government, or even forbid joinder of parties, to name just a few possibilities. The government does not consent to be sued when such a condition is not met, so sovereign immunity generally requires dismissal of the suit if the plaintiff does not satisfy all conditions imposed by the government. *See Block*, 461 U.S. at 287.

The Quiet Title Act waives the government's immunity from suits to determine title to property in which the plaintiff and the United States both claim an interest. The proper approach in this case would seem to be to analyze whether this waiver is conditioned on a ban on the intervention of parties aligned with the United States who raise no independent claim for relief. We will present

-22-

that analysis later in this opinion. But the SI concurrence makes an additional argument. We read the SI concurrence as saying that protection from such intervention is not just a condition on the waiver of immunity but is an essential aspect of sovereign immunity that must be explicitly waived by the government. We find no support for that view and strong indications to the contrary in Supreme Court precedent. We proceed to explain.

C. **Alleged Restriction on Intervention as Component of Sovereign Immunity**

The SI concurrence relies on two Supreme Court opinions for the proposition that joinder of a party, even one aligned with the government who makes no claim against the government, infringes upon sovereign immunity. Neither opinion says any such thing.

The principal opinion relied upon, *United States v. Sherwood*, 312 U.S. 584 (1941), offers no support to the SI concurrence's position. The SI concurrence asserts that "[t]he sole issue in *Sherwood* was joinder of necessary *parties.*" SI concurrence at 10 n.5. Yet it was the presentation of a new *claim* to the tribunal that *Sherwood* was about. A careful reading of *Sherwood* shows that the Supreme Court's holding was simply that the district court lacked jurisdiction to hear a suit between two private parties, and since victory in that suit was a necessary condition for the plaintiff to bring his suit against the government, that suit could not proceed.

*Sherwood* was a suit under the Tucker Act, which gave Article III district courts concurrent jurisdiction with the Court of Claims (established under Article I of the Constitution, *see* 312 U.S. at 587) to hear breach-of-contract and other claims against the United States of up to $10,000. Sherwood had obtained a judgment against Kaiser in New York state court for $5,567.22. The state court also entered an order authorizing Sherwood to sue under the Tucker Act to recover damages from the United States for breach of its contract with Kaiser. *See id*. at 585. Sherwood would be entitled to retain out of any recovery in that suit "a sum sufficient to satisfy his judgment with interest" and costs. *Id*. at 586. Sherwood then sued the United States and Kaiser in federal district court, claiming that Kaiser's damages were $14,448.49 and praying for judgment in the amount of $10,000. Kaiser had to be named as a party because of the need to determine (1) Sherwood's rights, as against Kaiser, to maintain the suit; (2) what rights Kaiser might have to any damages above $10,000; and (3) the apportionment between Sherwood and Kaiser of any recovery in the suit. *See id*. at 591. These were all issues quite different from the validity of the claim against the United States. The district court held that it lacked jurisdiction, the Second Circuit reversed, and the Supreme Court reversed the circuit court.

The Court observed that the suit could not have been maintained in the Court of Claims "because that court is without jurisdiction of any suit brought against private parties and because adjudication of the right or capacity of

-24-

[Sherwood] to proceed with the suit upon the contract of [Kaiser] with the United States is prerequisite to any recovery upon the Government contract." *Id*. at 588. It noted that in any suit by Sherwood under the state-court order (which authorized Sherwood to pursue Kaiser's claim against the government), Kaiser would have the right "to attack the validity of the order and of the judgment on which it is founded." *Id*. at 588–89. In other words, the Court of Claims had no jurisdiction to hear Sherwood's claim that he had the right to bring Kaiser's claim against the United States; and because resolution of the Kaiser-Sherwood controversy was necessary before Sherwood could proceed against the United States, the Court of Claims had no jurisdiction to hear the case.

The Supreme Court then raised the possibility that under the Tucker Act or by virtue of the rules of procedure the district court may have jurisdiction not granted the Court of Claims. *See id*. at 589. It rejected that possibility. It began by stating that the rules of procedure cannot enlarge a court's jurisdiction. *See id*. at 589–90. Therefore, the dispositive issue was whether the Tucker Act itself gave district courts greater jurisdiction than the Court of Claims. The Court held that it did not, explaining the complexities that would result from giving the district court, whose jurisdictional limit (unlike the Court of Claims) was $10,000, jurisdiction to hear a claim that could not be heard by the Court of Claims. It wrote:

The present litigation well illustrates the embarrassments which would attend the defense of suits brought against the Government if the jurisdiction of district courts were not deemed to be as restricted as is that of the Court of Claims. The Government, to protect its interests, *must not only litigate the claim upon which it has consented to be sued*, but must make certain that respondent's right, as against the judgment debtor, to maintain the suit is properly adjudicated. And since the alleged claim for damages is larger than the $10,000 jurisdictional amount the Government must either be subjected to successive suits for partial recoveries of the amount due or must make certain that respondent has legal authority to relinquish the judgment debtor's claim in excess of $10,000, and that this has been accomplished by the limitation of his demand for judgment to that amount.

*Id*. at 591 (emphasis added). If Sherwood's suit could be heard in district court, the government would be concerned with the litigation of a variety of issues totally distinct from those raised by the contract claim on which it had waived immunity and, because the district court's jurisdictional limit was $10,000, could be subjected to multiple lawsuits.

To repeat, all that *Sherwood* held was that Sherwood's claim against Kaiser (which was a predicate for Sherwood's claim against the United States) was beyond the jurisdiction of the Court of Claims and therefore beyond the jurisdiction of the district court, whose Tucker Act jurisdiction was limited to claims within the Court of Claims' jurisdiction.

The SI concurrence relies on the following passage:

Th[e incorrect] conclusion [of the lower court] presupposes that the United States, either by the rules of practice or by the Tucker Act or both, has given its consent to be sued in litigations in which issues between the plaintiff and third persons are to be adjudicated. But we

> think that nothing in the new rules of civil practice so far as they may be applicable in suits brought in district courts under the Tucker Act authorizes the maintenance of any suit against the United States to which it has not otherwise consented. An authority conferred upon a court to make rules of procedure for the exercise of its jurisdiction is not an authority to enlarge that jurisdiction; and the Act . . . authorizing this Court to prescribe rules of procedure in civil actions gave it no authority to modify, abridge or enlarge the substantive rights of litigants or to enlarge or diminish the jurisdiction of federal courts.

312 U.S. at 589–90. But the passage expresses nothing more than the unremarkable proposition that if the district court otherwise lacked jurisdiction to hear Sherwood's claim against Kaiser, the rules of procedure could not confer such jurisdiction.

It is worth noting the role of sovereign immunity in *Sherwood*. The Court said that a sovereign can impose conditions on its consent to be sued. *See id*. at 587. One condition in the Tucker Act was that the district court's jurisdiction was to be no greater than that of the Court of Claims, so if the Court of Claims could not hear a claim, neither could the district court. *See id*. 590–91. Because the Court of Claims could not hear Sherwood's claim against Kaiser, *see id*. at 588–89, the district court also lacked jurisdiction to hear it. *Sherwood* does not stand for the proposition that sovereign immunity itself always prohibits the joinder of other claims with a claim for which sovereign immunity has been waived, and says absolutely nothing about joinder of an intervenor who brings no new claims to the litigation.

*Sherwood* has been cited often enough, and it has been the subject of scholarly treatment, much of it critical, *see, e.g.*, 1 William W. Barron, Alexander Holtzoff & Charles Alan Wright, Federal Practice and Procedure, § 127, at 561–63 (1960); 3A James Wm. Moore, Moore's Federal Practice, ¶ 20.07(3), at 20–55 to 20–58 (2d ed. 1987), and suggesting that it be construed narrowly, *see* 4 Wright & Miller, *supra*, § 1027, at 131 (limiting *Sherwood* to the Tucker Act because of the peculiar nature of the concurrent jurisdiction of the Court of Claims); 17 *id*. § 4101 n.28, at 262 (describing holding as: "if [a suit's] maintenance against private parties is a prerequisite to prosecution of the action against the United States, the action must be dismissed"). But it has not been interpreted as standing for the broad proposition asserted by the SI concurrence.

The other opinion relied upon by the SI concurrence is *Henderson v. United States*, 517 U.S. 654 (1996). But *Henderson* addresses only whether a Federal Rule of Civil Procedure could override an explicit condition imposed by a statute waiving sovereign immunity. It says nothing about what is inherent in sovereign immunity.

Henderson filed suit against the United States under the former Suits in Admiralty Act, 46 U.S.C. App. § 741 *et seq*., repealed Pub. L. No. 109-304, § 19, 120 Stat. 1710 (2006). The statute required that service be made "forthwith." *Id*. § 742. Fed. R. Civ. P. 4, however, allows 120 days for service. The Court wrote: "We are . . . satisfied that Rule 4's regime conflicts irreconcilably with Suits in

Admiralty Act § 2's service 'forthwith' instruction, and we turn to the dispositive question: Does the Rule supersede the inconsistent statutory direction?" 517 U.S. at 663. The Court said that the answer to the question turned on whether the forthwith requirement was substantive or jurisdictional, citing 28 U.S.C. § 2072(a) (federal rules of procedure cannot modify substantive rights), and Fed. R. Civ. P. 82 (rules cannot extend or limit jurisdiction). *See id*. at 663–64. The Court held that it was neither. It explained: "Service of process, we have come to understand, is properly regarded as a matter discrete from a court's jurisdiction to adjudicate a controversy [1] of a particular kind,[19] or [2] against a particular individual or entity.[20]" *Henderson*, 517 U.S. at 671(Footnote 19 described [1] as subject-matter jurisdiction, *see id*. n.19, and footnote 20 described [2] as jurisdiction over persons, *see id*. n.20.) "Its essential purpose," continued the Court, "is auxiliary, a purpose distinct from the substantive matters aired in the precedent on which the dissent, wrenching cases from context, extensively relies—who may sue, on what claims, for what relief, within what limitations period." *Id*. (footnotes omitted).

The SI concurrence contends that *Henderson* identified "the 'substantive' core of sovereign immunity," which is not "governed by . . . generally applicable provisions of the Rules of Civil Procedure." SI concurrence at 7. But *Henderson* hardly supports the SI concurrence's theory that protection against intervention by a party who raises no claim is an inherent component of sovereign immunity.

-29-

*Henderson* does not address such intervention, and the SI concurrence misconceives *Henderson*'s use of the term *substantive*.

The language on which the SI concurrence rests is the Court's statement that "who may sue" is a "substantive matter[ ]." But "who may sue" refers to who may bring a suit, not who can intervene in an ongoing suit (especially when the intervenor adds no new claim). The case cited by the Court as illustrating "who may sue" was *Sherwood*. The Court described *Sherwood*'s holding in the following parenthetical: "Tucker Act, allowing contract claims against United States, does not authorize joinder of claims between private parties." *Id*. at 671 n.21. This description of *Sherwood*, which focuses on "joinder of claims," certainly implies that the Court was equating "who may sue" with "who may bring a claim." There is certainly nothing to suggest that the Court meant "who may sue" to encompass "who may intervene in an ongoing action without introducing a new claim." To reach that interpretation of the Court's language and citation to *Sherwood* would require "wrenching cases from context." *Id*. at 671.

Moreover, and perhaps more importantly, even if protection from intervention were considered a "substantive matter," it does not follow that it is an inherent component of sovereign immunity. The Court in *Henderson* distinguished jurisdictional matters—namely, subject-matter and personal jurisdiction—and substantive matters. 517 U.S. at 671. It devoted one sentence

to the proposition that service of process is not jurisdictional, *see id*. ("Service of process, we have come to understand, is properly regarded as a matter discrete from a court's jurisdiction to adjudicate a controversy of a particular kind, or against a particular individual or entity." (footnotes omitted)), and devoted the next sentence to the proposition that service of process is not a substantive matter, *see id*. ("Its essential purpose is auxiliary, a purpose distinct from the substantive matters aired in the precedent on which the dissent . . . relies—who may sue, on what claims, for what relief, within what limitations period." (footnotes omitted)). The dichotomy follows from the two sources of restrictions on application of the Federal Rules.  The Rules Enabling Act, which authorizes "general rules of practice and procedure," forbids rules that "abridge, enlarge or modify any *substantive* right."  28 U.S.C. § 2072(a) (emphasis added).  Fed. R. Civ. P. 82 states that the rules "shall not be construed to extend or limit the *jurisdiction* of the United States district courts." (emphasis added).  Thus, when *Henderson* lists various substantive matters, it is not asserting that they are jurisdictional (although they may be), much less that they are inherent in sovereign immunity (which, to be sure, is a jurisdictional matter).  For example, *Henderson* lists the "limitations period" as a substantive matter, even though the Court has referred to a statute of limitations as a "*condition* to the waiver of sovereign immunity,"

*Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 94 (1990) (emphasis

added), rather than as an inherent aspect of such immunity.[3]

Perhaps the SI concurrence is raising an argument never raised by the

parties: that intervention is a matter of substance and therefore is not a proper

subject of the Federal Rules of Civil Procedure. Given the longevity of Rule 24,

this would be a remarkable proposition. Also, we note that in permitting a union

member to intervene on the side of the government, the Supreme Court referred to

"the *procedural* device of intervention." *Trbovich v. United Mine Workers of*

*America*, 404 U.S. 528, 536 n.7 (emphasis added). Because it is not a matter of

jurisdiction, we need not address this unraised issue further.

Thus, there is no authority for the assertion by the SI concurrence that in a

suit against the government the mere addition of a party (even one who brings no

claim) infringes upon sovereign immunity. Indeed, although presented with clear

opportunity to do so, the Supreme Court has not even said that joinder of a claim

against a private party to a claim against the United States infringes upon inherent

sovereign immunity (as opposed to being a violation of a condition on a waiver of

sovereign immunity, as in *Sherwood)*.

---

[3]There remains the possibility, of course, that even if no "substantive right" is at stake, the waiver of sovereign immunity may be conditioned on a procedural rule that should be treated as a jurisdictional matter. *See Henderson*, 517 U.S. at 672–73 (Scalia, J., concurring).

That opportunity arose in *Finley v. United States*, 490 U.S. 545 (1989), which makes nary a mention of *Sherwood*'s alleged holding that sovereign immunity precludes the addition of a private defendant in a suit against the United States. Barbara Finley's husband and two of her children were killed when their plane struck electric transmission lines. She sued the United States under the Federal Tort Claims Act (FTCA) and attempted to join claims against nonfederal defendants. The FTCA waives sovereign immunity by granting district courts "jurisdiction of civil actions on claims against the United States" for certain torts by government employees. 28 U.S.C. § 1346(b)(1). The United States contended that the court lacked jurisdiction over the claims against other parties, arguing three points. First, it stated that "'the most natural reading—perhaps the only natural reading—of [the statutory] language is that it extends only to the adjudication of claims against the United States and not against other persons.'" David L. Shapiro, *Supplemental Jurisdiction: A Confession, an Avoidance, and a Proposal*, 74 Ind. L.J. 211, 213 (1998) (quoting United States Brief at 17) (brackets in article omitted). Second, it made a policy argument that the private claim could be tried to a jury (whereas an FTCA claim is heard by a judge) and "confusion . . . would be caused by the significant differences between the criteria governing the liability of the United States and the criteria governing the liability of private entities." *Id*. Third, it turned to *Sherwood*, noting that a private party could not be joined as a codefendant in a Tucker Act case and that a House

-33-

Report on the FTCA, citing *Sherwood*, had said that the proposed FTCA would not allow joinder of a defendant with the United States. *See id.* at 214. (Undoubtedly, the government was referring to joinder of an additional claim against the private defendant.)

The Supreme Court rejected jurisdiction over the private claim. Although reaffirming precedents that recognized "'pendent' claim jurisdiction—that is, jurisdiction over nonfederal claims between parties litigating other matters properly before the court," *Finley*, 490 U.S. at 548, it held that bringing additional claims under pendent-party jurisdiction ("jurisdiction over parties not named in any claim that is independently cognizable by the federal court," *id.* at 549) is impermissible absent statutory authority except in a limited class of ancillary-jurisdiction cases, *see id.* at 551–56. It decided that the FTCA gave no such statutory authority, writing:

> The FTCA, § 1346(b), confers jurisdiction over "civil actions on claims against the United States." It does not say "civil actions on claims that include requested relief against the United States," nor "civil actions in which there is a claim against the United States"—formulations one might expect if the presence of a claim against the United States constituted merely a minimum jurisdictional requirement, rather than a definition of the permissible scope of FTCA actions. . . . [W]e conclude that "against the United States" means against the United States and no one else . . . . The statute here defines jurisdiction in a manner that does not reach defendants other than the United States.

*Id.* at 552–53. The Court concluded: "All our cases . . . have held that a grant of jurisdiction over claims involving particular parties does not itself confer

jurisdiction over additional claims by or against different parties. Our decision today reaffirms that interpretative rule . . . ." *Id*. at 556.

Interestingly, *Finley* made only one reference to *Sherwood*:

It is true that here . . . the party seeking to bring the added claims had little choice but to be in federal rather than state court, since the FTCA permits the Federal Government to be sued only there. But that alone is not enough, since we have held that suits against the United States under the Tucker Act . . . cannot include private defendants. *United States v. Sherwood*."

*Id*. at 552. Despite this undoubted familiarity with *Sherwood*, *Finley* never mentions "sovereign immunity." The natural inference is that the Supreme Court did not read *Sherwood* as saying, or otherwise understand the doctrine of sovereign immunity to say, that the mere joinder of a claim between two other parties to a claim against the United States implicates sovereign immunity. This inference gains further strength from the Supreme Court's response to the congressional reaction to *Finley*.

That reaction to *Finley* was, as they say, swift and sure. The Judicial Improvements Act was enacted 18 months later. The provision pertinent to this case states:

*Supplemental Jurisdiction*

(a)    Except as provided in subsections (b) [relating to diversity jurisdiction] and (c) [granting district courts discretion to decline supplemental jurisdiction in certain circumstances] or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that

are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  Such supplemental jurisdiction shall include claims that involve the joinder or *intervention of additional parties*.

28 U.S.C. § 1367(a) (emphasis added).

Section 1367(a) is expressed in general terms, applying to all litigants. There is no mention of sovereign immunity or of the special status of the government as a litigant.  Under settled law, as recognized in the SI concurrence, this statute does not waive federal sovereign immunity.  *See, e.g.*, *Lane v. Pena*, 518 U.S. 187, 192 (1996) ("A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text and will not be implied." (citation omitted)).[4]  Thus, in the SI concurrence's view of sovereign

---

[4]Similarly, we doubt that § 1367 would override state sovereign immunity, as recognized in *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984).  In that case the plaintiffs alleged that state and local officials had violated federal and state law in the care of mentally disabled persons.  The Supreme Court implicitly assumed that the federal courts had jurisdiction over the federal-law claims.  The issue was whether there was also pendent jurisdiction over the state-law claims.  The Court first held that sovereign immunity under the Eleventh Amendment precludes a federal court from adjudicating "a claim that state officials violated state law in carrying out their official responsibilities."  *Id*. at 121.  It then ruled that Eleventh Amendment immunity was not defeated just because the barred claim would, absent the Eleventh Amendment, be within federal jurisdiction as a claim pendent to proper claims filed under federal statutes.  *See id*.  In other words, pendent-jurisdiction doctrine could not override the state sovereign immunity recognized by the Eleventh Amendment.  The critical fact was that the claim added under pendent jurisdiction was a new claim against the state which exposed the state to the risk of coercive sanctions.  "If we were to hold otherwise," said the Court, "a federal court could award damages against a State on the basis of a pendent claim."  *Id*. at 120.

(continued...)

immunity, § 1367 would not change the result in *Finley*. Sovereign immunity would still be infringed by the addition of a new defendant in an FTCA suit against the United States. Section 1367 would only have overturned the *holding* of *Finley* or the *rationale* of its result. Yet the Supreme Court stated in *Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546 (2005), that "§ 1367 overturned the *result* in *Finley*," *id.* at 558 (emphasis added). The Court's choice of the word *result* is hardly dispositive; but it is another good indicator that the Court does not view the mere addition of a party as an infringement of sovereign immunity.[5]

---

[4](...continued)
Perhaps we should note that *Pennhurst* did not suggest that merely adding a party, without adding a new claim against the sovereign, infringed upon sovereign immunity. Consider a case in which the plaintiff (1) had a proper claim against a state for which the Eleventh Amendment had been overridden (either by the State's consent or by Congressional enactment, *see, e.g.*, *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721 (2003) (family-leave provisions of Family and Medical Leave Act abrogate Eleventh Amendment immunity)), and (2) wished to join a claim against a private defendant. We are not aware of cases holding that Eleventh Amendment sovereign immunity would bar such joinder. In any event, *Pennhurst* does not address intervention and says nothing whatsoever about restrictions, if any, imposed by sovereign immunity when the sovereign faces no new claim.

[5]We have no doubt that § 1367(a) applies to claims under the Quiet Title Act. To be sure, under § 1367(a) a statute may "expressly" exclude joinder. But the term *expressly* must be narrowly construed. It is not enough that the statute clearly provides for only limited jurisdiction. After all, in *Finley* the Court thought that the FTCA unambiguously "define[d] jurisdiction in a manner that does not reach defendants other than the United States." 490 U.S. at 553. Yet all agree that § 1367 abrogates *Finley*. *See Allapattah*, 545 U.S. at 558. The difference in the language of the FTCA and the Quiet Title Act can hardly justify

(continued...)

The SI concurrence declares that our reference to *Finley*, and its aftermath in the enactment of § 1367 and the dictum in *Allapattah*, "is an extraordinarily slender reed" to rely on. SI concurrence at 10 n.4. But, of course, our purpose in discussing these cases is not so much to prove our point as to demonstrate the absence of support for the SI concurrence's position that sovereign immunity bars any addition of a party in a suit against the sovereign. As we have seen, the only support for the SI concurrence's conclusion is a misinterpretation of *Sherwood*. If that interpretation had any traction, it is passing strange that (1) the *Finley* Court did not accept the government's invitation and mention, at least in a footnote, this "fundamental" principle; (2) that Congress did not address sovereign immunity expressly in § 1367; and (3) that *Allapattah* stated that "§ 1367 overturned the result in *Finley*," 545 U.S. at 558. Quite simply, *Sherwood*, with all due respect, was the dog that did not bark.

Finally, as Judge Ebel states in his dissent, it makes no sense to say that sovereign immunity is infringed by participation on the side of the sovereign's claim or defense. No one thought to suggest in *Trbovich*, 404 U.S. 528, an

---

[5](...continued)
their being treated differently under § 1367. The FTCA states that "district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States." 28 U.S.C. § 1346(b)(1). The Quiet Title Act states that the "United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest." *Id*. § 2409a. Neither "expressly provide[s]" that § 1367(a) does not apply.

opinion that will be addressed further in our discussion of Rule 24, that there is a sovereign interest that would be violated by allowing a union member to intervene on the side of the Secretary of Labor in challenging a union election. The Second Circuit observed more than 40 years ago that it could find no "support [for] the proposition that the United States must consent to be defended." *Int'l Mortgage & Inv. Corp. v. Von Clemm*, 301 F.2d 857, 863–64 (2d Cir. 1962); *accord* 7C Wright & Miller, *supra*, § 1917 at 483. We can repeat that statement today.[6]

In sum, SUWA's intervention would not infringe upon the inherent sovereign immunity of the United States because SUWA raises no new claims against the government and does not seek damages or any coercive sanction against it.

D.     **Alleged Restriction on Intervention as Condition of Waiver of Sovereign Immunity**

We now turn to what we believe is the proper question to be addressed: Does the Quiet Title Act condition its waiver of sovereign immunity on a prohibition against joinder of intervenors on the side of the United States who add no claims to the litigation? The clear answer is No.

The SI concurrence attempts to find support in the language of the Quiet Title Act for a prohibition on intervention. But the effort fails. The SI

---

[6]This is an additional argument against the sovereign-immunity contention in this case. We are in no way implying that intervention on the side of the plaintiff in this case would be barred by sovereign immunity; that issue is not before us.

concurrence quotes § 2409a(a) of the Act, which states in pertinent part: "The United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest . . . ." As we have already noted, however, the statute says only that the United States may be *a* (not *the)* party defendant; it sets no restriction on what other parties may participate, and, as one might expect, courts have permitted other parties to participate, *see* discussion, *supra*, at 16.

The SI concurrence also relies on § 2409a(d), which states:

> The complaint shall set forth with particularity the nature of the right, title, or interest which the plaintiff claims in the real property, the circumstances under which it was acquired, and the right, title, or interest claimed by the United States.

But this is merely a requirement for what the plaintiff must plead to initiate the federal-court proceeding. It modifies the customary pleading requirements for an initial complaint set forth in Fed. R. Civ. P. 8(a), but it says nothing about pleading or practice once the case is in court. Neither do the cases cited by the SI concurrence that hold that one with no claim to title cannot initiate an action under the Quiet Title Act. *See* SI concurrence at 12. We fail to see even a hint in the Quiet Title Act that the government's waiver of sovereign immunity is conditioned on a prohibition against joinder of parties aligned with the United States, either with or without their own claims to title, once suit has been properly initiated.

-40-

Moreover, such a condition would be anomalous in light of the origin of the Quiet Title Act. Before enactment of the Quiet Title Act the United States could bring quiet-title actions. It was just that persons with claims adverse to the United States could not. As summarized in *Block v. North Dakota*, 461 U.S. 273, 280–81 (1982):

> Prior to 1972, States and all others asserting title to land claimed by the United States had only limited means of obtaining a resolution of the title dispute—they could attempt to induce the United States to file a quiet title action against them, or they could petition Congress or the Executive for discretionary relief. Also, since passage of the Tucker Act in 1887, those claimants willing to settle for monetary damages rather than title to the disputed land could sue in the Court of Claims and attempt to make out a constitutional claim for just compensation.

The Quiet Title Act resulted when "Congress sought to rectify this state of affairs." *Id*. at 282. In short, the Quiet Title Act provided for reciprocity. Rather than limiting quiet-title suits to those initiated by the government, private parties could now bring them against the government. The Act was intended to expand the access of private parties to quiet-title litigation with the United States.

Yet the SI concurrence would restrict access in one inexplicable respect. The concurrence concedes that in cases brought by the United States there is no sovereign-immunity concern with intervention on the side of the government. *See* SI concurrence at 32. Why would Congress wish to forbid such intervention only when it is a private party, rather than the government, that initiates the litigation, even though the subject matter of the litigation (namely, who holds title) would

-41-

be identical? We simply find it difficult to presume that the Quiet Title Act introduced a bar to intervention in support of the United States when such intervention would be possible if the United States had sued to quiet the same title.

In support of its strained construction of the Quiet Title Act, the SI concurrence invokes a perceived tradition of denying intervention to those without a claim to the property in litigation "between the United States and private parties over the ownership of property," relegating such persons to amicus status. SI concurrence at 13. The sole case law cited to demonstrate that tradition relates to the practice in century-old cases in which the courts never mentioned, much less ruled on, an attempt to intervene. (The SI concurrence also cites our recent decision in *High Country Citizens Alliance v. Clarke*, 454 F.3d 1177 (10th Cir. 2006); but that case involved neither an intervenor nor an amicus. It merely cited the old cases for a different proposition—whether one without a claim to title could file suit.) Our research suggests that the tradition asserted by the SI concurrence somehow failed to catch hold in this part of the country. In *Watt v. Western Nuclear, Inc.*, 462 U.S. 36 (1983), a decision reversing this circuit, Western Nuclear had used gravel on its property to pave roads and sidewalks. The United States claimed that it owned the gravel. The Wyoming Stock Growers Association, which obviously was not claiming a right in the gravel on Western Nuclear's land, intervened because of its concern that a

decision against Western Nuclear could mean, as a matter of stare decisis, that its members could not use the gravel on their own lands. *See id*. at 41 n.3. In *Pathfinder Mines Corp. v. Hodel*, 811 F.2d 1288, 1290 (9th Cir. 1987), a company challenged a federal-government decision that its mining claims were void. Two environmental organizations intervened on the government's side. The SI concurrence correctly notes that we should not make too much of these cases because neither addressed the propriety of intervention. But, of course, neither did the old cases on which the SI concurrence relies. Our only point is that the "traditional model of litigation" hypothesized by the SI concurrence, SI concurrence at 14, is a dubious invention.

We also reject the SI concurrence's reliance on cases interpreting explicit conditions imposed in statutes waiving sovereign immunity. Cases construing such conditions (such as a statute of limitations that conditions waiver on the suits being brought within a specified time) are inapplicable because the Quiet Title Act contains no provision barring intervention of a party that makes no claim against the United States. Even if an explicit condition in the Act were entitled to strict construction, there is no condition to be strictly construed.

Moreover, to construe strictly some vague "sentiment" emanating from a statute to foreclose the applicability of a rule that generally applies in civil litigation would run counter to Supreme Court doctrine that takes a realistic, rather than a jaundiced, view of conditions on waivers of immunity. In recent

years the Supreme Court has indicated that even when a statute waiving sovereign immunity imposes a categorical condition on that waiver (which has not happened in this case—the Quiet Title Act does not contain an explicit prohibition on intervention), the Court is likely to recognize exceptions to that condition that are recognized in private litigation, absent contrary indications in the statute. *Irwin*, 498 U.S. 89, recognized equitable tolling of a limitations period imposed as a condition of a waiver of sovereign immunity. Writing for the Court, Chief Justice Rehnquist acknowledged that "a condition to the waiver of sovereign immunity . . . must be strictly construed," *id*. at 94, and "[a] waiver of sovereign immunity cannot be implied but must be unequivocally expressed, " *id*. at 95 (internal quotation marks omitted). Nevertheless, he said, "[o]nce Congress has made such a waiver, we think that making the rule of equitable tolling applicable to suits against the Government, in the same way that it is applicable to private suits, amounts to little, if any, broadening of the congressional waiver." *Id*. He continued: "Such a principle is likely to be a realistic assessment of legislative intent as well as a practically useful principle of interpretation. We therefore hold that the same rebuttable presumption of equitable tolling applicable to suits against private defendants should also apply to suits against the United States." *Id*. at 95–96.

Of course, a rebuttable presumption can be rebutted, as it was in the unanimous decisions in *United States v. Beggerly*, 524 U.S. 38 (1998), and *United*

*States v. Brockamp*, 519 U.S. 347 (1997). But the general proposition enunciated in *Irwin* is hardly in doubt. The Supreme Court followed *Irwin* in *Scarborough v. Principi*, 541 U.S. 401 (2004). The Court considered the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412(d), which permits an award of attorney fees to a prevailing party in litigation against the United States. The EAJA requires an application for fees to be filed within 30 days of the favorable judgment. It also requires the fee application to allege that the United States' position in the litigation was not "'substantially justified.'" *Principi*, 541 U.S. at 405 (quoting 28 U.S.C. § 2412(d)(1)(A)). Although Scarborough had filed a timely fee application, the application omitted the not-substantially-justified allegation. He amended the application to include the necessary allegation, but not before expiration of the 30-day period to file the application. The Court held that the customary relation-back rules in ordinary civil litigation would apply and cure the defect in the original application. *See id*. at 418–19. The Court rejected the Government's argument "that § 2412's waiver of sovereign immunity from liability for fees is conditioned on the fee applicant's meticulous compliance with each and every requirement of § 2412(d)(1)(B) within 30 days of final judgment." *Id*. at 419–20. The Court relied on *Irwin* and its progeny for the proposition that "limitations principles should generally apply to the Government in the same way that they apply to private parties." *Id*. at 421 (internal quotation marks omitted).

The rationale of *Irwin* and *Scarborough* would seem to apply in general to procedural rules governing litigation.  Application of those rules in litigation against the government "amounts to little, if any, broadening of the congressional waiver [of sovereign immunity]" and "is likely to be a realistic assessment of legislative intent as well as a practically useful principle of interpretation." *Irwin*, 498 U.S. at 95–96.  Indeed, even the two dissenters in *Principi* would apply *Irwin* broadly.  Justice Thomas, joined by Justice Scalia, wrote:  "[W]here the Government is made subject to suit to the same extent and in the same manner as private parties are, *Irwin* holds that the Government is subject to the rules that are applicable to private suits."  541 U.S. at 426 (internal quotation marks omitted).  The dissent's difference with the majority was its view that the predicate for the *Irwin* holding was absent in *Scarborough*.  Justice Thomas said that "there is no analogue in private litigation for the EAJA fee awards at issue here [because] [s]ection 2412(d) authorizes fee awards against the Government when there is no basis for recovery under the rules for private litigation." *Id*. at 427 (citation and internal quotation marks omitted); *see id*. n.5 (observing that § 2412(b) makes the United States "liable for such fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award," whereas the provision at issue in the case, § 2412(d)(1)(A), adds a new ground for awarding attorney fees).

In our view, once a federal district court has jurisdiction of a case under the Quiet Title Act, the usual rules of procedure, which include Fed. R. Civ. P. 24, ordinarily apply. Indeed, as we noted earlier in this discussion of conditions on waiver, there is a significantly stronger case for applying the usual rules in this case than there was in *Irwin* and *Scarborough*. In those two cases the question was whether to recognize an exception to the specific requirement of a statute. *Irwin* recognized equitable tolling of the limitations period set forth in unqualified statutory language. *Scarborough* recognized relation back of an amendment adding an allegation that the statute directed to be included in the original EAJA application. Here, in contrast, there is no provision in the Quiet Title Act that explicitly prohibits intervention. We do not need to recognize, as in *Irwin* and *Scarborough*, an exception to a statutory mandate.

The SI concurrence, and we, have found only one Supreme Court opinion that imposes a condition on a waiver of sovereign immunity that is not explicitly stated in a statute. That opinion, however, relies on a long and clear tradition and indicia in the statute itself, and the condition is not contrary to the Rules of Civil Procedure. *Lehman v. Nakshian*, 453 U.S. 156 (1981), held that a plaintiff was not entitled to a jury trial in a suit against the government under the Age Discrimination in Employment Act (ADEA). Although the ADEA explicitly provided for jury trials in claims against private employers, it was silent regarding jury trials of claims against the United States. *See id*. at 162–63. And

-47-

Fed. R. Civ. P. 38(a) did not provide for a jury trial absent a constitutional or statutory right to one. *See id.* at 164–65. The Court observed that "[w]hen Congress has waived the sovereign immunity of the United States, it has almost always conditioned that waiver upon a plaintiff's relinquishing any claim to a jury trial," *id.* at 161, and stated that "[t]he appropriate inquiry, therefore, is whether Congress clearly and unequivocally departed from its usual practice in this area, and granted a right to trial by jury when it amended the ADEA," *id.* at 162. The Court examined the ADEA's language and history and reached the "inescapable" conclusion "that Congress did not depart from its normal practice of not providing a right to trial by jury when it waived the sovereign immunity of the United States." *Id.* at 168–69. Rather than standing for the broad proposition stated by the SI concurrence, *Lehman* stands only for the proposition that the Supreme Court will presume that Congress intended to impose traditional conditions on the waiver of sovereign immunity. There is no comparable tradition applicable here; Congress, to our knowledge, has never explicitly conditioned a waiver of sovereign immunity on a prohibition against intervention, as it has conditioned waiver on the absence of jury trial.

In sum, the Rules Enabling Act and the Federal Rules of Civil Procedure require applying Fed. R. Civ. P. 24 in this case unless doing so would expand the jurisdiction of the district court. The only possible expansion would be if intervention infringed on the government's sovereign immunity. But intervention

of a party who seeks no damages or other coercive sanction against the United States does not infringe on its sovereign immunity.  Nor does the Quiet Title Act impose any restriction on intervention as a condition to the Act's waiver of sovereign immunity.  The statutory language cannot be read as imposing such a condition, and such a condition would have the anomalous consequence of making the possibility of intervention depend on whether the government or the private claimant first arrived at the courthouse to seek resolution of their dispute.  Accordingly, we conclude that sovereign immunity does not impose a jurisdictional bar to SUWA's intervention.

## IV.    RULE 24(a) INTERVENTION AS OF RIGHT

Federal Rule of Civil Procedure 24(a) states:

Upon timely application anyone shall be permitted to intervene in an action:  (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

We are concerned only with clause (2).  A discussion of some of the history of the clause may be instructive.

Clause (2) was promulgated in 1966 to replace former clauses (2) and (3), which stated that the applicant must be permitted to intervene

(2) when the representation of the applicant's interest by existing parties is or may be inadequate and the applicant is or may be bound

-49-

by a judgment in the action; or (3) when the applicant is so situated as to be adversely affected by a distribution or other disposition of property which is in the custody or subject to the control or disposition of the court or an officer thereof.

39 F.R.D. 69, 109 (1966).  The Advisory Committee Notes indicate that at least part of the motivation for the change was to set aside the Supreme Court's unanimous decision in *Sam Fox Publishing Co. v. United States*, 366 U.S. 683, 691 (1961).  The *Sam Fox* decision arose out of a government antitrust proceeding against an unincorporated publishers' association, ASCAP, which had resulted in a consent decree that the government was attempting to modify.  Sam Fox, a member of ASCAP, moved to intervene in the action under Rule 24(a), arguing that the proposed modifications did not go far enough to protect the interests of small publishers who were members of the association and that the representation of the smaller members in the action was inadequate.  Construing the word *bound* in clause (2) narrowly, in its res judicata sense, the Court upheld the district court's denial of Sam Fox's motion to intervene.  The Court identified a Catch-22 in the clause:

> [A]ppellants . . . face this dilemma:  the judgment in a class action will bind only those members of the class whose interests have been adequately represented by existing parties to the litigation; yet intervention as of right presupposes that an intervenor's interests are or may *not* be so represented.  Thus appellants' argument as to a divergence of interests between themselves and ASCAP proves too much, for to the extent that it is valid appellants should not be considered as members of the same class as the present defendants, and therefore are not "bound."  On the other hand, if appellants are bound by ASCAP's representation of the class, it can only be

because that representation has been adequate, precluding any right
to intervene.

*Id.* (citation omitted). The Advisory Committee observed that "[t]his reasoning might be linguistically justified . . . but it could lead to poor results." Fed. R. Civ. P. 24 advisory committee notes (1966 Amendment).

The 1966 changes to Rule 24(a) were intended to refocus the rule on the practical effect of litigation on a prospective intervenor rather than legal technicalities, and thereby expand the circumstances in which intervention as of right would be appropriate. In forwarding the proposed amendment for approval by the Standing Committee on Practice and Procedure of the Judicial Conference of the United States (the Standing Committee), the Advisory Committee explained, "The effect of the amendment [to Rule 24(a)] is to provide that if a person who would be affected *in a practical sense* by the disposition of an action is not joined as a party, he has a right to intervene unless he is adequately represented by an existing party." Comm. on Rules of Practice & Procedure, Report, Ex. B (Statement on Behalf of the Advisory Comm. on Civil Rules to the Chairman & Members of the Standing Committee, June 10, 1965), at 11 (Sept. 1965).[7] The new rule's focus on practical, rather than technical, considerations is further reflected in the statement in the Advisory Committee Notes that "[i]f an absentee would be substantially affected in a practical sense by the determination

---

[7]*Available at* http://www.uscourts.gov/rules/Reports/ST09-1965-1.pdf.

made in an action, he should, as a general rule, be entitled to intervene . . . ." Fed. R. Civ. P. 24 advisory committee notes (1966 Amendment).

Moreover, the Rule's reference to practical consideration in determining whether an applicant can intervene implies that those same considerations can justify limitations on the scope of intervention. If the applicant is granted intervention because of an interest that may be injured by the litigation, it does not follow that the intervention must extend to matters not affecting that interest; and just because no party will adequately represent one particular interest of the applicant does not mean that the applicant must be allowed to participate in the litigation of other matters concerning which its interests *are* adequately represented. Thus, the Advisory Committee Notes state, "An intervention of right under the amended rule may be subject to appropriate conditions or restrictions responsive among other things to the requirements of efficient conduct of the proceedings." *Id*; *see Trbovich*, 404 U.S. at 537 (limiting union member's intervention to "claims of illegality presented by the [Secretary of Labor's] complaint"); *Beauregard, Inc. v. Sword Servs., LLC*, 107 F. 3d 351, 352–53 (5th Cir. 1997) ("[I]t is now a firmly established principle that reasonable conditions may be imposed even upon one who intervenes as of right."). *But see* 7C Wright et al., *supra*, § 1922, at 506 (questioning authority of statement in Advisory Committee Notes). In particular, we should mention again that an intervenor has no power to veto a settlement by other parties. *See Local No. 93*, 478 U.S. at

528–29 ("It has never been supposed that one party—whether an original party, a party that was joined later, or an intervenor—could preclude other parties from settling their own disputes and thereby withdrawing from litigation."); *Johnson*, 393 F.3d at 1106.

It should go without saying that the 1966 amendments to Rule 24 changed the law. Pre-1966 decisions are no longer binding precedent. *Sam Fox*, 366 U.S. 683, was clearly rejected. And even if *Smith v. Gale*, 144 U.S. 509, 518 (1892), is a "*triple* super-duper precedent" because it is 115 years old, Op. (Kelly, J., concurring) at 1 n.1 (internal quotation marks omitted), it would be such a precedent with respect to only the matter resolved by that decision—the meaning of a provision of the Code of the Dakota territory in the late nineteenth century. *Gale* hardly controls our interpretation of current Rule 24.[8] The extent of the change or, better, the meaning of the current rule is, however, a matter that continues to bedevil the courts.

## A.  Impaired Interest

We begin by addressing what we will call the impaired-interest requirement for intervention as of right—namely, that "the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant

---

[8]It may be of some interest that the only citations to *Gale* in the Wright & Miller treatise are as contrary authority to the treatise's view of the proper spelling of *intervenor*. *See*, *e.g.*, 7C Wright et al., *supra*, § 1902, at 231 n.3.

is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest." Fed. R. Civ. P. 24(a). We will later turn to the condition that "the applicant's interest [not be] adequately represented by existing parties." *Id.*

The Supreme Court has directly addressed the impaired-interest requirement on only two occasions. Neither opinion is much help. One contains merely a bare holding, with essentially no explanation. The other explains its holding but it is unclear how much it relies on Rule 24.

The first Supreme Court decision on present Rule 24(a)(2) was handed down shortly after the amendment was promulgated. *Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*, 386 U.S. 129 (1967), involved the attempted intervention of several parties in a Clayton Act proceeding by the government against El Paso Natural Gas Company. An earlier Court decision had held that El Paso's acquisition of Pacific Northwest Pipeline Corporation had violated the Clayton Act and "order[ed] divestiture without delay." *Id.* at 131 (internal quotation marks omitted). The parties then negotiated a divestiture plan. *Id.* at 132–33. Three nonparties sought to intervene, claiming that their interests would be adversely affected by the plan. *Id.* at 133–35.

The applications of the first two—the State of California and Southern California Edison, an industrial user of gas who purchased from El Paso sources—were reviewed under the pre-1966 version of Rule 24(a)(3). *See id.* at

135. Both applicants, according to the Court, had an interest in ensuring a competitive market for gas in California, *see id.* at 132–33, the interest that the original Court "mandate was designed to protect." *Id.* at 135. Addressing the requirement in the former Rule that the two applicants "be adversely affected by a . . . disposition of property which is in the custody or subject to the control or disposition of the court," 39 F.R.D. at 109 (former Rule 24(a)(3)), the Court held that they were "'so situated' geographically as to be 'adversely affected' within the meaning of [the] Rule . . . by a merger that reduces the competitive factor in natural gas available to Californians," *Cascade*, 386 U.S. at 135.

The third applicant for intervention was Cascade Natural Gas, a retail distributor of gas in Oregon and Washington whose sole supplier, which had been Pacific Northwest, would be the new company created by the divestiture plan. *See id.* at 133. It claimed that the divestiture plan could impair the ability of its supplier to provide Cascade's needs in the future. *See id.* The Court considered Cascade's application to intervene under the present version of Rule 24(a)(2). It baldly proclaimed: "Since the entire merits of the case must be reopened to give California and Southern California Edison an opportunity to be heard as of right as intervenors, we conclude that the new Rule 24(a)(2) is broad enough to include Cascade also." *Id.* at 136.

Because of the absence of any reasoning supporting the *Cascade* holding, "[w]ith an occasional rare exception, both the commentators and the lower courts

-55-

have refused to regard Cascade as significant precedent." 7C Wright et al, *supra,* § 1908, at 265. *But see id.* at 267 ("[C]riticism of Cascade on the ground that the Court's desire to have its mandate carried out caused it to stretch too broadly the concept of 'interest' in new Rule 24(a)(2) seems to strike at the wrong target. If Cascade is to be criticized, it ought to be on the ground that the Court misapplied the concept of adequate representation."). The Court's opinion was hardly an effort to provide a helpful explanation of a new rule. Indeed, it has been suggested that the Court was largely motivated by a desire to reach the substance of the divestiture plan itself, which some Justices thought did not implement their previous mandate. *See id.* at 266 ("It is simple historical fact that a majority of the Court in Cascade were of the view that the decree agreed upon by the Attorney General . . . did not carry out the Supreme Court's mandate when the case had last been before it."); David L. Shapiro, *Some Thoughts on Intervention Before Courts, Agencies, and Arbitrators*, 81 Harv. L. Rev. 721, 729–30, 741–42 (1968).

In contrast, the Supreme Court's second decision considering Rule 24(a)(2), *Donaldson v. United States*, 400 U.S. 517 (1971), explains its reasoning, but the extent to which it relied on Rule 24 alone is uncertain. *Donaldson* concerned a proceeding for judicial enforcement of IRS subpoenas issued to the employer of a taxpayer and the employer's accountant. *See id.* at 518–19. The taxpayer sought to intervene. *See id.* at 521. The Supreme Court affirmed the district court's

denial of intervention.  In addressing Rule 24(a)(2) the Court observed that although Fed. R. Civ. P. 81(a)(3) makes the Rules of Civil Procedure applicable to proceedings to enforce agency subpoenas, "the Civil Rules are not inflexible in this application."  *Id.* at 528.  It noted that Rule 81(a)(3) expressly permits a court to issue an order limiting the application of the Rules in such a case.  *Id.* at 528–29.  It agreed with lower-court decisions that a Supreme Court footnote stating that the Rules apply in IRS summons proceedings, *see United States v. Powell*, 379 U.S. 48, 58 n.18 (1964), "was not intended to impair a summary enforcement proceeding so long as the rights of the party summoned are protected and an adversary hearing, if requested, is made available," *Donaldson*, 400 U.S. at 529.

The *Donaldson* opinion then rejected the taxpayer's argument that he was entitled to intervene under language in *Reisman v. Caplin*, 375 U.S. 440, 445 (1964).  The Court said that *Reisman* had not "pronounce[d], even when confronted with a situation concerning an attorney's work product, that the taxpayer possesses an absolute right to intervene in an internal revenue summons proceeding.  The usual process of balancing opposing equities is called for." *Donaldson*, 400 U.S. at 530.  Particularly because *Reisman* never mentioned Rule 24, it is unclear how much of *Donaldson*'s discussion of *Reisman* is meant to construe that Rule and how much is meant to indicate how the applicability of the Rule is limited in agency-summons-enforcement proceedings.

Accordingly, it is appropriate to keep in mind the special context of *Donaldson* when one reads the language most commonly cited from that opinion in Rule 24(a) cases. That language appeared in the Court's discussion of the specific circumstances of the taxpayer in that case. The Court noted that the taxpayer had no proprietary interest and could assert no privilege in the documents sought from his employer and the employer's accountant. The taxpayer's "only interest—and of course it looms large in his eyes—lies in the fact that those records presumably contain details of [employer-to-taxpayer] payments possessing significance for federal income tax purposes." *Id.* at 530–31. The Court was not impressed by that interest, noting that it was "nothing more than a desire by Donaldson to counter and overcome [the employer's and its accountant's] willingness, under summons, to comply and produce records." *Id.* at 531. The Court found it significant "that the material in question . . . would not be subject to suppression if the Government obtained it by other routine means," such as voluntary disclosure by the employer or by analysis of deductions included in the employer's tax returns. *Id.* Thus,

> [t]his interest cannot be the kind contemplated by Rule 24(a)(2) when it speaks in general terms of "an interest relating to the property or transaction which is the subject of the action." What is obviously meant there is a significantly protectable interest. And the taxpayer, to the extent that he has such a protectable interest, as, for example, by way of privilege, or to the extent he may claim abuse of process, may always assert that interest or that claim in due course at its proper place in any subsequent trial.

We therefore hold that the taxpayer's interest is not enough and is not of sufficient magnitude for us to conclude that he is to be allowed to intervene.

*Id.* (citation omitted). The next sentence of the opinion, however, again suggests that the Court's analysis is limited to agency-summons-enforcement proceedings: "Were we to hold otherwise, as [the taxpayer] would have us do, we would unwarrantedly cast doubt upon and stultify the Service's every investigatory move." *Id.*

Given the ambiguities of *Cascade* and *Donaldson*, it is not surprising that the circuit courts of appeals have struggled to reach a definitive interpretation of Rule 24(a)(2). *See* 7C Wright et al., *supra*, § 1908, at 270 ("[A]ny attempt to extrapolate from Cascade or from Donaldson, and to deduce from those cases rules applicable to ordinary private litigation, is fraught with great risks."). In particular, the notion of "interest" has proved murky. *See* 6 James Wm. Moore et al., Moore's Federal Practice § 24.03[2][a], at 24-30 (3d ed. 2006) ("Courts have adopted a variety of approaches and a wide range of terminology in discussing the issue of interest."). As one treatise has put it,

> There is not as yet any clear definition, either from the Supreme Court or from the lower courts, of the nature of the "interest relating to the property or transaction which is the subject of the action" that is required for intervention of right. Indeed, it may well be, as some courts have suggested, that this is a question not worth answering.

7C Wright et al., *supra*, § 1908, at 263 (quoting Fed. R. Civ. P. 24(a)).

One formulation that has achieved considerable currency, and which the concurring opinions would follow, is that the interest must be "'direct, substantial, and legally protectable.'" *Utah Ass'n of Counties v. Clinton*, 255 F.3d 1246, 1251 (10th Cir. 2001) (quoting *Coalition of Ariz./N.M. Counties for Stable Econ. Growth*, 100 F.3d 837, 840 (10th Cir. 1996)). We will refer to this formulation as the "DSL" test. The DSL test, or at least its "direct" and "legally protectable" components, is problematic. Whether an interest is direct or indirect could be a matter of metaphysical debate because almost any causal connection can be represented as a chain of causation in which intermediate steps separate the initial act from the impact on the prospective intervenor. Indeed, early in this circuit's consideration of Rule 24(a)(2), we wrote, "Strictly to require that the movant in intervention have a *direct* interest in the outcome of the lawsuit strikes us as being too narrow a construction of Rule 24(a)(2)." *Natural Res. Def. Council v. U.S. Nuclear Regulatory Comm'n*, 578 F.2d 1341, 1344 (10th Cir. 1978).

The term *legally protectable interest* is perhaps even more malleable. It appears, albeit in slightly different form, in jurisprudence concerning the requirements of Article III standing. The Supreme Court has stated that a plaintiff has such standing only if it has suffered "an invasion of a legally protected interest." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). But as we recently wrote, "The term *legally protected interest* has generated some

confusion" in the standing context. *In re Special Grand Jury 89-2*, 450 F.3d 1159, 1172 (10th Cir. 2006); *see Smuck v. Hobson*, 408 F.2d 175, 178 (D.C. Cir. 1969) (Bazelon, C.J., plurality opinion) ("The effort to extract substance from the conclusory phrase 'interest' or 'legally protectable interest' is of limited promise.").

Furthermore, the DSL test misses the point. The central concern in deciding whether intervention is proper is the practical effect of the litigation on the applicant for intervention. Sometimes the DSL test captures that concern. Certainly when no one could dispute that the applicant's interest is direct, substantial, and legally protectable, intervention is highly likely to be proper (subject, of course, to Rule 24(a)'s other requirements). But the test is not particularly helpful otherwise. And, as we shall see, courts that pay lip service to the DSL test regularly manage to manipulate (ignore?) the language to reach the result required by practical considerations. In our view, a court's analysis is best served by avoiding formulations that only encourage manipulation or wooden logic.

It is worth exploring the provenance of the DSL test. We might feel ourselves obligated to try to apply it if the origin were of sufficient authority. As it turns out, however, the test has a questionable pedigree. It does not come from the Rule itself or a Supreme Court decision interpreting Rule 24(a); recall that *Donaldson* spoke only of a "significantly protectable interest," 400 U.S. at 531.

Rather, it comes from a district-court opinion whose reasoning was rejected on appeal. The district court had entered a desegregation order against the District of Columbia schools. *See Hobson v. Hansen*, 269 F. Supp. 401, 517 (D.D.C. 1967). When the D.C. Board of Education elected not to appeal the order, the former superintendent of schools and a group of parents of public-school children sought to intervene under Rule 24(a) to challenge the specifics of the order. *See Hobson v. Hansen*, 44 F.R.D. 18, 20–22 (D.D.C. 1968) (Circuit Judge Wright, sitting by designation). The district court declared that the 1966 changes to Rule 24(a) had not "effected a change in the kind of interest required." *Id.* at 24. Then, although having noted that "[f]ew [pre-1966] cases have focused on the kind of interest required by Rule 24 . . . [because t]ypically, the question of interest was subsumed in the questions of whether the petitioner would be bound or of what was the nature of his property interest," *id.* at 22, it stated, "Still required for intervention is a direct, substantial, legally protectable interest in the proceedings," *id.* at 24. Struggling to reconcile its analysis with the year-old decision by the Supreme Court in *Cascade*, the court wrote, "For though Cascade's interest in the decree may have been somewhat remote, it did show a strong, direct economic interest, for the new company [created by the consent decree] would be its sole supplier." *Id.* at 25. That struggle could be deemed successful only if one accepts a quite loose meaning for *direct* and *legally protectable*. This attempt to bring *Cascade* within the DSL test would have been

the first example of a court's distorting the language of the DSL test to justify a (preordained) result.

Moreover, the result reached by the first holding under the DSL test is questionable. The district court determined that neither the parents nor the former superintendent had shown a sufficient interest to support intervention, *id.* at 25–29, although it nevertheless granted intervention "in order to give the Court of Appeals an opportunity to pass on the intervention questions raised here, and the questions to be raised by the appeal on the merits if it finds the intervention was properly allowed," *id.* at 33. We note that later appellate courts have regularly differed from the district court in *Hobson* and acknowledged that parents have the interest required by Rule 24(a) to intervene as of right in opposing discrimination suits against school districts. *See Morgan v. McDonough*, 726 F.2d 11, 12–14 (1st Cir. 1984); *Johnson v. San Francisco Unified Sch. Dist.*, 500 F.2d 349, 353 (9th Cir. 1974); *United States v. Bd. of Sch. Comm'rs*, 466 F.2d 573, 574–75 (7th Cir. 1972). *But see United States v. Franklin Parish Sch. Bd.*, 47 F.3d 755, 756–57 (5th Cir. 1995).

Most striking about the pedigree of the district court's test in *Hobson* is that it was rejected on appeal. *See Smuck*, 408 F.2d 175. The circuit court permitted the parents to intervene, at least to the extent that the district court's order limited the discretion of the school board. *See id*. at 178-80. The three dissenters, including future Chief Justice Burger, did not address intervention; but

they implicitly accepted intervention because the sole appellants were prospective intervenors and the dissenters would have remanded the case to the district court with instructions to vacate the decree. *See id.* at 194 (Danaher, J., dissenting). Writing for three of the four members of the majority on this point (the fourth member would have denied intervention), Judge Bazelon interpreted Rule 24(a) differently than the district court. The plurality opinion concluded that the parents had a sufficient interest under Rule 24(a)(2) to attack the district-court decree to the extent that it limited the school board's discretion. *See id.* at 178. (The court found that some parts of the decree "d[id] not materially limit the discretion of the School Board." *Id.* at 177.) The plurality's analysis of Rule 24(a) has been influential and will be discussed further below. At this juncture it suffices to note that the opinion rejected the district court's approach, stating that "[t]he effort to extract substance from the conclusory phrase 'interest' or 'legally protectable interest' is of limited promise." *Id.* at 178. Thus, the DSL test did not survive the case in which it was first expressed.

This is not to say that it is error for a court addressing an application for intervention to consider whether the prospective intervenor's interest is direct, substantial, and legally protectable. As we previously stated, an interest that clearly satisfies all these conditions would likely justify intervention. *See* 7C Wright, et al., *supra*, § 1908, at 272 (requirement that an interest be direct, substantial, and legally protectable is best considered a test "of inclusion rather

-64-

than exclusion.  If there is a direct substantial legally protectable interest in the proceedings, it is clear that this requirement of [Rule 24(a)(2)] is satisfied").  But other interests may also suffice. "[T]he interest test is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Coalition*, 100 F.3d at 841 (internal quotation marks omitted).  This view best reflects the purpose of Rule 24(a)(2). As the Advisory Committee Notes to the 1966 Amendment state, "If an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene . . . ."  Fed. R. Civ. P. 24, advisory committee notes (1966 Amendment); *see* Comm. on Rules of Practice and Procedure, Report, Ex. B, *supra* ("The effect of the amendment [to Rule 24] is to provide that if a person who would be affected *in a practical sense* by the disposition of an action is not joined as a party, he has a right to intervene unless he is adequately represented by an existing party.")*;* Mem. from Benjamin Kaplan & Albert M. Sacks (Reporters) to the Advisory Committee on Civil Rules at FF-1, Intervention of Right (Rule 24(a) (Apr. 21, 1965) (on file with the Administrative Office of the United States Courts) (same); *see also* 6 Moore et al., *supra*, §24.03[1][c], at 24-26 ("Although each of the requirements [of Rule 24(a)(2)] involves distinct issues . . . , all . . . address the same basic question: Will denial of intervention have a significant enough effect on the applicant?").

As we understand Rule 24(a)(2), the factors mentioned in the Rule are intended to capture the circumstances in which the practical effect on the prospective intervenor justifies its participation in the litigation. Those factors are not rigid, technical requirements. It is worth recalling that in *Donaldson*, after rejecting the taxpayer's contention that he had "an absolute right to intervene in any internal revenue summons proceeding," the Supreme Court remarked, "The usual process of balancing opposing equities is called for." *Donaldson*, 400 U.S. at 530. To be sure, as we have noted, it is unclear how much *Donaldson* relies on Rule 24(a)(2) and how much it relies on the Court's authority to limit the application of the Federal Rules in summons proceedings; but the Court certainly seems to be saying that the determination of a party's right to intervene is, at least in part, a process of equitable balancing.

The leading treatises on the subject appear to share a similar reading of Rule 24(a)(2). One states:

> The inquiry required under Rule 24(a)(2) is a flexible one, and a practical analysis of the facts and circumstances of each case is appropriate. Although each of the three criteria is independent, practical application of Rule 24(a)(2) involves a balancing and blending of the independent components. The three criteria are not analyzed in a vacuum and, instead, are often applied as a group.
> The criteria should be considered together rather than discretely. Intervention should be granted of right if the interests favoring intervention outweigh those opposed. For example, a lesser showing of impairment may be required by the court if the applicant's interest is very strong. Likewise, intervention of right may be granted if the applicant's claimed interest may be significantly impaired by the action, even if some uncertainty exists

regarding the sufficiency of that interest. The inquiry under Rule 24(a)(2) must focus on the particular facts and procedural posture of each application.

6 Moore et al., *supra*, § 24.03[1][b], at 24-25 (footnotes omitted). *But see id.* § 24.03[2][a], at 24-26 to -27 (appearing to endorse DSL test). The other treatise quotes approvingly from Judge Bazelon's opinion in *Smuck*:

> "In determining whether . . . circumstances [justifying intervention] are present, the first requirement of Rule 24(a)(2), that of an 'interest' in the transaction, may be a less useful point of departure than the second and third requirements, that the applicant may be impeded in protecting his interest by the action and that his interest is not adequately represented by others.
>
> This does not imply that the need for an 'interest' in the controversy should or can be read out of the rule. But the requirement should be viewed as a prerequisite rather than relied upon as a determinative criterion for intervention. If barriers are needed to limit extension of the right to intervene, the criteria of practical harm to the applicant and the adequacy of representation by others are better suited to the task. If those requirements are met, the nature of his "interest" may play a role in determining the sort of intervention which should be allowed—whether, for example, he should be permitted to contest all issues, and whether he should enjoy all the prerogatives of a party litigant."

7C Wright et al., *supra*, § 1908, at 285 (quoting *Smuck*, 408 F.2d at 179–80); *see id.* at 288 (describing Judge Bazelon's opinion as "full and discriminating examination of the rule").

In light of the pragmatic concerns that gave birth to the 1966 amendment to Rule 24(a), it would be a step backwards to read the Rule's present language in an overly technical manner. After all, it was the Supreme Court's pre-1966 decision reading the word *bound* in the rule in its technical res judicata sense that

convinced the rulemakers of the need for new language and new commentary. *See* Fed. R. Civ. P. 24 advisory committee notes (1966 Amendment) (discussing *Sam Fox*, 366 U.S. 683). "[I]n applying Rule 24(a)(2) courts should 'not make a fortress of the dictionary' but rather should 'apply the rule with thoughtful consideration of the objectives it is intended to serve.'" *United States v. Hooker Chems. & Plastics Corp.*, 749 F.2d 968, 983 (2d Cir. 1984) (Friendly, J.) (quoting 7A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1904, at 474 (1st ed. 1972), now at 7C Wright et al., *supra*, § 1904, at 239 (2d ed. 1986)).

It is worth noting that even those circuits that pay lip service to the DSL test often recognize, explicitly or implicitly, that it must yield to pragmatic concerns. To give a few examples: The Ninth Circuit opinion cited in Judge Kelly's concurrence (the Rule 24 concurrence) as showing that circuit's adoption of the DSL test states: "The 'interest' test is not a clear-cut or bright-line rule, because no specific legal or equitable interest need be established. Instead, the 'interest' test directs courts to make a practical, threshold inquiry, and is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *So. Cal. Edison Co. v. Lynch*, 307 F.3d 794, 803 (9th Cir. 2002) (citations, brackets, and internal quotation marks omitted). This is the same circuit that has adopted "a virtual *per se* rule that the sponsors of a ballot initiative have a

-68-

sufficient interest in the subject matter of the litigation to intervene pursuant to Fed. R. Civ. P. 24(a)," without exerting an effort to explain what the sponsors' "legally protectable interest" is. *Yniguez v. Arizona*, 939 F.2d 727, 735 (9th Cir. 1991), *vacated sub nom*, *Arizonans for Official English v. Arizona*, 520 U.S. 43 (1997).

In another circuit that the Rule 24 concurrence identifies as having adopted the DSL test, the Seventh, at least two opinions have granted intervention as of right without identifying how the qualifying interest was legally protectable. In *Illinois v. Sarbaugh*, 552 F.2d 768 (7th Cir. 1977), the court permitted corporations that had been indicted (and then pleaded nolo contendre) to intervene to oppose the State's motion for disclosure of grand jury transcripts for a civil suit. Noting that Fed. R. Civ. P. 6(e) at that time said nothing about who could object to disclosure of grand-jury materials, the court said simply: "[T]he intervenors have an interest sufficient to satisfy the requirement of standing and to entitle them to intervene. . . . Indicted persons now defending a civil action involving the same facts are . . . among those who would be adversely affected by disclosure of the information, and therefore should have a right to be heard." *Id*. at 773. Later, in *Security Insurance Co. of Hartford v. Schipporeit, Inc.*, 69 F.3d 1377 (7th Cir. 1995), the court permitted a church suing an architect to intervene in a suit by the architect's insurer for a declaratory judgment that it had no obligation to defend or indemnify the architect, whose only significant asset was

the insurance policy, *see id*. at 1380.  After reciting the DSL test the court wrote,

"Whether an applicant has an interest sufficient to warrant intervention as a

matter of right is a highly fact-specific determination, making comparison to

other cases of limited value."  *Id*. at 1381.  Without bothering to identify the

church's legally protectable interest, it went on:

> [The insurer] opposed [the church's] petition to intervene because it
> wanted a quick, unopposed adjudication that it had no obligation to
> defend or indemnify [the architect].  And [the insurer], it seems, was
> on the verge of obtaining that result.   It wanted to play the
> Washington Generals and get out of town with a quick win.  The
> district court wisely allowed a more worthy opponent to get into and
> onto the court.

*Id*.  As a practical matter, intervention of the church was clearly proper.  The DSL

test would hamper, rather than facilitate, the analysis.  Why go through the

contortions of trying to explain how the church's interest in whether the architect

had insurance coverage was direct (after all, insurance coverage would be

irrelevant if the church lost its suit against the architect) or legally protectable?

Similarly, the Eighth Circuit opinion cited in the Rule 24 concurrence as

adopting the DSL test also noted that two controlling circuit precedents had held

that "an interest in protecting property values was a protectable interest . . . [and]

an interest in maintaining market values in the proposed intervenors' homes was

sufficient to support intervention."  *United States v. Union Elec. Co.*, 64 F.3d

1152, 1161 (8th Cir. 1995) (internal quotation marks omitted).  Of particular

interest is the court's description in the second of those precedents of the holding

in the first:

> In *Planned Parenthood of Minnesota, Inc. v. Citizens for Community Action*, 558 F.2d 861 (8th Cir. 1977), for example, a group of homeowners was allowed to intervene in an action involving the constitutionality of a municipal ordinance which placed a temporary moratorium on the operation of abortion clinics. The potential loss in the market value of the intervenors' homes constituted a sufficient "interest" under Rule 24(a)(2) even though three events would have had to take place before the homeowners experienced any actual loss: (1) the city had to lose the court fight on the constitutionality of the ordinance, (2) the abortion clinic had to open, and (3) the clinic's operation had to lead to a reduction in the homeowners' property values.

*SEC v. Flight Transp. Corp.*, 699 F.2d 943, 948 (8th Cir. 1983). We doubt that

such an interest would, in common parlance, be considered "direct."

The Fifth Circuit case cited by the Rule 24 concurrence also illustrates the

difficulty posed by trying to apply the DSL test. That court's recitation of the

DSL test was followed by the statement, "Despite these requirements, we have

observed that the interest test is primarily a practical guide to disposing of

lawsuits by involving as many apparently concerned persons as is compatible with

efficiency and due process." *Ross v. Marshall*, 426 F.3d 745, 757 (5th Cir. 2005)

(internal quotation marks omitted). It then permitted an insurer to intervene to

appeal a judgment against its insured. The court observed that "an insurer has a

financial stake in securing a favorable outcome for its insured in a lawsuit

alleging potentially covered claims," *id.*; and it noted that an insurer may have a

-71-

contractual right to take over the defense, although it made no mention of such a policy provision in that case, *see id.* at 757–58. The court also recognized that "some contingency remains in that [the insurer] may still avoid liability if it prevails in its coverage action, [but] we find this contingency insufficient to preclude intervention." *Id.* at 759. The court appeared more interested in practical matters than in parsing the terms *legally protectable* and *direct.*

As for our own circuit, we need point only to *Natural Resources Defense Council*, 578 F.2d 1341. We reversed denial of intervention under Rule 24(a)(2) to Kerr-McGee Nuclear Corporation, an operator of a New Mexico uranium mill, and the American Mining Congress, an industry group. The litigation concerned whether a license could be granted to United Nuclear Corporation without prior issuance of a governmental environmental impact statement (EIS). Under regulation by the State of New Mexico, to which the Nuclear Regulatory Commission (NRC) had delegated authority, no statement was required; but absent such delegation, federal law would have required one. The Natural Resources Defense Council sought a declaration either that a statement was required despite the delegation to the state or that the state program violated federal law. The concern of the applicants for intervention was that either an EIS would be required before any future license would be granted for a New Mexico uranium mill or the state's agreement with the NRC would be ended. We recognized that the pending litigation would have no res judicata effect on the

applicants but said that "the court is not limited to consequences of a strictly legal nature. . . . [T]he stare decisis effect might be sufficient to satisfy the requirement." *Id.* at 1345. We failed to identify any interest of the intervenors as being "legally protectable."

Finally, we note a decision of the District of Columbia Circuit. Although that circuit has not adopted the DSL test, the circumstances addressed in *Nuesse v. Camp*, 385 F.2d 694 (D.C. Cir. 1967), pose a particular challenge to advocates of the test. The court in that case permitted the Wisconsin banking commissioner to intervene in a suit by a Wisconsin bank against the United States Comptroller of the Currency to prevent the opening of a branch of a national bank near the state bank. One wonders what the commissioner's legally protectable interest was, yet the importance of the commissioner's intervention is made clear by the opinion.

In short, Rule 24(a)(2), though speaking of intervention "of right," is not a mechanical rule. It requires courts to exercise judgment based on the specific circumstances of the case. *See Clinton*, 255 F.3d at 1251 (noting that application of the interest requirement of Rule 24(a) is "highly fact-specific" (internal quotation marks omitted)). As a result, one must be careful not to paint with too broad a brush in construing Rule 24(a)(2). The applicant must have an interest that could be adversely affected by the litigation. But practical judgment must be applied in determining whether the strength of the interest and the potential risk

of injury to that interest justify intervention.  We cannot produce a rigid formula that will produce the "correct" answer in every case.  The law can develop only incrementally, as each opinion, while focusing on the language and purpose of the Rule, addresses the considerations important to resolving the case at hand.

We now turn to SUWA's application to intervene.  No party has suggested that our review is other than de novo, so we apply that standard of review.  *See City of Stilwell, Okla. v. Ozarks Rural Elec. Coop. Corp.*, 79 F.3d 1038, 1042 (10th Cir. 1996).  *But see Maine v. Dir., U.S. Fish & Wildlife Serv.*, 262 F.3d 13 (1st Cir. 2001) (applying abuse-of-direction review).  SUWA's concern in this case is the potential damage to the environment arising from vehicular traffic in Salt Creek Canyon.  It claims that its members "regularly visit Canyonlands National Park—and Salt Creek Canyon in particular—for conservation, aesthetic, scientific and recreational purposes."  Aplt. Supp. Br. at 4.  It has been a determined advocate for restricting vehicular access to Salt Creek Canyon, engaging in extensive, and successful, litigation to restrict that traffic.  *See San Juan County*, 420 F.3d at 1201–03; *S. Utah Wilderness Alliance v. Nat'l Park Serv.*, 387 F. Supp. 2d 1178, 1182–84 (D. Utah 2005).  Indeed, it was SUWA's previous litigation that led to the 1998 closure to vehicular traffic of Salt Creek Canyon above Peekaboo Spring and played some role in the NPS's June 15, 2004, closure order.  *See* 69 Fed. Reg. at 32,871–72 (adopting closure order and

recounting earlier litigation involving SUWA); *see also San Juan County*, 420 F.3d at 1202.

We think it indisputable that SUWA's environmental concern is a legally protectable interest. After all, it was this concern that gave it standing to bring its litigation against the NPS regarding Salt Creek Road. *See Lujan*, 504 U.S. at 562-63 ("[T]he desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing."); *Sierra Club v. Morton*, 405 U.S. 727, 734–35 (1972) (plaintiff would have standing to challenge road development because of impact on scenery and wildlife if it or its members would be significantly affected by the development); *Sierra Club v. U.S. Dep't of Energy*, 287 F.3d 1256, 1265–66 (10th Cir. 2002) (environmental group has standing to challenge grant of easement).

Moreover, SUWA's interest is "relat[ed] to the property or transaction which is the subject of the [quiet-title] action" and "the disposition of the action may as a practical matter impair or impede [SUWA's] ability to protect that interest." Fed. R. Civ. P. 24(a)(2). As we have already noted, the litigation here proceeds directly from SUWA's earlier advocacy of its interest. Following our remand in *Southern Utah Wilderness Alliance v. Dabney*, 222 F.3d 819, 822, 829 (10th Cir. 2000)*,* SUWA joined the County and the State as defendants in that litigation so that, as the district court later explained, "the R.S. 2477 issue could be resolved." Aplt. Add. at 2 (Order, Jan. 15, 2003). After the district court held

that it lacked jurisdiction to decide whether the County and the State held a perfected R.S. 2477 right-of way and the NPS permanently prohibited motor vehicles in Salt Creek Canyon above Peekaboo Spring, *see* 69 Fed. Reg. at 32,871, the County filed this action but did not name SUWA as a defendant. The quiet-title claim may well affect vehicular traffic on the road. In particular, it cannot be doubted that if the County prevails, it will then pursue opening the road to vehicular traffic that SUWA has been trying to prevent. The County's quiet-title claim alleges that the NPS's "acts have wrongfully denied [the County] and the public the use of the Salt Creek road." Aplt. App. at 17.

Of course, if the R.S. 2477 claim is rejected, the litigation will not injure SUWA's interests. But, unlike the Rule 24 concurrence, *see* Op. (Kelly, J., concurring) at 2, we think that this possibility is irrelevant. Otherwise, every application to intervene on the side of one of the parties would be rejected on the ground that the aligned party might win (and the applicant's interest would hence not be injured). The purpose of intervention is to increase the likelihood of that victory.

We also disagree with that concurrence's apparent view, *see id*., that SUWA is not entitled to intervene because its interests may not be injured even if the County and the State prevail. The issue is the *practical* effect of a judgment in favor of the County and the State, not the *legally compelled* effect. It is enough that the County and the State will pursue opening to vehicular traffic any

-76-

right-of-way that they obtain.  Courts regularly grant applications for intervention on the ground that the result of the litigation could affect which decisionmaker would resolve a matter concerning the applicant, even though it is far from certain that the applicant's preferred decisionmaker would act more favorably toward the applicant than the alternative decisionmaker.  For example, in *Natural Resources Defense Council*, 578 F.2d 1341, we refused to "suggest that Kerr-McGee could expect better treatment from state authorities than federal," *id*. at 1345; yet we reversed the denial of the company's application to intervene because we recognized that the litigation could result in changing licensing authority from the state to the federal government.  Similarly, in *Smuck*, 408 F.2d 175, the D.C. Circuit permitted parents of school children to intervene to oppose the portions of a district-court order that limited school-board discretion, even though there was room for doubt that the school board (whose membership was about to change and which was not itself challenging the order, *see id*. at 177) would exercise its discretion to do anything different from what was ordered.  *See id*. at 180–81; *see also Little Rock Sch. Dist. v. Pulakis County Special Sch. Dist. No. 1*, 738 F.2d 82 (8th Cir. 1984) (reversing denial of application to intervene by teacher organizations; litigation could result in change of organizations' bargaining partner from present school districts to a consolidated district).

We recognize that SUWA does not claim that it has title to Salt Creek Road, even though this is a quiet-title suit.  But Rule 24(a)(2) does not speak of

"an interest in the property"; rather, it requires only that the applicant for intervention "claim[] an interest *relating to* the property or transaction which is the subject of the action." Fed. R. Civ. P. 24(a)(2) (emphasis added). The SI concurrence appears to suggest that Rule 24 would not warrant SUWA's intervention because SUWA could not qualify as a party bringing a quiet-title claim regarding the road. *See* SI concurrence at 2. An intervenor, however, need not so qualify. Indeed, as the Seventh Circuit has observed, "[T]he strongest case for intervention is not where the aspirant for intervention could file an independent suit, but where the intervenor-aspirant has no claim against the defendant yet a legally protected interest that could be impaired by the suit." *Solid Waste Agency of N. Cook County v. U.S. Army Corps of Eng'rs*, 101 F.3d 503, 507 (7th Cir. 1996). To add just one example, in *Trbovich v. United Mine Workers of America*, 404 U.S. 528 (1972), the Supreme Court determined that a union member could intervene on the side of the Secretary of Labor in the Secretary's action to set aside a union election even though the member could bring no claim himself because the governing statute made suit by the Secretary the exclusive post-election remedy.

Thus, we conclude that SUWA's interest in the environmental impact of Salt Creek Road vehicular traffic satisfies the conditions of Rule 24(a)(2) that it claim "an interest relating to the property or transaction which is the subject of the action and [SUWA] is so situated that the disposition of the action may as a

practical matter impair or impede [its] ability to protect that interest."  This

conclusion is strengthened by our practice of considering the public interests at

stake when weighing the equities.  Our previous decisions under Rule 24(a)(2)

have distinguished between cases that implicate solely private rights and cases

that raise an issue of public interest.  *See* 6 Moore et al*., supra*, § 24.03[2][c], at

24-35 ("The Tenth Circuit . . . follows a very broad interpretation of the interest

requirement with respect to public law issues . . . ." (citing *Clinton*, 255 F.3d at

1251–53, and *Coalition*, 100 F.3d at 840–44)).  If the Supreme Court's one-

sentence holding on present Rule 24(a)(2) in *Cascade Natural Gas Corp. v. El

Paso Natural Gas Co.*, 386 U.S. 129, 136 (1967), tells us nothing else, it is that

the requirements for intervention may be relaxed in cases raising significant

public interests.

We are not persuaded by the Federal Defendants' effort to minimize

SUWA's interest by pointing to the federal government's continuing powers

concerning the road.  They claim that SUWA's interest in the use of Salt Creek

Canyon is "foreign" to this case because "even if title is quieted to San Juan

County, the United States still has authority to manage the use of the right-of-

way."  Aplee. (Fed. Defs.) Supp. Br. at 20.  In support of this assertion, they cite

our decision in *Southern Utah Wilderness Alliance v. Bureau of Land Mgmt.*, 425

F.3d 735, 740 (10th Cir. 2005), presumably for the proposition that

when the holder of an R.S. 2477 right of way across federal land proposes to undertake any improvements in the road along its right of way, beyond mere maintenance, it must advise the federal land management agency of that work in advance, affording the agency a fair opportunity to carry out its own duties to determine whether the proposed improvement is reasonable and necessary in light of the traditional uses of the rights of way as of October 21, 1976, to study potential effects, and if appropriate, to formulate alternatives that serve to protect the lands.

*Id*. at 748. But our discussion in that case related only to federal authority concerning improvements *beyond* maintenance of a previously established right-of-way. *See id*. The retention of some federal control over an R.S. 2477 right-of-way hardly eliminates the impact on SUWA's interest if the County prevails. The Federal Defendants are not contending, and could not contend, that the volume of traffic on Salt Creek Road will be unaffected by the quiet-title action. That is the whole point of the suit. *See* 69 Fed. Reg. at 32,873 ("Should it be . . . determined that the State [or the] County do[es] hold a valid R.S. 2477 right-of-way, the [closure of Salt Creek Road to vehicular traffic] will be revisited to ensure that it is consistent with the rights associated with such a right-of-way."). Furthermore, counsel for the Federal Defendants properly acknowledged at oral argument that even if the NPS retains regulatory authority, a district-court ruling that the County has an easement in Salt Creek Road "may have some impact on what can be regulated."

The Federal Defendants further suggest that SUWA lacks the requisite interest because even if the County and the State prevail on their R.S. 2477

claims, the United States through the power of eminent domain can "retain the right-of-way by paying just compensation." Aplee. (Fed. Defs.) Supp. Br. at 21; *see* 28 U.S.C. § 2409a(b). This argument strikes us as bizarre. Most litigation results could be "reversed" by paying enough. Such a possibility would bar almost all interventions if the Federal Defendants' argument is correct. The argument would make sense only if the United States had *bound* itself to retain the right-of-way should it lose the litigation.

The Appellees also rely on our decision in *Ozarks*, 79 F.3d 1038, to contend that SUWA has only a "contingent" interest in the litigation and that such an interest fails to satisfy Rule 24(a)(2). In that case the City of Stilwell sought to condemn certain distribution facilities owned by Ozarks Rural Electric Cooperative Corporation. *Id.* at 1040. KAMO, a nonprofit rural generation and transmission cooperative, sought to intervene as a matter of right. KAMO supplied electric power at wholesale rates to the 17 member distribution cooperatives, including Ozarks, that owned it. KAMO claimed that it had "a property interest in the subject of the litigation by virtue of its financial ties to Ozarks," and that because of those financial ties, an unfavorable result in the lawsuit could lead to increased costs to KAMO's other consumers. *See id.* at 1042. KAMO's sales of power to Ozarks represented roughly 4.4% of its total sales, or 8% of its Oklahoma revenue, *id.*, and the property subject to annexation by Stilwell accounted for 9.32% of Ozarks' sales revenue in the state, *id.* at 1041.

We said that KAMO "merely ha[d] a contingent interest in the subject of the lawsuit," and held that this interest was "too attenuated" to "satisfy the 'direct and substantial' requirement of Rule 24(a)(2)." *Id.* at 1042.

The decision in *Ozarks* seems correct—given the minimal impact the condemnation could have on KAMO's revenues (9.32% of 8% of its Oklahoma revenue), particular in light of Ozarks' adequate representation of KAMO's interest, *see id.* at 1042–43—but we do not read it to say that every contingent interest fails to satisfy Rule 24(a)(2). After all, the Supreme Court permitted intervention by Cascade, whose interest in the litigation was that it would get a new supplier for its gas which might not be able to meet its needs. *See Cascade*, 386 U.S. at 133, 136. KAMO's problem was that its interest was *too* contingent, *too* indirect, and hardly substantial: it would suffer injury only if an adverse decision (leading to the condemnation of the distribution facilities) would reduce the revenues KAMO received from Ozarks so much as to create substantial increased costs to KAMO's other customers. *See Ozarks*, 79 F.3d at 1042. The likelihood of such a result was simply too speculative. There is nothing speculative about the impact on SUWA's interests if the County prevails in its quiet-title action.

As we said some time ago, "Strictly to require that the movant in intervention have a *direct* interest in the outcome of the lawsuit strikes us as being too narrow a construction of Rule 24(a)(2)." *Natural Res. Def. Council*,

578 F.2d at 1344. We agree with the Eighth Circuit: "Although the intervenor cannot rely on an interest that is wholly remote and speculative, the intervention may be based on an interest that is contingent upon the outcome of the litigation." *Union Elec. Co.,* 64 F.3d at 1162.

Before addressing whether SUWA should be denied intervention because its interests are adequately represented by the Federal Defendants, we note that our discussion thus far is consistent with our precedents denying intervention on which the Appellees rely. In *Allard v. Frizzell*, 536 F.2d 1332 (10th Cir. 1976) (per curiam), we affirmed the denial of an application to intervene as of right by environmental groups seeking to enter an action challenging the constitutionality of the Migratory Bird Act and Eagle Protection Act insofar as it restricted possession of certain feathered artifacts. *Id.* at 1333; *id.* at 1334 n.1 (Holloway, J., concurring in the result). We explained that the applicants could not demonstrate that they had an interest that would be "impeded by the disposition of th[e] action." *See id.* at 1334 (per curiam). We have said nothing here that would require a contrary result.

Likewise, in *Alameda Water & Sanitation District v. Browner*, 9 F.3d 88, 90 (10th Cir. 1993), we affirmed the denial of intervention as of right to environmental groups seeking to intervene to provide the district court the benefit of its views regarding "nonstructural alternatives" to the construction of a dam. But consideration of those alternatives would not have been proper in the district-

court proceeding, which was restricted to the administrative record. *See id.* at 91. We reasoned that "[t]he opportunity to offer extraneous evidence" beyond the issues before the court was not a protectable interest, and that therefore the interest requirement of Rule 24(a)(2) was not satisfied. *See id.* Nothing we have said would contravene the holding that Rule 24(a)(2) does not require intervention as of right for the purpose of presenting only irrelevant argument or evidence.

## B. Adequate Representation

We now address whether SUWA's interest is adequately represented in this litigation by the Federal Defendants. Even if an applicant satisfies the other requirements of Rule 24(a)(2), it is not entitled to intervene if its "interest is adequately represented by existing parties." Fed. R. Civ. P. 24(a)(2).

SUWA claims that "[t]he lack of congruity between [its] focused conservation interests and the government's broader considerations have been evident throughout SUWA's decade-long battle to eliminate vehicle use in Salt Creek." Aplt. Supp. Br. at 21. The Appellees respond that this litigation does not require the government to choose between competing interests; rather, the Federal Defendants' interest in the case is "simply defend[ing the government's] title." Aplee. (Fed. Defs.) Supp. Br. at 26; *see* Aplee. (County) Supp. Br. at 21.

We are persuaded that the Appellees have the better of the argument. SUWA correctly asserts that much precedent states that a prospective intervenor need make only a minimal showing to establish that its interests are not

adequately represented by existing parties.  But those decisions involve

contentions that the government, when it has multiple interests to pursue, will not

adequately pursue the particular interest of the applicant for intervention.

The leading such case is *Trbovich*, 404 U.S. 528.  The Secretary of Labor

was seeking to set aside the election of officers of a union.  When a union

member sought to intervene, the Secretary objected on the ground that he would

adequately represent the member's interest.  The Court disagreed.  It observed

that under the applicable federal statute the Secretary of Labor had duties both to

protect the rights of individual union members against their union and to serve the

"vital public interest in assuring free and democratic union elections that

transcends the narrower interest of the complaining union member."  *Id.* at 539

(internal quotation marks omitted).  "Even if the Secretary is performing his

duties, broadly conceived, as well as can be expected," wrote the Court, "the

union member may have a valid complaint about the performance of 'his

lawyer.'"  *Id.*  In a footnote the Court added:  "The requirement of [Rule 24(a)(2)]

is satisfied if the applicant shows that the representation of his interest 'may be'

inadequate; and the burden of making that showing should be treated as minimal."

*Id.* at 538 n.10.

We have repeatedly adopted this reasoning.  In *National Farm Lines v.

Interstate Commerce Commission*, 564 F.2d 381, 382 (10th Cir. 1977), the

plaintiff challenged the constitutionality of a section of the Interstate Commerce

Act and subordinate regulations. Several representatives of common carriers operating under certificates issued by the Interstate Commerce Commission sought to intervene to defend the statutory scheme. We held that representation by the Interstate Commerce Commission of the applicant's interests was inadequate because "the governmental agency [was] seeking to protect not only the interest of the public but also the private interest of the petitioners in intervention." *Id.* at 384.

We did so again in *Clinton*, 255 F.3d at 1248, a suit challenging the validity of a presidential proclamation establishing a national monument. Environmental organizations sought to intervene. We disagreed with the district court's view that the "'case [was] not about the environment, . . . not about the intervenors' property rights or interests in the monument in question. . . . [but] about the legality of the president's actions in creating the monument.'" *Id.* at 1252. We explained that "the government is obligated to consider a broader spectrum of views, many of which may conflict with the particular interest of the would-be intervenor." *Id.* at 1256. The environmental organizations, we concluded, had "met the minimal burden of showing that their interests may not be adequately represented by the existing parties." *Id.*

This precedent does not apply, however, when interests are aligned. We have stated the general presumption that "representation is *adequate* 'when the objective of the applicant for intervention is identical to that of one of the

parties.'" *Ozarks*, 79 F.3d at 1042 (quoting *Bottoms v. Dresser Indus., Inc.*, 797 F.2d 869, 872 (10th Cir. 1986)); *see id.* ("While [the applicant's] ultimate motivation in this suit may differ from that of [the original party], its objective is identical—to prevent [the city's] condemnation.").

This presumption should apply when the government is a party pursuing a single objective. In *Hooker*, 749 F.2d 968, the United States filed an action against a chemicals-and-plastics corporation and related business organizations for disposal of chemical waste allegedly in violation of federal law. Environmental groups sought to intervene. The Second Circuit, per Judge Friendly, upheld the district court's denial of intervention on the ground that the groups had failed to show inadequate representation of their interests by governments that were already parties (the United States, the State of New York, and the City of Niagara Falls, New York, representing the interests of some groups; and the Province of Ontario representing the interests of others). The court discussed at length the reasons why in that type of suit the representation by the governments should be considered adequate. Much of that reasoning appears to be inapplicable here; but one of the court's observations is particularly apt. The court rejected the argument that the Supreme Court's decision in *Trbovich*, 404 U.S. 528, always imposed only a minimal burden of showing inadequate representation by the government. *See Hooker*, 749 F.2d at 985–87. In *Trbovich*, noted the court, "the Secretary [of Labor had] a duty to serve two distinct

-87-

interests—the individual Union member's interest in the election's outcome and the general public's interest in free and democratic union elections." *Id.* at 986 (internal quotation marks omitted). The case before the Second Circuit was different. "Appellants have not pointed to anything like the conflicting statutory obligations imposed on the Secretary in *Trbovich* to challenge this claim and thus to justify requiring only a 'minimal' burden to show possible inadequate representation." *Id.* at 987.

The Seventh Circuit has spoken to the same effect, although perhaps more emphatically. In *Solid Waste Agency*, 101 F.3d 503, a multicity joint venture brought an action against the Army Corps of Engineers after the Corps denied its permit for a proposed landfill. The village in which the landfill was to be located and a citizens group sought to intervene on the side of the Corps. *See id.* at 504. The appeals court rejected the prospective intervenors' arguments, reasoning that "[w]here the interests of the original party and of the intervenor are identical—where in other words there is no conflict of interest—adequacy of representation is presumed." *See id.* at 508. It noted that the interests of the Corps and the prospective intervenors in the case were "the same: to defeat [the joint venture's] effort to invalidate the denial of the permit." *Id.* The court acknowledged that the Corps' lawyer, the Department of Justice, possessed "additional interests stemming from its unique status as lawyer for the entire federal government." *Id.* But it reasoned that this alone could not be enough to

defeat the presumption of adequate representation, because "then in no case brought or defended by the Department could intervention be refused on the ground that the Department's representation of the would-be intervenor's interest was adequate." *Id.*

Perhaps closest in point is the First Circuit's opinion in *Maine v. Director, U.S. Fish & Wildlife Service*, 262 F.3d 13 (1st Cir. 2001). The State of Maine and several business groups challenged the designation by the Fish and Wildlife Service and the National Marine Fisheries Service (collectively, the Services) of the Atlantic Salmon in part of Maine as an endangered species. *See id.* at 14. Several conservation groups sought to intervene on the side of the Services, contending that because they had previously engaged in litigation with the Services over protection of the salmon, the Services could not adequately represent their interests. *See id.* In rejecting the prospective intervenors' application, the appeals court employed an "assumption, subject to evidence to the contrary, that the government will adequately defend its actions, at least where its interests appear to be aligned with those of the proposed intervenor." *Id.* at 19. As in *Hooker*, the court observed that the case involved "no statutorily imposed conflict" that would undermine the Services' ability to defend the endangered-species designation and the interests of the conservation groups. *Id.* Rather, the Services and the conservation groups shared a "general alignment of interest . . . in upholding the designation." *Id.* at 18. As for the prior litigation

between the Services and the conservation groups, "[a]n earlier adverse relationship with the government does not automatically make for a present adverse relationship," *id.* at 20, especially because the Services had ultimately designated the salmon as endangered "of their own accord," *id.* at 21.

Turning to the present case, the issue before us is whether the Federal Defendants will adequately represent SUWA's interests in the quiet-title action. Although the County's second cause of action (for declaratory relief) appears to go beyond the issue of title, the district court, when denying intervention, stated that "the pleadings define the case in a very narrow fashion . . . the existence or non-existence of a right-of-way and its length and its breadth," Aplt. App. at 198; and the Appellees have likewise defined the scope of the case in their defense of the district court's ruling. We therefore do not address the propriety of intervention with respect to any additional issues that may be raised by the claim for declaratory relief. We hold that on the record before us, SUWA will be adequately represented by the Federal Defendants with respect to the quiet-title claim.

We recognize that SUWA and the NPS have had their differences over the years regarding Salt Creek Road. But when SUWA filed its application to intervene, the Federal Defendants had only a single litigation objective—namely, defending exclusive title to the road—and SUWA could have had no other objective regarding the quiet-title claim. Because SUWA's objective is identical

to the Federal Defendant's sole objective, we presume adequate representation of SUWA's interest by the Federal Defendants. This is not like the situation we found in *Coalition*, 100 F.3d at 845, in which the federal agency was defending a position that it had reluctantly adopted only as a result of litigation by the prospective intervenor. The Federal Defendants have displayed no reluctance, at least so far as the record before us shows, to claim full title to Salt Creek Road. SUWA has provided no basis to predict that the Federal Defendants will fail to present pertinent evidence uncovered by SUWA or an argument on the merits that SUWA would make. *Cf. Maine*, 262 F.3d at 18–20 (affirming denial of intervention even though prospective intervenors would present an argument that the government was highly unlikely to make; argument could be presented by them in capacity of amicus curiae in district court). Contrary to the dissent, Op. (Ebel, J., dissenting) at 9, we are not inclined to infer from the Federal Defendants' opposition to intervention that they will fail to vigorously resist the claim to an RS 2477 right-of-way. Indeed, we think that their assertion that they will adequately represent SUWA's interests in this case is entitled to respect. One of the arts of litigation is keeping matters as simple as possible. We have been instructed from childhood that too many cooks spoil the broth. To oppose another cook in the kitchen is not to oppose the other cook's desire for a superb meal.

Although the Federal Defendants may not wish to exercise their authority as holder of title in the same way that SUWA would wish, the district court did not treat such exercise of authority as being at issue in this litigation when SUWA's application for intervention was rejected. SUWA has given us no reason to believe that the Federal Defendants have any interest in relinquishing to the County any part of the federal title to the road. They may wish to compromise with the County concerning use of the road, but nothing has indicated that they would do so by transferring an easement and the authority that goes with it. And so long as the United States retains title, SUWA can continue with its pursuit of requiring the NPS to conform to federal environmental laws. This litigation, however, did not implicate those laws when the district court denied intervention.

We hold that SUWA did not overcome the presumption that the Federal Defendants would adequately represent its interest. The district court properly denied SUWA's application to intervene as of right.

We note, however, that this denial does not forever foreclose SUWA from intervention. If developments after the original application for intervention undermine the presumption that the Federal Defendants will adequately represent SUWA's interest, the matter may be revisited. *See Maine*, 262 F.3d at 21–22; *Solid Waste Agency*, 101 F.3d at 508–09.

## V.     RULE 24(b) PERMISSIVE INTERVENTION

The district court in this case also denied SUWA's application to intervene permissively under Fed. R. Civ. P. 24(b).  The panel opinion did not address permissive intervention because it held that intervention as of right was required. *See San Juan County*, 420 F.3d at 1213–14.

In its opening supplemental brief on en banc review, SUWA addresses permissive intervention only in an abbreviated footnote.  *See* Aplt. Supp. Br. at 2 n.1 ("SUWA also warrants permissive intervention in this case.  To permissively intervene, a party need not have a direct personal or pecuniary interest in the subject of the litigation.  Accordingly, even if SUWA does not meet the 'legally protectable interest test, permissive intervention should be granted." (citation and internal quotation marks omitted)).  We question whether this is sufficient to require us to address the issue.  *See Norris, a Dover Res. Co. v. NLRB*, 417 F.3d 1161, 1168 (10th Cir. 2005) (issue mentioned but not argued in footnote not adequately briefed); *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1169 (10th Cir. 2002) (argument consisting entirely of conclusory statements and unhelpful citations deemed waived for failure to brief).  In any event, the district court's denial of permissive intervention was not an abuse of discretion.  *See Ozarks*, 79 F.3d at 1043 (reviewing denial of permissive intervention under abuse-of-discretion standard).

## VI.    CONCLUSION

We VACATE the panel decision and AFFIRM the district court's denial of SUWA's application to intervene.  We GRANT Attorney Eric Biber's Motion for Withdrawal.

*No. 04-4260, San Juan County, Utah v. United States, et al.*

**KELLY**, Circuit Judge, joined by **TACHA**, Chief Judge, **PORFILIO**, **O'BRIEN**, **McCONNELL** and **HOLMES**, Circuit Judges, concurring in the judgment:

The court holds that SUWA is not entitled to intervene in this lawsuit, and I agree. However, I do not join the court's discussion of the meaning of "interest" in Fed. R. Civ. P. 24(a), and I respectfully dissent from its conclusion that SUWA has a legally protectable interest in this quiet title action.

This case is a dispute between the federal government and San Juan County over whether the County has a valid right of way over a dirt road in Canyonlands National Park. Although it claims no legal or equitable interest in the title to the land, SUWA seeks to intervene as of right pursuant to Rule 24(a). That rule requires the would-be intervenor to establish "an interest relating to the property or transaction which is the subject of the action . . . ." Id. Under our precedent, the interest at stake must be "direct, substantial, and legally protectable." City of Stilwell v. Ozarks Rural Elec. Coop. Corp., 79 F.3d 1038, 1042 (10th Cir. 1996). In other words, the interest must be one "by which the intervening party is to obtain immediate gain or suffer loss by the judgment which may be rendered between the original parties." Smith v. Gale, 144 U.S. 509, 518 (1892).[1] SUWA's asserted interest is contingent at best because it will be implicated only

---

[1] At 115 years old, this decision may fairly be described as a triple "super-duper precedent." See 151 Cong. Rec. S10168, S10168 (2005) (statement of Sen. Specter).

if (1) the County obtains a favorable ruling and (2) the County later decides to open the road to traffic, a potential decision that cannot be affected by this lawsuit in any way.  See Alameda Water & Sanitation Dist. v. Browner, 9 F.3d 88, 91 (10th Cir. 1993) ("The opportunity to offer extraneous evidence . . . beyond the scope of the narrow issue before the district court, is not an interest protectable in the underlying action.").

Moreover, SUWA's interest is not related to the property rights at stake. The "property" at issue in this case is the title to Salt Creek Road, not the land on which it sits.  The natural reading of "relate" is "to show or establish logical or causal connection between."  Webster's Ninth New Collegiate Dictionary 994 (1991).  There can be no "logical or causal connection between" the interest in land use asserted by SUWA and the dispute over land ownership in this case; a mere change in ownership will have no "practical effect" on the land's use, just as a change in the land's use would not affect the ownership of Salt Creek Road.[2]

---

[2]  In Utah Association of Counties v. Clinton, we permitted SUWA and other environmental groups that had fought to have federal land designated as the Grand Staircase Escalante National Monument to intervene in a lawsuit challenging that designation because "[t]he interest of the intervenor is not measured by the particular issue before the court but is instead measured by whether the interest the intervenor claims is related to the property that is the subject of the action."  255 F.3d 1246, 1252 (10th Cir. 2001).  Their claim was sufficiently related to the property at issue because both the lawsuit and the asserted interest concerned the use of the land.  See id. at 1253 ("The intervenors contend these environmental and conservationist interests would be impaired were the monument to lose its protected status and previous land use plans to be reinstated.") (emphasis added).  However, we have never held that a use interest

(continued...)

Although the court concerns itself with the "practical effect" of this lawsuit on SUWA, I am most concerned about the "practical effect" of the court's interpretation of Rule 24(a) on future intervention cases. Until today, our circuit (along with at least six others[3]) has used a clearly articulated and comprehensible standard for judging a party's entitlement to mandatory intervention.[4] The court

[2](...continued)
is sufficiently related to an ownership lawsuit to mandate intervention. <u>See, e.g.</u>, <u>Ozarks</u>, 79 F.3d at 1042 (holding that a party with an interest in the use of power lines cannot intervene in an eminent domain lawsuit over the ownership of the lines). Indeed, the common law teaches that the opposite is true: to intervene in a quiet title suit under the common law, "the interest must be that created by a claim to or lien upon the property . . . ." <u>Smith</u>, 144 U.S. at 518 (quoting <u>Horn v. Volcano Water Co.</u>, 13 Cal. 62, 70 (1859) (Stephen J. Field, J.)). This long-standing practice should inform our understanding of "relating" in Rule 24(a).

[3] <u>See Person v. New York State Bd. of Elections</u>, 467 F.3d 141, 144 (2d Cir. 2006); <u>Ross v. Marshall</u>, 426 F.3d 745, 757 (5th Cir. 2005); <u>Mt. Hawley Ins. Co. v. Sandy Lake Properties, Inc.</u>, 425 F.3d 1308, 1311 (11th Cir. 2005); <u>S. Cal. Edison Co. v. Lynch</u>, 307 F.3d 794, 803 (9th Cir. 2002); <u>Transamerica Ins. Co. v. Smith</u>, 125 F.3d 392, 396 n.4 (7th Cir. 1997); <u>United States v. Union Elec. Co.</u>, 64 F.3d 1152, 1161 (8th Cir. 1995). Not surprisingly, many states have also utilized this standard. <u>See, e.g.</u>, <u>Brown v. Patel</u>, 157 P.3d 117, 125 (Okla. 2007); <u>In re Adoption of D.M.</u>, 710 N.W.2d 441, 444-45 (S.D. 2006); <u>Sportsmen for I-143 v. Mont. Fifteenth Judicial Dist. Court</u>, 40 P.3d 400, 402 (Mont. 2002); <u>Cohen v. Cohen</u>, 748 So.2d 91, 92 (Miss. 1999); <u>Fisher v. Fisher</u>, 546 N.W.2d 354, 356 (N.D. 1996); <u>Ex parte Reichlyn</u>, 427 S.E.2d 661, 664 (S.C. 1993); <u>State Highway Dep't v. Parsons</u>, 623 So.2d 285, 290 (Ala. 1993); <u>Fairview Gen. Hosp. v. Fletcher</u>, 591 N.E.2d 1312, 1316 (Ohio Ct. App. 1990); <u>Winn v. First Bank of Irvington</u>, 581 S.W.2d 21, 23 (Ky. Ct. App. 1978).

[4] The court suggests that, while other courts have paid "lip service" to the "direct, substantial and legally protectable" standard, they have applied it unevenly. Ct. Op. at 61. Of course, a few case citations cherry-picked from three decades of jurisprudence hardly casts doubt on the test's vitality, especially given that these same courts have continued to articulate and apply it. Moreover, even

(continued...)

-3-

criticizes the standard's "questionable pedigree" and declares it "problematic." Ct. Op. at 60-61 It may not be perfect, but it is preferable to the vague and malleable "practical effect" test the court employs in this case.[5]

Indeed, given the substantial "practical effect" an intervenor may have on litigation, I think it makes good sense to require an intervenor to have a "direct, substantial, and legally-protectable interest" before permitting intervention as of right. Despite the court's assertions to the contrary, see Ct. Op. at 17-20, intervenors may well be full participants in lawsuits.[6] They are given the

---

[4](...continued)
if certain courts in certain cases have "granted intervention as of right without identifying how the qualifying interest was legally protectable," id. at 69, this does not mean that those courts failed to look for (or find) one. Courts are certainly capable of understanding and applying the test without "parsing the terms legally protectable and direct." Id. at 72.

[5] Our "direct, substantial, and legally protectable" test is also more consonant with the "significant protectable interest" requirement articulated in Donaldson v. United States, 400 U.S. 517, 542 (1971). Given that the court offers no defined alternative to our traditional standard, I hope lower courts will continue to employ it. The court's opinion leaves open this possibility. See Ct. Op. at 64 ("This is not to say that it is error for a court addressing an application for intervention to consider whether the prospective intervenor's interest is direct, substantial, and legally protectable.").

[6] Indeed, a "leading treatise" cited by the court has written: "It seems very doubtful . . . that the court has the right to make significant inroads on the standing of an intervenor of right; in particular, it should not be allowed to limit the intervenor in the assertion of counterclaims or other new claims." 7C Wright, Miller & Kane, Fed. Prac. & Proc. § 1922 (2d ed. 1986); see also Cotter v. Mass. Ass'n. of Minority Law Enforcement Officers, 219 F.3d 31, 36 n.2 (1st Cir. 2000) (citing Wright & Miller and noting that "the extent to which such conditions may be imposed [is] unclear").

opportunity to make arguments, present evidence, register objections, and appeal adverse decisions. Furthermore, an intervenor in a quiet title action seeking to maintain the land's current use has every incentive to use its participation to postpone a final decision on the merits, thereby prolonging its use at the expense of the parties' need to have a final adjudication of the title.[7] In light of the significant costs of permitting intervention in a case like this, a party that simply fears the "practical effect" of a lawsuit is deserving of the more limited (but still significant) participation available to an amicus curiae.

Accordingly, I conclude that SUWA has not asserted "an interest relating to the property . . . which is the subject of the action," and I concur in the court's judgment that SUWA is not entitled to intervene as of right under Fed. R. Civ. P. 24(a). I also agree with Judge McConnell's conclusion that intervention in this case is barred by sovereign immunity, and I join his concurrence in full. As a result, it is not necessary in my view to reach the question of adequate representation.

---

[7] I do not mean to suggest that SUWA has engaged in delaying tactics in this lawsuit, but the potential for abuse is very real. Moreover, even SUWA's non-abusive appeals have had the "practical effect" of delaying the resolution of this lawsuit for three years. Given that SUWA has no asserted interest in the title to the land at issue, this delay is unwarranted.

04-4260, *San Juan County, Utah v. United States, et al.*

**MCCONNELL**, J., joined by **TACHA**, C.J., and **PORFILIO**, **KELLY**, **O'BRIEN**, and **HOLMES**, JJ., concurring in the judgment.

I share the majority's ultimate conclusion that the district court correctly denied SUWA's motion to intervene, but do not agree with its reasoning.

## I. SUWA LACKS THE LEGAL INTEREST NECESSARY TO INTERVENE UNDER RULE 24(A)

The proposed intervenors unquestionably have the interest and expertise to contribute meaningfully to judicial deliberations in this case. The issue, though, is whether they have legal interests relating to the litigation such that they should be admitted as *parties*, and not merely as amici curiae. The principal difference between party and amicus status is that only parties ordinarily have the right to raise new issues, oppose settlements, appeal, and file petitions for certiorari. While amici have the right to make arguments, only parties can avail themselves of judicial power to compel action by other parties, either inside or outside the litigation.

In administrative, constitutional, and other public law litigation, we have become accustomed to wide-ranging interest-group participation and the distinction between amici and parties is somewhat blurred. This tradition of broadly inclusive public law litigation helps explain why this Circuit has taken a "liberal line" toward intervention, *Utah Ass'n of Counties v. Clinton*, 255 F.3d 1246, 1249 (10th Cir. 2001) (internal quotation marks omitted), and is what

makes the majority's conclusion that SUWA has an "interest relating to" the subject of this litigation seem even remotely plausible.

But this is not ordinary public law litigation. This is a case about title to real property. Whatever may be the rules for intervention in proceedings about how national park land should be administered, it is hard to see how SUWA (or its off-road vehicle user counterparts, who are waiting in the wings to intervene on the same legal theory that supports SUWA's intervention, *see* San Juan County's Pet. for Reh'g En Banc 3) can be considered a *party* to the question of what real property the United States owns, or whether the United States granted an easement to San Juan County decades ago. SUWA may wish or hope that the United States owns unfettered title to this beautiful stretch of canyon country so that statutory protections will apply, and ATV users may wish or hope that San Juan County obtained a transportation right-of-way to enable them to travel through it, but neither interest group has a *right*—a legally protectable interest—one way or the other. As citizens and users, SUWA's members have enforceable statutory rights regarding how the land is administered *if* the United States owns the land, but they have no legal rights regarding *whether* the United States owns the land. Indeed, the majority admits that this lawsuit "concern[s] only the relative rights of the County, the State, and the United States in Salt Creek Road." Maj. Op. 19. Logically, that should be the end of the matter. I therefore join Judge Kelly's concurring opinion, to the extent it holds that SUWA

-2-

lacks the legal interest necessary to intervene in a case involving solely the question of real property ownership.[1]

## II. SOVEREIGN IMMUNITY BARS INTERVENTION BY A PARTY OUTSIDE THE TERMS OF THE QUIET TITLE ACT

The real answer to the problem in this case, however, lies outside Rule 24(a), in the Quiet Title Act, 28 U.S.C. § 2409a. Indeed, I worry that in our attempt to avoid cluttering this action with non-parties, we may inadvertently announce rules for 24(a) intervention that are too stringent for other contexts. Rather than apply general principles of intervention to this case as if it were ordinary public law litigation, we should—indeed, must—apply the specific principles applicable to lawsuits in which the title of the United States to real property is at issue. The Quiet Title Act is a limited waiver of sovereign immunity to permit suits against the United States only by parties claiming legal title to property also claimed by the United States. In contrast to Rule 24(a), which allows intervention by "anyone" who claims an interest "relating to" the property (and meets the other qualifications), the Quiet Title Act limits suits to parties who claim a right, title, or interest "in the real property," 28 U.S.C. §

---

[1] As explained below, I conclude that the motion for intervention should be dismissed on jurisdictional grounds. However, because the Court reaches the merits of the motion to intervene, I do so as well. *See Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1105 n.1 (10th Cir. 2006) (en banc) (Tacha, C.J., dissenting on jurisdictional grounds but concurring on the merits). Because SUWA lacks the legal interest necessary to intervene, there is no need to decide whether any interests it may have are adequately represented by the United States.

2409a(d). The narrower terms of the immunity waiver must take precedence over the broader terms of the Rule. I thus conclude that SUWA's motion to intervene should have been denied on the ground that the district court lacks jurisdiction to expand the scope of a Quiet Title Act case to include parties other than those authorized by the Act.

**A. Our Jurisdiction To Consider the Issue**

The United States contends that its sovereign immunity prohibits SUWA's intervention in this case. Federal Appellees' Supp. Reply Br. on Rehearing En Banc 7–10. "When the United States consents to be sued, the terms of its waiver of sovereign immunity define the extent of the court's jurisdiction." *United States v. Mottaz*, 476 U.S. 834, 841 (1986). Thus, even though the government raised this issue late in the litigation, it is not an argument that this Court may ignore or treat as waived. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998) ("The requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'") (quoting *Mansfield, C. & L.M.Ry. Co. v. Swan*, 111 U.S. 379, 382 (1884)); *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982) ("Subject matter jurisdiction . . . is an Art. III . . . requirement . . . . [A] party does not waive the requirement by failing to challenge jurisdiction early in the proceedings."). As this Court noted in *Neighbors for Rational Development v. Norton*, because the federal government's

-4-

sovereign immunity argument under the "Quiet Title Act . . . involves subject matter jurisdiction, we begin there." 379 F.3d 956, 960 (10th Cir. 2004).

### B. Merits of the Issue

The Supreme Court has long recognized that the United States enjoys immunity from suit unless Congress explicitly and unequivocally waives that immunity by statute. *Lane v. Pena*, 518 U.S. 187, 192 (1996); *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 411–12 (1821). And even when the United States does waive its sovereign immunity, that waiver is to be "strictly construed, in terms of its scope, in favor of the sovereign." *Lane*, 518 U.S. at 192; *see also Library of Congress v. Shaw*, 478 U.S. 310, 318 (1986) ("[W]e must construe waivers strictly in favor of the sovereign, and not enlarge the waiver beyond what the language requires." (internal citations and quotation marks omitted)); *United Tribe of Shawnee Indians v. United States*, 253 F.3d 543, 547 (10th Cir. 2001). In other words, we are to "constru[e] ambiguities in favor of immunity." *United States v. Williams*, 514 U.S. 527, 531 (1995). Consequently, where a statute can plausibly be read not to waive an aspect of the government's immunity, the Court must adopt that reading. *United States v. Nordic Village, Inc.*, 503 U.S. 30, 37 (1992); *see also U.S. Dep't of Energy v. Ohio*, 503 U.S. 607, 627 (1992).

This does not mean that rules of procedure never apply in suits against the government unless they were expressly incorporated in the waiver statute. The Supreme Court has distinguished between what it calls "auxiliary" rules, which

-5-

are ordinarily governed by the standard rules of procedure, and "substantive" or "jurisdictional" rules, which implicate sovereign immunity. In *Henderson v. United States*, 517 U.S. 654 (1996), the Supreme Court considered whether the 120-day period for service of process set forth in Fed. R. Civ. P. 4(j)[2] applies to suits against the United States brought pursuant to the Suits in Admiralty Act, 46 U.S.C. § 741 *et seq.*, which contains a provision stating that service shall be made "forthwith." *Id.* § 742. The government contended that Rule 4's 120-day period could not supersede the Suits in Admiralty Act's "forthwith" requirement because that requirement "is 'jurisdictional' and affects 'substantive rights' by setting the terms on which the United States waives its sovereign immunity." 517 U.S. at 664. The Court rejected the government's argument on the ground that "[s]ervice of process, we have come to understand, is properly regarded as a matter discrete from a court's jurisdiction to adjudicate a controversy of a particular kind, or against a particular individual or entity." *Id.* at 671. "Its essential purpose is auxiliary," the Court explained, "a purpose distinct from the substantive matters aired in the precedent on which the dissent . . . relies—who may sue, on what claims, for what relief, within what limitations period." *Id.* (footnotes omitted). *See also id.* at 667–68 (describing certain rules as having "a distinctly facilitative,

_____

[2] The provision is now found at Fed. R. Civ. P. 4(m).

'procedural' cast" and explaining that "[t]hey deal with case processing, not substantive rights or consent to suit").

On the other hand, as if to foreclose the very argument made by the majority in this case, the Court held that other matters, even though addressed by the Rules of Civil Procedure, lie at the "substantive" core of sovereign immunity and must be governed by the terms of the statutory waiver rather than by generally applicable provisions of the Rules of Civil Procedure. *Id.* at 671. Significantly, those matters include "who may sue, on what claims, for what relief, within what limitations period." *Id.* (footnotes omitted). It follows that rules such as Fed. R. Civ. P. 14 (impleader), 18 (joinder of claims), 19 (joinder of additional parties), 20 (permissive joinder of additional parties), 24 (intervention), and 65 (injunctions) cannot apply to suits against the government to the extent that they expand upon the parties, claims, or available relief specified in applicable immunity waiver statutes. Indeed, the Supreme Court has repeatedly held that where a litigation rule normally applicable to suits between private parties would touch upon one of these core jurisdictional areas, the rule does not apply. *See, e.g.*, *Library of Congress v. Shaw*, 478 U.S. 310 (1986) (available relief); *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 120 (1984) (claims).

In support of its conclusion that "who may sue" forms part of the substantive core of sovereign immunity, the *Henderson* Court cited *United States*

*v. Sherwood*, 312 U.S. 584 (1941). *See* 517 U.S. at 671 n.21. *Sherwood* concerned the relation between joinder of necessary parties under the Federal Rules of Civil Procedure and the Tucker Act's waiver of sovereign immunity to permit suits against the United States "founded . . . upon any contract, express or implied, with the Government of the United States." *Id.* at 587 (internal quotation marks omitted). Sherwood, a judgment creditor, brought suit in federal district court against the United States for damages for breach of contract owed Kaiser, the judgment debtor. *Id.* at 586–87. Because the judgment debtor was a necessary party to such a suit, Sherwood included Kaiser as co-defendant, along with the United States, in the Tucker Act suit. *Id.* at 588. *Henderson*'s citation of *Sherwood* demonstrates that the substantive question of "who may sue" is not confined to who may initiate suit, *see* Maj. Op. 30, but includes who may be joined as a party to a suit brought by another.

The Second Circuit held that the Tucker Act gave the court jurisdiction to adjudicate Sherwood's claim against the United States and the Federal Rules of Civil Procedure authorized the court to include Kaiser as co-defendant. *Id.* at 589. The Supreme Court reversed. It explained that the Second Circuit's theory

> presuppose[d] that the United States, either by the rules of practice or by the Tucker Act or both, has given its consent to be sued in litigations in which issues between the plaintiff and third persons are to be adjudicated. But we think that nothing in the new rules of civil practice so far as they may be applicable in suits brought in district courts under the Tucker Act authorizes the maintenance of any suit against the United States to which it has not otherwise consented.

> An authority conferred upon a court to make rules of procedure for the exercise of its jurisdiction is not an authority to enlarge that jurisdiction and the Act . . . authorizing this Court to prescribe rules of procedure in civil actions gave it no authority to modify, abridge or enlarge the substantive rights of litigants or to enlarge or diminish the jurisdiction of federal courts.

*Id.* at 589–90. Interpreting the Tucker Act "in the light of its function in giving consent of the Government to be sued," *id.* at 590, and stressing that "[t]he matter is not one of procedure but of jurisdiction whose limits are marked by the Government's consent to be sued," *id.* at 591, the Court held that the Act "did no more than authorize the District Court to sit as a court of claims," which is not authorized to hear suits between private parties, *id.* Accordingly, notwithstanding the Rule of Civil Procedure authorizing joinder of a private third party in district court, notwithstanding the fact that Kaiser (like SUWA) would be a co-defendant and not a plaintiff, and notwithstanding that Kaiser would present no new claims for coercive relief against the United States, the Court held that the district court lacked jurisdiction to extend the Tucker Act suit to parties or claims other than those expressly authorized. *Id.*[3]

---

[3] There is no need to respond to the majority's labored attempts to distinguish *Sherwood*, because the grounds of distinction do not touch the only point for which I rely on it—that sovereign immunity precludes the joinder of parties outside the scope of the statutory waiver in cases against the United States, even where such joinder would be authorized by the rules of civil procedure in private litigation.

The majority cannot cite any case in which the Supreme Court or this Court has interpreted a waiver of sovereign immunity to permit the addition of parties other than those identified in the waiver statute.[4] The majority's argument is precluded by *Sherwood* and *Henderson*, which treat the matter of "who may sue" and who may be joined in an existing suit as no less "substantive," 517 U.S. at 671, and "jurisdiction[al]," 312 U.S. at 591, than the matter of "what claims" may be brought.[5] I believe these decisions make clear that Rule 24 does not and cannot be used to expand the parties to a Quiet Title Act suit beyond its terms.

Let us turn, then, to the Quiet Title Act. Under Supreme Court precedent, the proper approach toward determining the extent of sovereign immunity waived

---

[4] The best the majority can offer is a complicated, multi-page argument along the following lines: (1) *Finley v. United States*, 490 U.S. 545 (1989), which makes no reference to sovereign immunity, could have contained an alternative holding based on sovereign immunity; (2) Congress enacted 28 U.S.C. § 1367(a), which reversed the actual holding of *Finley*; (3) the Supreme Court, in *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 558 (2005), subsequently referred to that statute as reversing the "result" (and not just the holding) of *Finley*; and (4) therefore, *Finley*'s hypothetical alternative holding based on sovereign immunity has also, impliedly, been rejected by the Court. *See* Maj. Op. 32–38. That is an extraordinarily slender reed. *See Pennhurst*, 465 U.S. at 119 (warning against ascribing precedential significance "when questions of jurisdiction have been passed on in prior decisions *sub silentio*" (internal quotation marks omitted)).

[5] At one point, the majority suggests that *Sherwood* is really about the joinder of claims. Maj. Op. 30. That is not a tenable reading of the decision. The sole issue in *Sherwood* was joinder of necessary *parties*, 312 U.S. at 588. It had nothing to do with the joinder of new claims between existing parties. Indeed, the Supreme Court itself described *Sherwood* as a case about "who may sue" in contradistinction to a case about "what claims" may be made. *Henderson*, 517 U.S. at 671 & nn.21–22.

-10-

and retained is to engage in a strict construction of the terms of statutory waiver, with attention to traditional limits on suits against the sovereign. *See Shaw*, 478 U.S. at 319–20 ("[S]tatutes placing the United States in the same position as a private party . . . have been read narrowly to preserve certain immunities that the United States has enjoyed historically."); *Lehman v. Nakshian*, 453 U.S. 156, 160–62 (1981).

The Quiet Title Act allows the United States to "be named as a party defendant in a civil action . . . to adjudicate a disputed title to real property in which the United States claims an interest." 28 U.S.C. § 2409a(a). The Act requires that a plaintiff's "complaint . . . set forth with particularity the nature of the right, title, or interest which the plaintiff claims in the real property, the circumstances under which it was acquired, and the right, title, or interest claimed by the United States." *Id.* § 2409a(d). If the final determination is adverse to the United States, the government may elect either to cede possession and control of the disputed property or to pay just compensation. *Id.* § 2409a(b). The Act also contains a specific statute of limitations. *Id.* § 2409a(g). The Quiet Title Act thus specifies who may sue, what claims may be made, what relief may be afforded, and what limitations period applies. These are precisely the matters the Supreme Court deems "substantive" and not "auxiliary." *Henderson*, 517 U.S. at 671. They are, therefore, governed by the terms of the waiver statute, strictly construed, rather than by the Rules of Civil Procedure. *See, e.g.*, *United States v.*

*Beggerly*, 524 U.S. 38, 48–49 (1998) (strictly interpreting the statute of limitations in the Quiet Title Act).

The Quiet Title Act is carefully limited to the adjudication of disputes among parties with competing claims to title to resolve the question of ownership. This Court has said time and again that other "interests" in government property do not suffice. *See Sw. Four Wheel Drive Ass'n v. Bureau of Land Mgmt.*, 363 F.3d 1069, 1071 (10th Cir. 2004) ("Members of the public . . . do not have a 'title' in public roads, and therefore cannot meet the requirements of section 2409a(d)."); *Kansas v. United States*, 249 F.3d 1213, 1225 (10th Cir. 2001) ("The 'interest' which the State seeks to protect in this case is not an interest in the title to real property contemplated by the QTA."); *Kinscherff v. United States*, 586 F.2d 159, 160–61 (10th Cir. 1978) (holding that a plaintiff asserting a right as a member of the public to use a road could not bring a Quiet Title Act suit because he had no title interest).[6]

Allowing parties like SUWA or ATV-user groups—that is, parties without a claim to title—to intervene in a Quiet Title Act suit would introduce into the litigation parties not contemplated by the Act, thereby forcing the United States to

---

[6] That, as the majority notes, the Quiet Title Act permits other parties claiming title to the disputed land to be joined as co-defendants (presumably only if they satisfy the statute of limitation and other prerequisites to bringing a claim specified in the Act), Maj. Op. 16, 40, is no reason to allow intervention by parties without any such claim.

engage in litigation it has not consented to.  There is no reason to think Congress intended Quiet Title Act cases to become forums for consideration of broad-ranging arguments about competing environmental and recreational uses of the land, offered by public-interest groups that are strangers to the underlying title dispute.  *See Block v. North Dakota*, 461 U.S. 273, 280 (1983) (noting that Congress passed the Quiet Title Act to augment the "limited means" parties "*asserting title to land* claimed by the United States" had in "obtaining a resolution of the *title dispute*") (emphasis added).

The limited scope of the Quiet Title Act is consistent with longstanding congressional policy, expressed in a wide variety of statutes addressing disputes between the United States and private parties over the ownership of property.  In every such statutory context of which I am aware, Congress has limited litigation to parties who have a claim to the property in question, relegating to the status of amici curiae those parties who—like SUWA—oppose the interests of other private claimants but do not themselves claim the property.

In *High Country Citizens Alliance v. Clarke*, 454 F.3d 1177 (10th Cir. 2006), this Court engaged in a comprehensive review of statutory schemes for resolution of disputes over claims to patents and other ownership interests in federal land and mining claims, dating back to 1866.  *Id.* at 1182–86.  The Court found that cases involving mining claims "uniformly preclude persons . . . not claiming a property interest in the land, from judicially contesting the validity of

-13-

the patent." *Id.* at 1186; *see also id.* at 1188 (similar conclusion with respect to land patents). This Court concluded: "Permitting a challenge by third parties with no interest in the land would allow the kind of lengthy litigation over rights that a patent was designed to avoid." *Id.* at 1185. As the Supreme Court commented as far back as 1881, "[i]t does not lie in the mouth of a stranger to the title to complain of the act of the government with respect to it." *Smelting Co. v. Kemp*, 104 U.S. 636, 647 (1881).

In these analogous contexts, entities similar to SUWA—that is, entities without any ownership claim—sometimes were accorded the right to file protests against the claims of other private parties at the administrative level, but in court they were given only the standing of amicus curiae. *High Country*, 454 F.3d at 1187 (citing *Wight v. Dubois*, 21 F. 693, 693–94, 696 (C.C.D. Col. 1884); *Beals v. Cone*, 188 U.S. 184, 187 (1903)). In light of the Quiet Title Act's careful specification of parties and claims and its other requirements designed to limit litigation over title disputes, it is highly unlikely that Congress implicitly departed from this traditional model of litigation when it consented to be sued by persons claiming title to real property. *See Lehman*, 453 U.S. at 162 ("The appropriate inquiry, therefore, is whether Congress clearly and unequivocally departed from its usual practice in this area . . . ."); *cf. Block*, 461 U.S. at 284 (noting that one of the concerns prompting the inclusion of a statute of limitations and a limited retroactivity provision in the Quiet Title Act was the government's

-14-

fear of "'a flood of litigation . . . putting an undue burden on the Department [of Justice] and the courts'") (quoting H.R. Rep. No. 92-1559, at 7 (1972) (letter from the Deputy Attorney General)).

The majority disparages these cases as "century-old"—a strange complaint given *High Country*'s recent vintage and the importance of traditional limitations as a guide to interpreting sovereign immunity waivers. It cites two cases to suggest that intervention by parties without an interest in title is commonplace, at least "in this part of the country." Maj. Op. 42. Upon closer examination, those cases do little to undermine the traditional limitation of lawsuits over federal land claims to parties with claims to title.

The majority first cites *Watt v. Western Nuclear, Inc.*, 462 U.S. 36 (1983), which was a challenge, brought under the Administrative Procedures Act, to the Department of Interior Board of Land Appeals' ruling that gravel constituted "'a mineral reserved to the United States in patents issued under the Stock-Raising Homestead Act.'" *Id.* at 41 (quoting 85 Interior Dec. 129, 139 (1978)). The plaintiff also sought to quiet title to the gravel. As this Circuit explained in our opinion in the case:

> In the trial court, the Wyoming Stock Growers Association, John Orr, and the Associated General Contractors of Wyoming were permitted to intervene as parties plaintiff. The basis for such intervention was that they too had an interest in lands patented under the Stock-Raising Homestead Act of 1916 and subject to the same mineral reservation as Western Nuclear.

-15-

*W. Nuclear v. Andrus*, 664 F.2d 234, 236 n.4 (10th Cir. 1981). In other words, the intervenors were allowed into the case because the agency's interpretation of what constituted "minerals" under the Stock-Raising Homestead Act might control ownership of gravel on their own lands; they apparently sought to quiet title to ownership of the gravel on their property. In any event, because the district court made no rulings with respect to their claims, the intervenors did not appeal and neither this Court nor the Supreme Court had occasion to pass on whether their intervention was proper. In both this Court and the Supreme Court, the former intervenors participated solely as amici curiae, as the cases cited in *High Country* suggest is proper for parties whose own claim to title is not at issue.

In the second case relied on by the majority, *Pathfinder Mines Corp. v. Hodel*, 811 F.2d 1288 (9th Cir. 1987), the Department of Interior Board of Land Appeals determined that the statute creating the Grand Canyon National Game Preserve "withdrew Preserve lands from entry because mineral entry was inconsistent with the purposes of the Game Preserve." *Id.* at 1290. The Board thus declared void *ab initio* several of Pathfinder's mining claims, which were brought under the General Mining Law of 1872. *Id.* Two environmental organizations intervened in support of the Board's interpretation, and the Ninth Circuit merely noted this posture in its opinion. *Id.* The court did not address the propriety of the intervention, and made no mention of any claims or

-16-

arguments raised by the intervenors.  *See Pennhurst*, 465 U.S. at 119 (warning against ascribing precedential significance "when questions of jurisdiction have been passed on in prior decisions *sub silentio*" (internal quotation marks omitted)).

I therefore conclude that the question of "who can sue" and who can join a preexisting lawsuit of this sort is answered by the Quiet Title Act itself.  Whether "strictly construed" in favor of the sovereign (as it must be) or interpreted in light of traditional limitations on litigation over federal land claims, the Act does not contemplate the participation of parties, like SUWA, who have no claim to the disputed land.  Rule 24(a) allows intervention by "anyone" who claims an interest "relating to" the property, while the Quiet Title Act limits suits to parties who claim a "right, title, or interest . . . in the real property," 28 U.S.C. § 2409a(d).  Even assuming SUWA's interests are sufficient to qualify under the Rule, they fall short under the statute.  And it is the statute, not the Rule, that determines the scope of Congress's waiver of sovereign immunity.  *See* Fed. R. Civ. P. 82 ("These rules shall not . . . extend . . . the jurisdiction of the United States district courts . . . .").

## III.  THE MAJORITY'S SOVEREIGN IMMUNITY ARGUMENTS ARE UNPERSUASIVE

The majority offers three lines of argument in support of its claim that sovereign immunity would not bar intervention by a party that does not meet the

criteria set forth in the Quiet Title Act: (1) that permitting intervention would not expose the government to litigation burdens beyond those necessarily contemplated by the Quiet Title Act, Maj. Op. 17–20; (2) that the identity of intervening parties is a mere "condition" on the waiver of sovereign immunity, which must be affirmatively reserved by Congress, *id.* at 22; and (3) that sovereign immunity does not bar the addition of parties nominally aligned as co-defendants with the government, even if their interests and legal positions diverge, *id.* at 38-39. The majority does not explain how these seemingly inconsistent arguments fit together. In any event, none of them comports with Supreme Court precedent. Perhaps the Supreme Court some day will adopt one of these positions, and I make no claim that fundamental principles of constitutional structure would be offended if it did so. As of now, however, the Supreme Court has not constricted sovereign immunity in the fashion envisioned by the majority.

A.    **SUWA's Intervention Would Affect the Government's Substantive Rights**

The majority responds first by stressing the "limited nature of what is at stake." Maj. Op. 17. According to the majority, the government is wrong to invoke the protections of sovereign immunity in this case because the intervention of SUWA "would not expose the United States to any burden not inherent in the litigation to which it has consented in the Quiet Title Act." *Id.* at 19. I cannot agree.

-18-

This Court has held that "[i]f a party has the right to intervene under Rule 24(a)(2), the intervenor becomes no less a party than others." *Coalition of Arizona/New Mexico Counties for Stable Econ. Growth v. Dep't of Interior*, 100 F.3d 837, 844 (10th Cir. 1996). Party status entails the rights to seek and enforce coercive judicial remedies—to raise new issues, oppose settlement, appeal, and file petitions for certiorari. The majority addresses each of these party prerogatives and attempts to show either that SUWA would not have the right to exercise them or that doing so would be inconsequential to the government. On each of these points, the majority gravely underestimates the significance of according party status to an organization whose interests diverge from the government's.

*New issues.* The majority does not deny the right of a party to raise new issues, but dismisses this prerogative as inconsequential on the ground that "the court trying the case (even in the absence of any intervenor) can require the government to address a legal theory not raised by the original parties." Maj. Op. 19 (citing *Dickerson v. United States*, 530 U.S. 428, 441 n.7 (2000)). This is not persuasive.

There must be hundreds of cases in this Circuit holding that the court has no obligation to, and ordinarily should not, address issues not raised by the parties. *See, e.g.*, *Tyler v. City of Manhattan*, 118 F.3d 1400, 1404 (10th Cir. 1997) ("Our review of the relevant case law demonstrates that it is truly the

-19-

exceptional case when an appellate court will reach out to decide issues advanced not by the parties but instead by *amicus*."); *Pittsburg & Midway Coal Mining Co. v. Yazzie*, 909 F.2d 1387, 1422 (10th Cir. 1990) (declining to address an issue waived by the parties despite its being raised by the amici); *Warner v. Aetna Health Inc.*, 333 F. Supp. 2d 1149, 1154 (W.D. Okla. 2004) ("Because the parties do not raise any issue of whether the rehabilitation program . . . was appropriately tailored . . . , the Court does not address the reasonableness of the rehabilitation plan itself."); *Cotracom Commodity Trading Co. v. Seaboard Corp.*, 189 F.R.D. 655, 666 (D. Kan. 1999) ("Where the parties fail to raise the issue of choice of law, the Court need not raise the issue *sua sponte* . . . ."); *United States v. Rith*, 954 F. Supp. 1511, 1517 n.2 (D. Utah 1997) ("Because the government did not raise this argument in its suppression motion, this court reluctantly declines to do so as well."); *Masek Distributing, Inc. v. First State Bank & Trust Co.*, 908 F. Supp. 856, 861 (D. Kan. 1995) ("The parties do not raise and the court does not address whether or not the facsimile at issue has an authorized authentication."). Even though, in unusual cases like *Dickerson*, courts sometimes exercise their discretion to entertain arguments not made by the parties, the difference between a party and a non-party remains significant: a party has the *right* to raise new issues. This means that the addition of a co-defendant with divergent legal views will *force* the government to litigate issues that it prefers not to address and that have not been raised by any party to whose participation Congress has consented.

*Appeal and certiorari.* The majority states that "there is no need to resolve at this stage of this case whether SUWA could appeal or seek certiorari when the government does not wish to." Maj. Op. 18. That can be so only if these litigation possibilities do not matter. But surely they do. It is not uncommon for the government to decline to appeal or petition for certiorari when it loses a case, sometimes because, in the Solicitor General's professional judgment, the particular case is an unpropitious vehicle for vindicating the government's views. Yet it is also not uncommon for intervenor-defendants to disagree with the Solicitor General's judgment. *See, e.g.*, Pet. for Writ of Cert. at 10, *Mitchell v. Helms*, 530 U.S. 793 (2000) (No. 98-1648) (petition for certiorari filed by a private intervenor-defendant where the Court of Appeals held a federal statute unconstitutional and the United States declined to petition). Indeed, experienced practitioners regard the ability to appeal or petition as one of the principal reasons to intervene in support of the government in public interest litigation. From the government's point of view, however, the ability of a nominal co-party to appeal or petition deprives the Department of Justice of a valuable tool of strategic litigation management.

It thus appears that the majority's reservation of this issue is merely a convenient way of disguising or ignoring the full implications of allowing SUWA into this suit. Once SUWA is granted party status at the trial level—in other words, once we hold that the Quiet Title Act permits such participation—it would

-21-

make little sense to hold that the Act precludes such a party's participation at the appellate level. Nothing in the Act supports such a bifurcation. At either level, SUWA's arguments will be the same, will be contrary to the government's position, and will offend sovereign immunity. The majority responds that such a reading of the Quiet Title Act "make[s] perfect sense" because the doctrine of standing might block an intervenor from pursuing an appeal. Maj. Op. 18. But standing is a jurisdictional question separate and apart from sovereign immunity; the issue here is what sovereign immunity permits, not what the law of standing might preclude.

*Settlement.* The possibility that an intervenor might oppose a settlement negotiated by the claimants to title is particularly significant. The majority dismisses the importance of this prerogative on the ground that intervenors cannot "block a settlement." Maj. Op. 18. To be sure, the Supreme Court has held that intervenors do not have the power of absolute veto over settlements. *See Local No. 93 v. City of Cleveland*, 478 U.S. 501, 528–30 (1986). But, in the same breath, the Court also held that "an intervenor is entitled to present evidence and have its objections heard at the hearings on whether to approve a consent decree." *Id.* at 529. Thus, in *City of Cleveland* itself, "Local 93 took full advantage of its opportunity to participate in the District Court's hearings on the consent decree. It was permitted to air its objections to the reasonableness of the decree and to introduce relevant evidence . . . ." *Id.* Consequently, while a non-title intervenor

-22-

in a Quiet Title Act case would not hold an absolute veto over settlement, it might well take advantage of litigation prerogatives not open to an amicus—such as evidentiary hearings and the power to enforce rulings in its favor. In other words, the United States would have to litigate against the intervenor in defense of its settlement with the parties that actually have a claim to title—a form of litigation not contemplated by the Quiet Title Act's limited waiver of sovereign immunity.

*Identity of legal positions.* The majority's only remaining argument must be that SUWA's intervention would not impose improper litigation burdens on the United States because its interests and legal positions coincide with those of the government. *See* Maj. Op. 38-39, 84-93. If there is no divergence of interests, the intervenor would raise no new issues, would not appeal or seek certiorari unless the government did also, and would not oppose any settlement in which the government joined. But this raises the interesting question: Does the majority's sovereign immunity analysis apply only when the intervenor's interests are adequately represented by the government, and thus only when the intervention fails the test of Rule 24(a)? Is the majority defending a null set?

This argument raises an even more puzzling question for the three dissenting judges who join this part of the majority's opinion and are necessary to its majority status. Unlike the majority, the dissenters argue that "SUWA's objectives are not identical to those of the United States," Ebel, J., dissenting, at 3, and "the potential and even likelihood of a conflict between the positions of the

United States and SUWA cannot be avoided," *id.* at 6. If this is correct, then SUWA's participation as a party will indeed "expose the United States to [] burden[s] not inherent in the litigation to which it has consented." Maj. Op. 19. Either the dissenters are wrong to join the majority on this point, or the majority's assurances regarding the "limited nature of what is at stake" are hollow. Maj. Op. 17. Suppose the dissenters are right about SUWA's interests and likely legal positions. Would the majority then agree that sovereign immunity is violated?

**B. The Majority's Affirmative Theory of Sovereign Immunity Is Inconsistent with Supreme Court Precedent**

Let us turn now to the majority's affirmative theory. According to the majority, it is necessary to "distinguish two concepts: (1) sovereign immunity and (2) a condition on a waiver of sovereign immunity." Maj. Op. 20. "Sovereign immunity," according to the majority, refers to the government's immunity from "the imposition of a coercive sanction" without its express consent. *Id.* at 21. In other words, in the absence of consent, "a court cannot make a government pay its debts or compensate for its torts, or impose other coercive remedies on the government." *Id.* On the other hand, so goes the majority's theory, "[w]hen the government consents to be sued, it can impose conditions on that consent," such as to "require notice of suit, set a statute of limitations, forbid discovery . . . , or even forbid joinder of parties." *Id.* at 22. The obligation to "impose conditions" appears to be affirmative; that is, according to the majority, "conditions" on the

-24-

waiver of sovereign immunity must be expressly articulated by the Congress, *see id.* 40.  In other words, the government is subject to *all* generally applicable burdens of litigation, such as those imposed by the Rules of Civil Procedure, unless the waiver has been conditioned on their inapplicability.  *See id.* at 46 ("[O]nce a federal district court has jurisdiction of a case under the Quiet Title Act, the usual rules of procedure . . . ordinarily apply.").  Moreover, according to the majority, the Supreme Court has abandoned the rule of strict construction of waivers of sovereign immunity and is now likely to construe conditions on the government's consent the same as it would construe similar conditions imposed on private litigation.  *Id.* at 43-44.  Because the Quiet Title Act does not explicitly mention Rule 24 intervention, one way or the other, the majority concludes that sovereign immunity does not bar intervention (even by a party outside the scope of the express terms of the waiver) unless the intervenor is raising an independent claim for monetary compensation or other coercive sanctions against the government.  *Id.* at 48-49.

This conception of sovereign immunity is the majority's own construct.  No opinion of the Supreme Court has ever suggested that what the majority views as the waiver of the essential core of sovereign immunity—susceptibility to coercive sanctions—must be express, but that the government is otherwise subject to all generally applicable burdens of litigation unless Congress explicitly reserves its immunity.  On the contrary, the Court has unequivocally stated that the identity of

-25-

parties to litigation against the government—"who can sue" and what parties may join existing lawsuits—is substantive and jurisdictional, and is governed by the "strict construction" rule of the sovereign immunity precedents. *Henderson*, 517 U.S. at 671; *Sherwood*, 312 U.S. at 591. *See* pages 7-10 above. Nor has the Supreme Court abandoned the rule of strict construction of waivers of sovereign immunity "[i]n recent years," as the majority provocatively asserts. Maj. Op. 43. For recent cases to the contrary see, for example, *Orff v. United States*, 596 U.S. 601–02 (2005); *Dept. of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999); *Lane*, 518 U.S. at 192.

The majority extracts its theory from two Supreme Court decisions interpreting statutes of limitations in immunity waiver statutes. *See* Maj. Op. 43–46 (citing *Irwin v. Dept. of Veterans Affairs*, 498 U.S. 89 (1990); *Scarborough v. Principi*, 541 U.S. 401 (2004)). In both cases, the Court interpreted the statutes of limitation contained within immunity waivers as allowing generally-applicable exceptions to strict compliance with the limitations period. *See Irwin*, 498 U.S. at 95–96; *Scarborough*, 541 U.S. at 413, 418–19. In two unanimous decisions after *Irwin*, however—given only passing reference by the majority—the Court distinguished *Irwin* and rejected claims for generally-applicable exceptions to statutes of limitations on the ground that "Congress did not intend courts to read other unmentioned, open-ended, 'equitable' exceptions into the statute that it wrote." *United States v. Brockamp*, 519 U.S. 347, 352 (1997); *see also United*

*States v. Beggerly*, 524 U.S. 38, 48 (1998) (strictly interpreting the statute of limitations in the Quiet Title Act). Thus, *Irwin* and *Scarborough* do not even establish a general rule for interpreting statutes of limitations, let alone for application of all rules of procedure not expressly disavowed. Indeed, contrary to the majority, in *Irwin* the Court stated: "Respondents correctly observe that [the statute of limitations] is a condition to the waiver of sovereign immunity *and thus must be strictly construed*." 489 U.S. at 94 (emphasis added) (citing *Shaw*, 478 U.S. 310).

According to the Court's opinion in *Irwin*, the decision reflected nothing more than a "realistic assessment of legislative intent"—namely, that when Congress set a statute of limitations it most likely understood it to be interpreted the same way most statutes of limitations are interpreted. *Id.* at 95–96. *Scarborough* was essentially the same. *See* 541 U.S. at 421.[7] The majority's argument in this case, by contrast, does not purport to be based on the likely meaning or legislative intent of the words of the Quiet Title Act, but rather on

_____

[7] One distinguished commentator finds the results in *Irwin* and *Scarborough* difficult to reconcile with the Court's strict construction of the scope of sovereign immunity waivers in *Shaw* and other cases. Gregory C. Sisk, *Litigation With the Federal Government* § 2.03, at 97 (4th ed. 2006). Contrary to the majority, he concludes that "the *Shaw* strict construction approach appears to predominate," while observing that "unless and until *Irwin* has been either discarded by the Court as an anomalous opinion or placed by the Court into a separate procedural category," it will produce what he calls "continuing tension." *Id.* This case appears to be an example.

application of a rule expressed outside of the Act—namely, Rule 24—to Quiet

Title Act proceedings.  That is quite a different matter, as the majority appears to

recognize elsewhere in its opinion.  *See* Maj. Op. 37 (acknowledging that "[u]nder

settled law," 28 U.S.C. § 1367(a), which "is expressed in general terms, applying

to all litigants," but which contains "no mention of sovereign immunity," "does

not waive federal sovereign immunity").

Even if the majority's general theory were adopted, however, it does not

follow that the identity of parties or issues could be classified as a "nonessential"

aspect of sovereign immunity—a mere "condition" on the waiver.  The question

of who can litigate and what claims can be brought is the core of subject matter

jurisdiction, and is specified (in terms general or specific) in every statute

waiving sovereign immunity.[8]  It is more logical to think of questions about the

---

[8] *See, e.g.*, 5 U.S.C. § 702 ("A person suffering a legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."); 28 U.S.C. § 1498(a) (authorizing the "owner" of a patent to bring an "action against the United States in the . . . Court of Federal Claims" if the invention "described in and covered by" the patent "is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same," but specifying that "any patentee or any assignee of such patentee" has no right to sue "with respect to any invention discovered or invented by a person while in the employment or service of the Untied States, where the invention was related to the official functions of the employee"); 28 U.S.C. § 2674 (specifying that the "United States shall be liable . . . to tort claims[] in the same manner and to the same extent as a private individual under like circumstances"); 33 U.S.C. §§ 1365(a), (g) (authorizing "any citizen" to "commence a civil suit on his own behalf" against the United States alleging that the government has violated air

(continued...)

-28-

identity of parties and issues as involving the "scope" of the waiver than as involving "conditions" on the waiver, analogous to the statutes of limitations in *Irwin* and *Scarborough*. *Irwin* and *Scarborough* involved statutes that waived sovereign immunity for certain defined lawsuits—that is, suits involving defined parties and defined claims—and, in separate sections, imposed time frames for filing. *See Scarborough*, 541 U.S. at 406–408; *Irwin*, 498 U.S. at 91–93. It was therefore logical for the Supreme Court to read compliance with those time frames as "conditions" on the waiver of immunity. The question of who may participate as a party in a Quiet Title Act case, however, is of a different order. The Act does not "condition" its waiver of sovereign immunity on the nonintervention of entities without claim to title. (There is no suggestion, for

---

[8](...continued)
quality standards set out in the Clean Water Act, and specifying that a "citizen" is a "a person or persons having an interest which is or may be adversely affected"); 42 U.S.C. § 405(g) (providing that "[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action"); 42 U.S.C. §§ 2000e-16(a), (c) (specifying that "[a]ll personnel actions affecting employees or applicants for employment" in most areas of the federal government "shall be made free from any discrimination based on race, color, religion, sex, or national origin," and declaring that "an employee or applicant for employment, if aggrieved by the final disposition of his complaint [by the Equal Opportunity Employment Commission], or by the failure to take final action on his complaint, may file a civil action" against a federal department or agency); 42 U.S.C. § 2000bb-1(c) ("A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.").

example, that if an entity without claim to title were a necessary party, the court would lose jurisdiction over the case.) Rather, the Act defines the interests an entity must possess in order to be a party. Properly understood, this case has nothing to do with "conditions"; it has to do with the scope of the immunity waiver—"who may sue" and who may join. *See Henderson*, 517 U.S. at 671 & n.21 (citing *Sherwood*, 312 U.S. 584). Not even the majority can suggest that the *scope* of an immunity waiver must be broadly construed, or that restrictions on the scope of a waiver must be affirmatively articulated.

**C. There Is No Exception to Sovereign Immunity In Cases Where a Party Seeks to Intervene As Co-Defendant**

Finally, the majority endorses Judge Ebel's argument that sovereign immunity does not preclude intervention by parties who "seek[] only to intervene *on the United States' behalf*." Ebel, J., dissenting, at 2-3 n.2; *see* Maj. Op. 38 ("[I]t makes no sense to say that sovereign immunity is infringed by participation on the side of the sovereign's claim or defense.").[9]

---

[9] The majority coyly states in a footnote that this is merely "an additional argument against the sovereign-immunity contention," and that "[w]e are in no way implying that intervention on the side of the plaintiff in this case would be barred by sovereign immunity." Maj. Op. 39 n.6. Of course, if it is not true that intervention on the side of the plaintiff would be barred, this would not even be an "additional argument." In any event, it appears to be central to the position of the four dissenting judges, who form an essential part of the majority on the sovereign immunity issue.

I do not see how the majority can square an endorsement of a distinction between intervenor-plaintiffs and intervenor-defendants with its general theory of sovereign immunity waivers. If admitted as an intervenor, an ATV-users group would raise no new claim against the United States for damages or other coercive sanctions, but would simply advance claims already asserted by San Juan County and the State. Under the majority's theory of sovereign immunity, therefore, participation by such a group raises only the question of "conditions" on the waiver. Because the Quiet Title Act is silent on the question of intervention by intervenor-plaintiffs, just as it is silent on intervention by intervenor-defendants, the majority's theory suggests that sovereign immunity poses no bar to intervention by ATV users. The fact that the majority embraces Judge Ebel's position suggests that its overarching theory must be lacking in some respect.

Even on its own terms, the argument that sovereign immunity necessarily allows intervention by entities that seek only to intervene on the United States' behalf is unwarranted.

Let us begin with precedent. Neither the majority nor Judge Ebel successfully squares this position with *Sherwood*, which rejected joinder of a co-defendant (and not just a co-plaintiff) under the Tucker Act. *See* 312 U.S. at 589. Unless we accept the majority's untenable view that *Sherwood* speaks only to the joinder of claims, *see* note 5 above, or has been limited by treatises, Maj. Op. at 27–28, this is a decisive objection.

The majority does cite *Trbovich v. United Mine Workers of America*, 404 U.S. 528 (1972), drawing significance from the fact that, in the case, "[n]o one thought to suggest . . . that there is a sovereign interest that would be violated by allowing a union member to intervene on the side of the Secretary of Labor in challenging a union election." Maj. Op. 39. But no one thought to advance this argument because sovereign immunity does not apply in cases, like *Trbovich*, where the government is the plaintiff.[10] *Trbovich* is, therefore, irrelevant.

With no authority in the Supreme Court or this Court to support its position, the majority quotes and adopts the holding of a moth-eaten decision from the Second Circuit, *International Mortgage & Investment Corp. v. Von Clemm*, 301 F.2d 857 (2d Cir. 1962). That opinion, however, illustrates precisely the danger of the idea that there is no sovereign immunity bar to the intervention of anyone who is nominally aligned with the government. The case involved competing claims to property originally owned by International Mortgage and Investment Corporation ("IMC"), which had been seized by the federal Office of Alien Property after Nazi Germany appropriated stock in the corporation from its Jewish owners. *Id.* at 859. The plaintiffs were private persons and entities,

_____

[10] The majority finds it "anomalous" that different rules apply to suits brought by the United States as plaintiff, where sovereign immunity does not apply, than to suits brought against the United States. Maj. Op. 50. Admittedly, this may be anomalous, but if so, it is an anomaly that runs throughout the realm of litigation against the government. There is no reason to think the Quiet Title Act is an exception.

American citizens, who asserted claims to the property and sued the United States in federal court. *Id.* The potential intervenors were non-enemy stockholders in IMC who sought to defend the corporation's interests by opposing the claims of the plaintiffs. *Id.* at 859–60. Because they missed a notice of claim filing deadline, they were barred from instituting a suit directly against the United States. *Id.* at 860. In district court, they sought to intervene both as plaintiffs and as defendants, but on appeal characterized their claim as being that of party defendants, apparently on the ground that their interests were adverse to the party plaintiffs. *Id.* The Second Circuit permitted intervention as of right, rejecting the sovereign immunity objection on the ground that the consent of the United States is not necessary "to the intervention as a party defendant of one otherwise qualified to intervene for the purpose of asserting various defenses on behalf of the United States." *Id.* at 863.

The result in *Von Clemm* is perverse. Intervention served as an end-run around the clear terms of the waiver of sovereign immunity. Although the United States consented to be sued only when claimants to property filed an action within a particular time, the *Von Clemm* intervenors, who failed to do so, were permitted to litigate. Moreover, although the Second Circuit justified intervention (as the majority and Judge Ebel do here) on the ground that the intervenors were aligned with the government, in fact their interests greatly diverged. As the court described it: the governmental parties had "shown a conspicuous disinterest in

asserting the rights of IMC to the vested property" and there was "no reason . . . to suppose that the Department of Justice . . . will exhibit . . . enthusiasm for pressing appellants' claims in the court." *Id.* at 861. Nonetheless, because IMC's claims were technically "defenses on behalf of the United States" against the plaintiffs, *id.* at 863, and the Second Circuit could "see no reason why the defense of the action should be wholly within the control of officers of the government," *id.* at 864, the court allowed the IMC stockholders to intervene. The result was that the government was forced to take positions on issues neither it nor the actual parties wished to litigate, and to contemplate results it had a "conspicuous disinterest" in achieving. In the court's words, it lost "control" over the defense of the lawsuit, all because of the intervention of persons who had neglected to file suit in accordance with the terms of the waiver of sovereign immunity. I dissent from the majority's embrace of this ruling.

Let us turn now to the logic of the matter. By limiting their argument to intervention by parties on the same side as the United States, Judge Ebel and the majority appear to concede that sovereign immunity would bar intervention by opposing parties, presumably because this would require the United States to expend resources in litigating against parties to whose participation it has not consented. But this distinction erroneously assumes that formal alignment of the intervenor as co-defendant eliminates the danger that it will take positions different from, or adverse to, those taken by the United States. This is the very

-34-

assumption Judge Ebel challenges in the remainder of his opinion. As he says, "SUWA's objectives are not identical to those of the United States," Dissenting Op. 3, and "the potential and even likelihood of a conflict between the positions of the United States and SUWA cannot be avoided," *id.* at 6.

SUWA seeks to intervene so that it can advance arguments and strategies that the government, for a variety of reasons, opposes or prefers to avoid. After all, SUWA must have a reason to want to intervene, and the United States and the County—aligned on this issue—must have a reason to prefer to keep SUWA out. In SUWA's own words, it "may press a different interpretation of Utah law concerning the creation of rights-of-way, may argue that San Juan has a tougher burden of proof than Interior is willing to press, may more vigorously seek out additional witnesses, or more aggressively confront the County's witnesses." Appellant's Supp. Br. on Reh'g En Banc 22 n.11. As SUWA explains the difference between its interests and those of the government:

> [T]he government must balance the nation's varying interests when deciding what defenses to raise, what arguments to make, how vigorously to make them, and whether to defend itself at all. In doing so, the federal government may weigh factors that carry little or no weight with individuals, groups, or local and state governments . . . .

*Id*. at 20–21. In a given suit, the government may opt for a particular litigation strategy that best suits its overall interests—including political and policy objectives, possibly including smoothing relations with state and local

governments—but that fails to maximize its chances of winning that particular suit or of setting the most favorable precedent for other R.S. 2477 suits.

As already discussed, the possibility that an intervenor might oppose a settlement negotiated by the claimants to title is particularly significant. For example, in the litigation culminating in *S. Utah Wilderness Alliance v. Bureau of Land Mgmt.*, 425 F.3d 735, 742–43 (10th Cir. 2005), SUWA initially sued BLM; BLM then sued the Utah counties and aligned itself with SUWA. On remand after this Court's decision, BLM negotiated a settlement with the counties. At that point, the party alignments shifted a second time, and SUWA opposed the settlement, which was then approved over SUWA's opposition. *See S. Utah Wilderness Alliance v. Bureau of Land Mgmt.*, No. 2:96-cv-00836, Memorandum in Support of Motion to File Third Amended Complaint, Docket No. 461, at 4–5 (D. Utah May 3, 2006). One would expect precisely the same type of maneuvering if ATV user groups intervened in support of the counties and the counties settled for less than the ATV users desired. Either way, the parties with claims to title—namely, the United States, the counties, and the State—would be forced to litigate against an entity that is a "stranger to the title." *Smelting Co.*, 104 U.S. at 647. And if that is impermissible in the context of intervenor-plaintiffs, I should think it equally impermissible in the context of intervenor-defendants.

* * * *

For all these reasons, if SUWA is allowed to intervene in this QTA suit, even as a co-defendant, there is a significant "potential and even likelihood" that it will file motions in opposition to the litigation strategies and legal positions pursued by the government.  The government, in turn, would be forced to oppose its formerly friendly intervenor and would thereby be subjected to litigation beyond the scope of the Quiet Title Act—namely, battling a party that has no claim to title in the land at issue.  Congress has consented to no such thing.

No. 04-4260, San Juan County, Utah v. United States, et al.

**EBEL**, Circuit Judge, joined by Judges **SEYMOUR, BRISCOE**, and **LUCERO,** concurring in part and dissenting in part.

I agree fully with the majority opinion through Section IV.A, that the Southern Utah Wilderness Alliance, Grand Canyon Trust, and The Wilderness Society (collectively "SUWA") have established "an interest relating to the property" at issue in this litigation and "that the disposition of the action may as a practical matter impair or impede [SUWA's] ability to protect that interest." Fed. R. Civ. P. 24(a)(2). SUWA is, therefore, entitled to intervene as a matter of right, "unless [its] interest is adequately represented by existing parties." Id.; see also Utah Ass'n of Counties v. Clinton, 255 F.3d 1246, 1254 (10th Cir. 2001). I part company with the majority, however, on Section IV.B because I conclude SUWA has satisfied its minimal burden of showing that the United States, the Department of the Interior and the National Park Service (collectively the "United States") "may not" adequately represent SUWA's interests in this litigation. Trbovich v. United Mine Workers, 404 U.S. 528, 538 n.10 (1972); Utah Ass'n of Counties, 255 F.3d at 1254.

The majority opinion agrees that this quiet title action is narrow. And I recognize, and appreciate the majority's recognition, that SUWA may renew its motion to intervene at a later date if it can demonstrate more clearly a conflict between its interests and the conduct of the United States in this or subsequent

litigation. Nevertheless, I still believe that SUWA has made an adequate showing that the United States may not adequately represents its interests.

This court has recognized that in many circumstances a government's representation of many broad interests precludes it from adequately representing an intervention applicant's more narrow and discrete interest. See Utahns for Better Transp. v. United States Dep't of Transp., 295 F.3d 1111, 1117 (10th Cir. 2002); Utah Ass'n of Counties, 255 F.3d at 1255-56; Coalition of Az./N.M. Counties for Stable Econ. Growth v. Dep't of Interior, 100 F.3d 837, 845-46 (10th Cir. 1996); Nat'l Farm Lines v. Interstate Commerce Comm'n, 564 F.2d 381, 383-84 (10th Cir. 1977). Further, this court has consistently held that the intervention applicant's burden in this regard is minimal. See Utah Ass'n of Counties, 255 F.3d at 1254; Coalition of Az./N.M. Counties for Stable Econ. Growth, 100 F.3d at 844. This is in line with this circuit's "somewhat liberal line in allowing intervention." Utah Ass'n of Counties, 255 F.3d at 1249 (quotation omitted).

To deny intervention in this case after SUWA has already established an interest that may be impaired in the litigation, this court must conclude that the coalescence of SUWA's objectives with those of the United States is not just substantial but identical. See Coalition of Az./N.M. Counties for Stable Econ. Growth, 100 F.3d at 844-45. Only if the objectives are identical may we presume

the United States will adequately represent SUWA's interest.[1]  See id.  The

majority opinion agrees that this is the proper measure.  See Majority op. at 86.

The crux of my disagreement then is that I cannot conclude that SUWA's

objectives are identical to those of the United States.  Because I conclude that

SUWA, in at least two ways, has met its minimal burden of showing that its

objectives are not identical to those of the United States and that the United States

will not adequately represent SUWA's interests, I believe SUWA is entitled, as a

matter of right, to intervene and have its voice heard in this litigation.

I.      **SUWA's objectives are not identical to those of the United States.**

The United States, as well as San Juan County, would have us believe that

this quiet title action[2] requires a simple binary determination – i.e., does San Juan

---

[1]I do not quarrel with the majority's statement that this presumption may
apply when a governmental party possesses objectives that are identical to those
of the intervention applicant.  See Majority op. at 88-92 (citing United States v.
Hooker Chems. & Plastics Corp., 749 F.2d 968 (2d Cir. 1984); Solid Waste
Agency v. United States Army Corps of Eng'rs, 101 F.3d 503 (7th Cir. 1996); and
Maine v. Dir., United States Fish & Wildlife Serv., 262 F.3d 13 (1st Cir. 2001)).

[2]San Juan County brought this quiet title action against the United States
under 28 U.S.C. § 2409a.  This statute, which "is the exclusive means for
challenging the United States' title to real property," Southwest Four Wheel Drive
Ass'n v. Bur. of Land Mgmt., 363 F.3d 1069, 1071 (10th Cir. 2004), "contains a
limited waiver of sovereign immunity.  It allows the United States to be named as
a party defendant in a civil action under this section to adjudicate a disputed title to real
property in which the United States claims an interest."  Neighbors for Rational Dev.,
Inc. v. Norton, 379 F.3d 956, 961 (10th Cir. 2004).  "When the United States
consents to be sued, the terms of its waiver of sovereign immunity define the
extent of the court's jurisdiction."  Southwest Four Wheel Drive Ass'n, 363 F.3d
at 1071 (quotation omitted).

(continued...)

-3-

County have a right-of-way easement through Salt Creek Canyon or not. But the real question at issue in this litigation is more nuanced than that. This litigation concerns a right-of-way in the nature of an easement. As such, this litigation may address, and will unavoidably affect, not only whether there is any right-of-way, but also the nature and scope of that right-of-way if it does exist.[3] See Maj. Op. at 76 ("The quiet-title claim may well affect vehicular traffic on the road."); id. at 80 (quoting 69 Fed. Reg. at 32,873, "Should it be . . . determined that the State [or the] County do[es] hold a valid R.S. 2477 right of way, the [closure of Salt Creek Road to vehicular traffic] will be revisited to insure that it is consistent with the rights associated with such a right-of-way" (emphasis added)); id. at 80

_____

[2](...continued)

For the first time in its en banc briefs, the United States vaguely suggests that, because § 2409a represents a waiver of the United States' sovereign immunity, it also somehow precludes SUWA's intervention. Generally, this court will not address an issue raised for the first time on appeal. See Shell Rocky Mountain Prod., LLC v. Ultra Res., Inc., 415 F.3d 1158, 1164 (10th Cir. 2005). To the extent the United States' argument implicates the federal courts' subject matter jurisdiction, however, we can consider that argument for the first time on appeal. See Daigle v. Shell Oil Co., 972 F.2d 1527, 1539 (10th Cir. 1992). But § 2409a does not preclude SUWA's intervention in this quiet title action. SUWA claims no ownership interest in the United States' property at issue in this case. Instead, SUWA seeks only to intervene on the United States' behalf in an action where the United States has already been named a defendant. Sovereign immunity, therefore, would not preclude SUWA's intervention. See 7C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1917 (2d ed. 1986).

[3]The complaint filed by the intervenor State of Utah, after the district court denied SUWA's motion to intervene, reiterates that this litigation concerns not only the existence of a right-of-way, but the scope of that right-of-way if it does exist.

(observing that at oral argument counsel for the federal defendants acknowledged that, even if the NPS retains regulatory authority, a district court ruling that the County has an easement in Salt Creek Road "may have some impact on what can be regulated"). San Juan County alleges that "its right of way must be sufficient in scope for <u>vehicle</u> traffic," <u>id.</u> at 12 (emphasis added), and that is really the crux of the dispute between the parties. It is SUWA's objective, not only to defend the United States' unencumbered title to this property, but to keep all vehicles out of Salt Creek Canyon and to argue that if any historical easement does exist it does not encompass vehicular traffic. Seeking to protect its purely environmental interest in this property, SUWA will want any right-of-way that does exist to be drawn as narrowly as possible. <u>See</u> <u>id.</u> at 74 (describing SUWA's "concern in this case" to be "the potential damage to the environment arising from vehicular traffic in Salt Creek Canyon").

On the other hand, the United States' objectives, if a right of way is found to exist, will involve a much broader range of interests, including competing policy, economic, political, legal, and environmental factors. <u>See</u> 16 U.S.C. §§ 1, 1a-1, 271d. The United States will have to take all these multiple interests into account when it develops its litigation strategy, and it may very well take the position that if a right-of-way easement does exist, it may be broad enough to encompass some vehicular traffic. And, whether the United States takes such a position overtly or not, that issue will unavoidably be affected by the ruling in

this quiet title action. Because this quiet title action will affect not only whether

Utah or San Juan County have any right-of-way easement along Salt Creek

Canyon but also the scope of such an easement, the potential and even likelihood

of a conflict between the positions of the United States and SUWA cannot be

avoided. If there is an easement, it must be founded on historic usage, and that

historic usage will define the scope of the easement. SUWA, accordingly, has a

vital interest in ensuring as an intervenor that the record is fully and fairly

developed as to the historic public usage of this alleged right-of-way.

This court has previously held that an intervention applicant can "easily"

show its interest diverges from that of an existing party to the litigation "when the

party upon which the intervenor must rely is the government, whose obligation is

to represent not only the interest of the intervenor but the public interest

generally, and who may not view that interest as coextensive with the intervenor's

particular interest." Utah Ass'n of Counties, 255 F.3d at 1254. "[I]n such a

situation the government's prospective task of protecting not only the interest of

the public but also the private interest of the petitioners in intervention is on its

face impossible and creates the kind of conflict that satisfies the minimal burden

of showing inadequacy of representation." Utahns for Better Transp., 295 F.3d at

1117 (quotation omitted).

> [T]he government's representation of the public interest generally
> cannot be assumed to be identical to the individual parochial interest
> of a particular member of the public merely because both entities

occupy the same posture in the litigation. In litigating on behalf of the general public, the government is obligated to consider a broad spectrum of views, many of which may conflict with the particular interest of the would-be intervenor. Even the government cannot always adequately represent conflicting interests at the same time. This potential conflict exists even when the government is called upon to defend against a claim which the would-be intervenor also wishes to contest.

Utah Ass'n of Counties, 255 F.3d at 1255-56 (quotation, citation, and alteration omitted).

Because SUWA's "interest is similar to, but not identical with, that of one of the parties, a discriminating judgment is required on the circumstances of the particular case, but he ordinarily should be allowed to intervene unless it is clear that the party will provide adequate representation for the absentee." Natural Res. Def. Council, Inc. v. United States Nuclear Regulatory Comm'n, 578 F.2d 1341, 1346 (10th Cir. 1978) (quotation omitted).[4]

## II.    History of conflict between SUWA and the United States.

Even if SUWA's objectives are identical to those of the United States in this litigation, SUWA has alternatively established that the United States may not adequately represent its interests based upon the long history of conflict between

_____

[4]As a practical matter, we can rely to some extent on SUWA's own assessment of its interest. "There is good reason in most cases to suppose the applicant is the best judge" of whether its interests are already being represented adequately, particularly since a prospective intervenor is willing to bear the cost of participating in the litigation as a party. 7C Wright, Miller & Kane, Federal Practice and Procedure § 1909; see also 6 James Wm. Moore, Moore's Federal Practice § 24.03[4][a][i] (2006).

SUWA and the United States on this precise issue. The United States did not restrict vehicular traffic from Salt Creek Canyon until SUWA sued it. See San Juan County v. United States, 420 F.3d 1197, 1202 (10th Cir. 2005). The administrative proceedings and litigation involved in that dispute spanned over a decade. See id. This is certainly a factor to be considered in determining whether SUWA's interests and those of the United States diverge. See Coalition of Az./N.M. Counties for Stable Econ. Growth, 100 F.3d at 845-46.

SUWA contends that, after the United States prohibited vehicles in Salt Creek Canyon, the United States still has not been as protective of the Salt Creek environment as it should have been. For example, SUWA points to the fact that the United States has, on occasion, still permitted San Juan County employees to drive motorized vehicles through the canyon despite the federal ban. And in the earlier litigation, it was SUWA–not the United States–that sought to preclude San Juan County employees from doing so. See Majority op. at 7-8. This further suggests that the United States does not fully share SUWA's environmental commitment in the canyon. Cf. Coalition of Az./N.M. Counties for Stable Econ. Growth, 100 F.3d at 845 (noting in that case that the government's "ability to adequately represent [the intervention applicant] despite its obligation to represent the public interest is made all the more suspect by its reluctance in protecting the Owl, doing so only after [the intervention applicant] threatened, and eventually brought, a law suit to force compliance with the [Endangered

Species] Act"). The United States must represent multiple interests in the decisions as to how broadly or narrowly it attempts to portray the easement and how zealously it chooses to resist San Juan County and Utah's claims for an R.S. 2477 right-of-way. But that is exactly the point–even in this quiet title action, the United States is representing multiple interests. As such, it cannot adequately represent SUWA's narrower and more focused environmental interest.

Moreover, the fact that the United States has opposed SUWA's intervention in this action suggests that the United States does not intend fully to represent SUWA's interests. See Utah Ass'n of Counties, 255 F.3d at 1256; Utahns for Better Transp., 295 F.3d at 1117.

In addition, according to SUWA, the National Parks Service ("NPS") has never finalized its investigation of the existence of the right-of-way San Juan County claims in this litigation. A 2002 environmental assessment did analyze San Juan County's claim, concluding that "an R.S. 2477 right-of-way was not established in Salt Creek Canyon. Existing known evidence does not show by a preponderance of the evidence that the route meets the standard for an R.S. 2477 right-of-way." San Juan County, 420 F.3d at 1213 (quotation omitted; emphasis added). But that preliminary assessment went on to recommend that "[a] formal public notification be carried out and a determination made based upon notice and the opportunity for the public to provide any additional information that may exist regarding the establishment of an R.S. 2477 right-of-way in Salt Creek Canyon."

Id. (quotation omitted). SUWA now alleges that the NPS has never acted on its own recommendation to undertake additional investigation of the right-of-way.

NPS's failure in this regard is of concern because the determination of whether, and to what extent, San Juan County has a right-of-way through Salt Creek Canyon will turn on the historic uses of the canyon. The creation of a record will be critical to that determination. See S. Utah Wilderness Alliance v. Bur. of Land Mgmt., 425 F.3d 735, 741-42 (10th Cir. 2005). Yet, as SUWA alleges, NPS has not further investigated these matters. If SUWA is entitled to intervene, it will be able to ensure that the evidentiary record before the district court is complete, as well as fully reflecting SUWA's interests and concerns.

In Maine v. Director, United States Fish and Wildlife Service, the First Circuit, even though presuming the government would adequately defend its actions and those of potential intervenors with interests aligned with it, noted that "we might view this case differently" if the proposed intervenors sought to assert an argument different than that asserted by the government and the intervenors' argument "depended on introduction of evidence that the [government] would refuse to present." 262 F.3d at 20. However, the applicants' request to intervene in that case was denied, in part because the federal courts' review of the government action in Maine was limited to an already-created administrative record. See id.

That is not the case here. Rather, the disposition of this lawsuit will turn heavily on a record yet to be created during this litigation. As an intervenor, SUWA will be able to affect what evidence that record includes and ensure that the record includes all the evidence necessary to reflect SUWA's environmental concerns and enable the court to make a fully informed decision.

Judges are not required to disregard reality. Based upon the historical hostility between the United States and SUWA concerning this canyon, one can easily conclude that there is a possibility that the United States will not adequately represent SUWA's interests relating to this property, interests that may be impaired by this litigation. That is all SUWA must establish.

## III. Conclusion

If not allowed to intervene, SUWA will be left with an acknowledged interest in this property, an interest which may be impaired by the disposition of this lawsuit, and yet have no opportunity to have its voice heard in support and protection of its interest and no opportunity to ensure that the record is fully and fairly developed so that the court can make an adequately informed decision regarding the R.S. 2477 claim. Once this quiet title action is decided, either by settlement or judicial decision, it may be too late. Because I conclude that SUWA has met its minimal burden to show that there is a possibility that the United States may not adequately represent SUWA's interest in this litigation, I would

-11-

hold that SUWA is entitled to intervene in this action as a matter of right. Accordingly, I would reverse and remand with instructions that the district court should allow SUWA to intervene.

04-4260, San Juan County, Utah v. United States, et al.

**LUCERO**, J., concurring in part, dissenting in part.


I concur in the majority opinion through Section IV.A, but I join Judge Ebel's dissent as to Section IV.B. In my judgment, SUWA is entitled to intervene as of right. I write separately because some of today's holdings are rather well huddled in the scholarly debate of my respected colleagues, and it seems to me that there is a certain utility to be gained by extracting and synthesizing some of the key holdings. In addition, I write to explain the basis of my vote.

## I

Beginning with the issue of sovereign immunity, the majority opinion reaches a narrow and unremarkable holding: Congress has not conditioned its waiver of sovereign immunity under the Quiet Title Act to foreclose the intervention of a party seeking to come into the litigation on the <u>same</u> side as the United States, to advocate for the <u>same</u> outcome, and to add <u>no new claims</u> to the litigation. This conclusion strikes me as fundamentally correct, given the nature of the principle of sovereign immunity and the limited consequences of allowing the Southern Utah Wilderness Alliance, the Grand Canyon Trust, and The Wilderness Society (collectively "SUWA") to intervene in this case.

As Chief Justice John Marshall recognized over 185 years ago, the basic principle of sovereign immunity is "that no suit can be commenced or prosecuted <u>against</u> the United States," <u>Cohens v. Virginia</u>, 19 U.S. (6 Wheat.) 264, 411-12

(1821) (emphasis added), unless Congress has given its consent, <u>United States v. Clarke</u>, 33 U.S. (8 Pet.) 436, 444 (1834). Although courts have spent nearly two centuries since <u>Cohens</u> defining the precise contours of sovereign immunity, no federal court, to my knowledge, has ever found the principle to be so sweeping that the United States must provide its unequivocal consent not only to be <u>sued</u>, but also to be <u>defended</u> by a party seeking to intervene. To the contrary, in its long history of crafting statutory immunity waivers, Congress has never evidenced any notion that intervention on the side of the United States could pose a threat to federal sovereignty. I thus agree with the majority's conclusion that SUWA's intervention does not the offend traditional principle of sovereign immunity and that the Quiet Title Act does not condition its waiver of immunity in a way that would prevent SUWA from intervening in this litigation.

Moreover, in so far as the sovereignty of the United States is concerned, the practical consequences of allowing SUWA to intervene are extremely limited. As Judge Hartz aptly recognizes, SUWA's intervention would not expose the United States to any litigation burden not already inherent in the Quiet Title Act's waiver of immunity; the nature of this suit is fundamentally the same with or without SUWA's intervention. Appropriately, that should be the end of the jurisdictional matter.

## II

Turning to the question of intervention of right, I understand the majority to reject the artificial hurdles imposed by the "direct, substantial, and legally protectable" interest test ("DSL test") as previously espoused by this circuit and currently applied by certain other circuits. See, e.g., Utah Ass'n of Counties v. Clinton, 255 F.3d 1246, 1251 (10th Cir. 2001); Coal. of Ariz./N.M. Counties v. Dep't of Interior, 100 F.3d 837, 840 (10th Cir. 1996). Like the court, I consider the DSL test to be improperly narrow and unnecessarily dismissive of the practical effect that litigation can have on potential intervenors. That test also largely ignores our jurisprudence counseling that a less restrictive approach is mandated by the text of Rule 24(a)(2). See Natural Res. Def. Council, Inc. v. U.S. Nuclear Regulatory Comm'n, 578 F.2d 1341, 1344 (10th Cir. 1978); see also Nat'l Farm Lines v. Interstate Commerce Comm'n, 564 F.2d 381, 384 (10th Cir. 1977).

In rejecting the DSL test, I agree that whether a proposed intervenor has asserted an interest meriting Rule 24(a)(2) protection depends on whether the applicant can demonstrate at the threshold that it possesses an interest that may, from a practical perspective, be adversely affected or impaired by the litigation. Although it creates an admittedly relaxed standard, in my judgment, this holding provides courts in our circuit with the flexibility to practically resolve lawsuits by allowing the participation of as many parties as is compatible with the primary

-3-

concerns of Rule 24(a)(2)—efficiency and due process. See Coalition, 100 F.3d at 841 (citing Nuesse v. Camp, 385 F.2d 694, 700 (D.C. Cir. 1967)).

In adopting a revised formulation of the impaired-interest requirement, I do not read the embedded holding of the majority opinion as allowing indiscriminate intervention. Rather, today's opinion holds that courts considering the issue should pay careful attention to the strength of an applicant's asserted interest and the degree to which that interest will be impaired if intervention is declined. This approach to the interest inquiry, in my judgment, appropriately allows the law to develop on a case-by-case basis. It also avoids the pitfalls inherent in the rigid DSL test, which otherwise requires an applicant for intervention to surmount linguistic hurdles not mandated by Rule 24(a)(2).

There can be no question that under today's pronounced Rule 24(a)(2) inquiry, SUWA has cognizable interests that merit our recognition.[1] Simply put, SUWA seeks to resolve title to the disputed right-of-way in favor of the United States because a decision in favor of San Juan County will adversely affect SUWA's aesthetic, conservation, and recreational interests in seeing the Salt Creek Road closed to vehicular traffic. These are not remote concerns; SUWA

---

[1] We are certainly not the first court to hold that a public interest group such as SUWA has a cognizable interest under Rule 24(a)(2) in a litigation despite lacking a "direct" legal interest (i.e., an ownership interest). See, e.g., Mausolf v. Babbitt, 85 F.3d 1295, 1302 (8th Cir. 1996); Sagebrush Rebellion, Inc. v. Watt, 713 F.2d 525, 528 (9th Cir. 1983).

-4-

has vigorously sought to vindicate these and related interests in numerous administrative and judicial proceedings. See, e.g., San Juan County v. United States, 420 F.3d 1197 (10th Cir. 2005); Sw. Four Wheel Drive Ass'n v. Bureau of Land Mgmt., 363 F.3d 1069 (10th Cir. 2004); S. Utah Wilderness Alliance v. Dabney, 222 F.3d 819 (10th Cir. 2000); S. Utah Wilderness Alliance v. Nat'l Park Serv., 387 F. Supp. 2d 1178 (D. Utah 2005). Were SUWA to be impeded from intervening as a result of the threshold interest requirement, its ability to protect these interests would be irreparably impaired. See, e.g., Coalition, 100 F.3d at 844; Utah Ass'n, 255 F.3d at 1253-54.

As the majority recognizes, SUWA must also show that its Rule 24(a)(2) articulated interests are "relat[ed] to the property . . . which is the subject of the action." It has undoubtedly made such a showing. Although couched in the form of an action to quiet title to Salt Creek Road, this is ultimately a case about how Salt Creek Road will be used. Should San Juan County eventually prevail on the merits, its stated goal is to open Salt Creek Road to vehicular traffic—the very outcome SUWA hopes to foreclose by participating in this case.

In short, SUWA's asserted interest is subject to sufficient practical threat of impairment, and is sufficiently related to the property in dispute, that the impaired-interest requirement of Rule 24(a)(2) should not bar SUWA's intervention.

## III

Because I am unable to conclude that the United States adequately represents SUWA's interests, I join Judge Ebel's dissent from Section IV.B of the majority opinion. I reach this conclusion based on two observations. First, SUWA is narrowly concerned with its articulated interests, including the scope of any potential easement. By contrast, the government must, under its mandate, balance an array of competing political, environmental, and economic concerns. Second, by limiting SUWA's participation to that of an amicus, we constrain its ability to effectively ensure that its interests are adequately advanced. Should the government change its position at a critical point in the litigation or settlement negotiations, SUWA will be left as a mere protestor forced to fight the rearguard action by renewing its motion to intervene at a late stage in the proceedings. SUWA must then confront all of the further procedural difficulties compounded by the unavoidable delay, as well as the huge burden of persuading the court to "do it all over again." Judicial economy—and fairness—demand more.